HAITIAN REFUGEE CENTER, an unincorporated, not–for–profit organization; Solomon Jocelyn; Prosper Bayard; Theodore Cadet; Emile Beliard; Odilus Jean; Alteon Jean Belias; Indique Dormeus; and Augustin Sennecharles; Plaintiffs,

v.

Benjamin CIVILETTI, Attorney General of the United States; Edmund Muskie, Secretary of State; David Crosland, Acting Commissioner of Immigration and Naturalization Service; Raymond Morris, District Director, Immigration and Naturalization Service, District Office Number 6; Defendants.

No. 79–2086–Civ–JLK.

United States District Court,
S. D. Florida.

July 2, 1980.

---

Kurzban & Kurzban, P.A., Ira J. Kurzban, Miami, Fla., for the Haitian Refugee Center and National Emergency Civil Liberties Foundation; Peter A. Schey and Timothy S. Barker, Los Angeles, Cal., National Center for Immigrants' Rights; Dale F. Swartz, Washington, D.C., Alien Rights Law Project of the Washington Lawyers' Committee for Civil Rights Under Law; Vera Weiss and Steven Forester, Miami, Fla., Haitian Refugee Center; Ira Golobin, New York City, National Council of Churches; Nancy Trease, Miami, Fla., Legal Services of Greater Miami, Inc.; Gary Lee Caldwell and Robert M. Hustead, West Palm Beach, Fla., Florida Rural Legal Services; Donald I. Bierman and Neal R. Sonnett, Miami, Fla., of counsel, for plaintiff.

Daniel Fromstein, Washington, D.C., Criminal Division, U.S. Dept. of Justice; Rex Young and William Nail, Miami, Fla., U.S. Immigration and Naturalization Service; Atlee W. Wampler, III, Jack Eskenazi and Peter Nimkoff, Miami, Fla., Asst. U.S. Attys., for the Southern District of Florida, for defendant.

JAMES LAWRENCE KING, District Judge.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Introduction | 450 |
| | A. Limits of Immigration Law | 452 |
| | B. Asylum Rights: Substantive | 453 |
| | C. Asylum Rights: Procedural | 454 |
| II. | Threshold Legal Issues | 456 |
| | A. Jurisdiction | 457 |
| | B. Justiciability | 461 |
| | 1. Mootness | 462 |
| | 2. Timing of Judicial Review | 467 |
| | 3. Political Question | 470 |
| | 4. Standing | 473 |
| III. | Conditions in Haiti | 474 |
| | A. Haitian Refugees: Treatment on Return | 476 |
| | 1. A Pattern of Persecution | 476 |
| | 2. The State Department Report | 482 |
| | a. Composition of the Study Team | 486 |
| | b. The Sample | 487 |
| | c. Assurances to Returnees | 488 |
| | d. The Interviews | 491 |
| | e. Conclusion | 492 |
| | B. Haitian Prisons: Persecution Exemplified | 493 |
| | C. Haitian Power: The Rule of the Duvalier Security Forces | 497 |
| | D. Haitian Legal Systems: The Absence of a Rule of Law | 500 |
| | E. Haitian Politics: Suppression of the Opposition | 503 |
| | F. Haitian Society: Suppression of Free Voices | 506 |
| | G. Haitian Economics: The Economics of Repression | 507 |
| | H. Conclusion | 510 |
| IV. | INS Treatment of Haitian Asylum Claims | 510 |
| | A. The Haitian Program: Intentional Discrimination | 511 |
| | 1. The Haitian Problem | 511 |
| | 2. The Goals of the Haitian Program | 512 |

IV. INS Treatment of Haitian Asylums Claims—Continued
 A. The Haitian Program: Intentional Discrimination—Continued Page
 3. Implementation at the District Level 516
 4. Conclusion: Discrimination 518
 B. The Haitian Program: Systematic Due Process Violations 519
 1. Immigration Judge Action 519
 a. Failure to Suspend Deportation Proceedings 520
 b. Derogation of the Right to Remain Silent 521
 c. Time Limits 521
 d. Conclusion 523
 2. Cumulative Effect of Accelerated Process 523
 a. Mass Scheduling 523
 b. Cumulative Effect 525
 c. Conclusion 526
 3. Conduct of Asylum Interviews 526
 4. Asylum Decision–Making 527
 5. Other Asylum Procedures 529
 a. Public Access to Prior Decisions and Nonrecorded Matter 529
 b. Use of Form Letter Denials 530
 c. Accuracy of Translation 530
 d. Failure to Advise Haitians of Rights Prior to Taking Statements 530
 6. State Department Participation in Asylum Decisions 531
 7. Deprivation of the Haitian Refugee Center's Right to Free Speech 531
 C. Conclusion 532
V. Relief 532

## FINAL ORDER GRANTING RELIEF

This case involves thousands of black Haitian nationals, the brutality of their government, and the prejudice of ours. Perhaps thirty thousand Haitians have flocked to the shores of South Florida over the past twenty years, fleeing the most repressive government in the Americas. From among that group come the plaintiffs: five thousand persons who have sought political asylum in the United States. They claim that if they are returned to Haiti they will face persecution, imprisonment and death. All of their asylum claims were denied by the Immigration and Naturalization Service.

For the most part, the plaintiffs reached the United States in old, small, leaky wooden sailboats. The boats are dangerously overcrowded, but these Haitians continue to brave the elements across eight hundred miles of open sea. The vast number spent weeks adrift without food or water. Many died in the attempt:

*When I heard the news, I went to Freeport. When I entered the morgue, I saw my wife lying there with the four children. I had nothing in my hand. It was only myself and God there.* Constant Louis, Tr. at 1195–96.

This case has forced the court to confront a profound set of questions: Why have so many taken such great risks? What do they flee? Why do they fear to return?

In searching for the answer to these and other questions, the court has seen a stark picture of how these plaintiff–immigrants will be treated if they return to Haiti. And it has seen an equally stark, and even more troubling, picture of the treatment of Haitians by the Immigration and Naturalization Service.

## I. INTRODUCTION

The plaintiffs seek political asylum in this country. Hence, this case calls into question many of the intricacies of asylum pro-

cedures before the Immigration and Naturalization Service (INS). The court must examine the minutiae of those procedures to determine if the plaintiffs were accorded fundamentally fair due process. One central issue, however, overshadows this entire case: unlawful discrimination. The plaintiffs charge that they faced a transparently discriminatory program designed to deport Haitian nationals and no one else. The uncontroverted evidence proves their claim.

The Haitians allege that the actions of INS constitute impermissible discrimination on the basis of national origin. They have proven their claim. This court cannot close its eyes, however, to a possible underlying reason why these plaintiffs have been subjected to intentional "national origin" discrimination. The plaintiffs are part of the first substantial flight of *black* refugees from a repressive regime to this country. All of the plaintiffs are black. In contrast, for example, only a relatively small percent of the Cuban refugees who have fled to this country are black. Prior to the most recent Cuban exodus, all of the Cubans who sought political asylum in individual 8 C.F.R. Sec. 108 hearings were granted asylum routinely.[1] None of the over 4,000 Haitians processed during the INS "program" at issue in this lawsuit were granted asylum.[2] No greater disparity can be imagined.

In contrast to the discriminatory practices of INS, local government and private charity groups have tried mightily to help all the refugees who have come to Florida, irrespective of race. A report by Dade County Manager Stierheim advocates: "Agencies of local government which conduct broad *community development* and *protection* responsibilities that are largely *preventive* find that they are properly blind to technical questions of residence or nationality or legal presence in the United States." PE # 353 at 3 (emphasis in original). After summarizing a number of arguments for humane treatment of the refugees, the report concludes "[t]hese arguments all recommend a minimum standard of health and decency for all persons, as a matter of course." *Id.* at 6. The burden often falls on private charities as well. Monsignor Brian Walsh, the Director of Catholic Charities of the Social Service Agency of the Miami Archdiocese, testified that Haitians—as opposed to other refugee groups—have to depend exclusively on private charity when they reach the United States because unlike other groups they are prevented from obtaining work permits. Tr. at 951.

Irony after irony plagues this case. A research instructor in the Psychiatry Department of the University of Miami School of Medicine testified that the Haitians "come here with the expectation that they should reach a land of freedom." Tr. at 2134. What they found was an Immigration Service which sought to send them back to Haiti without any hearing by an immigration judge on their asylum claims, *Sannon v. United States,* 427 F.Supp. 1270 (S.D.Fla.1977), and a systematic program designed to deport them irrespective of the merits of their asylum claims. They were assured by good people in this country that Miami was not Haiti, that they did not have to fear persecution by the United States, and then their claims were denied without any meaningful consideration. They came to a land where both local officials and

1. Most Cuban refugees were not processed under 8 C.F.R. § 108 because of special Presidential and Congressional action. However, all those who were processed in individual proceedings under 8 C.F.R. § 108 did receive asylum. *See, e.g.,* Tr. at 3029–30. Under 8 C.F.R. § 108, Cubans had one provision for admission open to them which was unavailable to Haitians. *See* 8 U.S.C. § 1153(a)(7); INS Operating Instruction 108.1(f)(1) ("A qualified alien . . . [as defined by 8 U.S.C. § 1153(a)(7)] should be considered for the benefits of the proviso to that section"). However, the requirements for relief under 8 U.S.C. § 1153(a)(7) are interpreted by INS as being *more restrictive* than asylum under 8 U.S.C. § 1253(h) or the United Nations Protocol. *See* PX. # 375; *see generally* notes 21–21a *infra.* Hence, the comparison between the treatment Haitian and Cuban applications under 8 C.F.R. § 108 is even more stark.

2. *See* section IV *infra.* After the Haitian program had ground to a halt, a handful of the applications which had been originally denied were reconsidered and granted.

private groups were compassionate, indeed where the President had once promised that the government would be as compassionate as its people, and then their applications for asylum from persecution were arbitrarily denied *en masse* by a somewhat less than compassionate INS.

In reaching its conclusions the court has listened to a wealth of in–court testimony, examined numerous depositions, and read hundreds of documents submitted by the parties. Much of the evidence is both shocking and brutal, populated by the ghosts of individual Haitians–including those who have been returned from the United States–who have been beaten, tortured and left to die in Haitian prisons. Much of the evidence is not brutal but simply callous–evidence that INS officials decided to ship all Haitians back to Haiti simply because their continued presence in the United States had become a problem. The manner in which INS treated the more than 4,000 Haitian plaintiffs violated the Constitution, the immigration statutes, international agreements, INS regulations and INS operating procedures. It must stop.

### A. Limits of Immigration Law

▮ There is no area of law in which Congress has more unreviewable power than in immigration and naturalization matters.[3] The Supreme Court has explicitly warned lower courts that they are not to imply restrictions on Congressional flexibility to respond to changing international conditions which might require changes in immigration and naturalization matters.[4] For example, Congress, if it so chooses, may discriminate against and among aliens on grounds which would violate the Constitution if applied to American citizens.[5] Nonetheless, the discretion of Congress is not completely unfettered. Its classifications with respect to aliens must have some rational basis.[6] In addition, persons must be afforded fundamentally fair proceedings under the due process clause before they may be deported.[7]

▮ By contrast, the power of INS is more circumscribed. In addition to complying with the limited application of the Constitution to aliens, INS must conform its actions to the statutes passed by Congress and the international agreements joined by the United States.[8] Where it has been given discretion by statute or treaty, INS may not exercise that discretion arbitrarily or capriciously.[9] In addition, INS must adhere to its own regulations and procedures.[10]

▮ The history of immigration laws in the United States is a tale of accommoda-

**3.** See, e. g., *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 329, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)).

**4.** In *Mathews v. Diaz*, 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976) the Court stated: "Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution." As stated, of course, this applies to both Congressional and Presidential action. For an example of appropriate Presidential action, see *Narenji v. Civiletti*, 617 F.2d 745 (D.C.Cir.1979) (regulation promulgated by the Attorney General at the direction of the President upheld).

**5.** See, e. g., *Mathews v. Diaz*, 426 U.S. 67, 79–80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976).

**6.** See, id. 426 U.S. at 82–83, 96 S.Ct. at 1893: In short, it is unquestionably reasonable for Congress to make an alien's eligibility [for Medicare benefits] depend on both the character and the duration of his residence. Since neither requirement is wholly irrational, this case essentially involves nothing more than a claim that it would have been more reasonable for Congress to select somewhat different requirements of the same kind.

**7.** See, e. g., *Wong Yang Sung v. McGrath*, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950).

**8.** See generally C. Gordon & H. Rosenfield, 2 *Immigration Law and Procedure* §§ 8.12(a), 8.15(a) & 8.17(b) (1980) (courts will review contentions that immigration officers misinterpreted or misapplied the immigration statute).

**9.** See generally *id.* § 8.15(c).

**10.** See, e. g., *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267, 74 S.Ct. 499, 503, 98 L.Ed. 681 (1954); *United States v. Nix-*

tion between the humanitarian goal of accepting into this country those immigrants who seek to build a new life here and a variety of reasons for restricting immigration.[11] In retrospect, one cannot be proud of all the measures taken by Congress in the past. For many years, the immigration laws explicitly discriminated against persons of various races and nationalities. Fortunately, such provisions are now gone from the immigration statutes. In 1965, Congress abandoned the national quota system of immigration and added a provision prohibiting discrimination in the granting of visas on the basis of "race, sex, nationality, place of birth, or place of residence."[12] This provision manifested Congressional recognition that the maturing attitudes of our nation made discrimination on these bases improper. In the face of such a decision by Congress, INS has no authority to discriminate on the basis of national origin or race—except perhaps by promulgating regulations in a time of national emergency.[13]

## B. Asylum Rights: Substantive

Morally, persons fleeing political persecution have long had a special claim on this land of freedom. In 1952, Congress explicitly recognized this claim by granting the Attorney General the power to withhold the deportation of aliens who would face "physical persecution" if they were deported.[14] In 1965, this provision was rewritten and

broadened to include "persecution on account of race, religion, or political opinion."[15] In 1968, the United States became a party to the United National Protocol Relating to the Status of Refugees which defines refugees as persons who have a "well–founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion."[16] The Protocol prohibits the deportation of a refugee "to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."[17] Moreover, it also requires that the United States apply the provisions of the Protocol "without discrimination as to race, religion or country of origin."[18]

In March of this year, Congress enacted a statute entitled the Refugee Act of 1980[19] which seeks to deal with the admission of refugees in a comprehensive fashion. Neither party has argued that the present plaintiffs come within the scope of the 1980 Act and the court declines to so hold. The court merely observes that Congress declared in the Act "that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands."[20] Just as the old provisions on asylum did not discriminate on the basis of country of origin or race, neither does the new statute.[21]

*on*, 418 U.S. 683, 695–96, 94 S.Ct. 3090, 3100–01, 41 L.Ed.2d 1039 (1974).

11. *See generally* Gordon & Rosenfield, *supra* note 8 §§ 1.1–1.5.

12. *See* 8 U.S.C. § 1152(a).

13. *Cf. Narenji v. Civiletti*, 617 F.2d 745 (D.C. Cir.1979) (Attorney General, at the direction of the President, may promulgate regulation requiring Iranian students to report to INS with information on their immigration status in view of the hostage crisis).

14. Immigration and Nationality Act, ch. 477, § 243(h), 66 Stat. 212 (1952) (present version codified at 8 U.S.C. § 1253(h)).

15. 8 U.S.C. § 1253(h).

16. United Nations Convention Relating to the Status of Refugees, Art. 1, *as incorporated in*

United Nations Protocol Relating to the Status of Refugees, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577 (entered into force with respect to the United States on November 1, 1968). *See generally* Gordon & Rosenfield *supra* note 8 at § 2.3i.

17. Convention, *supra* note 16, Art. 33.

18. *Id.*, Art. 3.

19. Pub.Law 96–212 (March 17, 1980).

20. *Id.* at § 101(a).

21. In fact, the 1980 Act, § 203(c), eliminated a special provision under prior law, 8 U.S.C. § 1153(a)(7), for the admission of persons fleeing communist and certain other countries. The prior existence of a separate provision for persons fleeing communist countries does not

■ Irrespective of the 1980 Act, the plaintiffs had a right to the Attorney General's nonarbitrary, nondiscriminatory consideration of their individual claims for political asylum pursuant to 8 U.S.C. Sec. 1253(h) and the United Nations Protocol.

## C. Asylum Rights: Procedural

An alien in this country who seeks political asylum here may have his application considered by either of two routes. On the one hand, he may apply for asylum before the local INS District Director, who will grant or deny the application in the Director's discretion. 8 C.F.R. § 108.2 (1978). An alien may also raise his claim for asylum during a deportation hearing as a claim for discretionary relief under 8 U.S.C. § 1253(h) or the United Nations Protocol. However, the application to the District Director is the alien's primary means of obtaining asylum. It is something he can initiate. Moreover, under the regulations and operating instructions in force during the time period at issue in this case, if the application was made after a show cause order had been issued but before the hearing on that order, or even if it was made for the first time in an actual deportation hearing, the issue of asylum was to be referred to the District Director for his initial consideration.[21a] See 8 C.F.R. §§ 108.1 & 108.2; Operating Instruction 108.1f(1) & (2). While it is true that, if denied by the District Director, the asylum application may also be presented to an immigration judge, 8 C.F.R. § 108.2, there was considerable evidence at trial that the immigration judge often bases his decision solely on the administrative record compiled by the District Director and will permit the applicant to be impeached on the basis of the prior administrative record if he seeks to bring additional evidence to the attention of the immigration judge.[22] The evidence adduced at trial tended to show that the immigration judge's decision on an asylum application never differed from the local District Director's decision. Hence, although it is true that the alien may resurrect his asylum application before an immigration judge, he must have asylum from the District Director if he wants to avoid deportation.

■ The Constitution states flatly: "No person shall be ... deprived of life, liberty, or property, without due process of law." Amend. V. This constitutional guarantee of due process of law protects an alien within this country's borders as well as a United States citizen. *The Japanese Immigrant Case (Yamataya v. Fisher)*, 189 U.S. 86, 101, 23 S.Ct. 611, 615, 47 L.Ed. 721 (1903). Both are persons. *Cf. Graham v. Richardson*, 403 U.S. 365, 371, 91 S.Ct. 1848, 1851, 29 L.Ed.2d 534 (1971). Nonetheless, due process is a flexible concept which mandates varying procedures and different degrees of formality in sundry contexts. *See Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961) *quoted in Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 86, 98 S.Ct. 948, 953, 55 L.Ed.2d 124 (1978). The Supreme Court has observed that deportation, while not a criminal penalty, can realistically deprive an individual of all that makes life worth living. *See, e. g., Ng Fung Ho v. White*, 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938 (1922) *quoted in Bridges v. Wixon*, 326 U.S. 135, 147, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103 (1945). Hence, the Constitution requires that before a person may be deported he must be afforded most of the protections provided to citizens

---

undercut the comparison between asylum processing for Haitians and Cubans. *See* note 1 *supra.*

**21a.** INS has vascillated on the merits of the two route procedure. New regulations effective on May 10, 1979 eliminated the application to the District Director once deportation proceedings have begun, *see* 8 C.F.R. § 108.3 (1980), but were interpreted by INS to preserve the right to apply to the District Director for

any alien who has not been issued a show cause order. 44 Fed.Reg. 21253, 21256 (April 10, 1979). New regulations promulgated pursuant to the Refugee Act of 1980 preserve the two route procedure except that an application to the District Director is once again barred after the initiation of deportation proceedings. 45 Fed.Reg. 37392 (June 2, 1980).

**22.** *See* Section IV, *infra.*

who face serious deprivations of life, liberty, or property. For instance, an alien facing deportation has the right to a fair hearing before an unprejudiced arbiter.[23] He has the right to be represented by counsel.[24] In sum, his hearing—while it need not conform to all of the punctilious requirements of a criminal trial—must conform to our society's standards of fundamental fairness. *See, e. g., Wong Yang Sung v. McGrath,* 339 U.S. 33, 50–51, 70 S.Ct. 445, 454, 94 L.Ed. 616 (1950).

In considering a request for asylum, the District Director must weigh various issues which realistically involve the applicant's life, liberty, and property in a most direct fashion. In a very graphic sense, the political asylum applicant who fears to return to his homeland because of persecution has raised the specter of truly severe deprivations of life, liberty, and property: in this case, harassment, imprisonment, beatings, torture, and death. Moreover, if granted by the District Director, the asylum application will prevent the alien from having to face the rigors of deportation proceedings.

 Clearly then, just as a deportation hearing must conform to the flexible standards of due process, so too must the processing of the application for asylum. Moreover, lest due process get lost in the shuffle between District Director and immigration judge, the requirements of due process must be met in the initial proceeding before the District Director. Of course, this conclusion does not mean that proceedings before the District Director must be as formalized as the deportation hearing before an immigration judge.[25]

This court need not decide all the ramifications of applying due process to asylum applications before a District Director. However, a good starting point for an examination of procedural fairness is the relevant statute and the agency's own regulations and operating procedures. Indeed, departures from the statute, and regulations, and the standardized operating procedures must be studied quite closely since such departures, especially if willful, systematic, and cumulative, may amount to a breach of the fundamental fairness which due process guarantees. *See, e. g. United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 268, 74 S.Ct. 499, 504, 98 L.Ed. 681 (1954).

 Neither 8 U.S.C. § 1253(h) nor the United Nations Protocol specify a procedure for deciding on asylum applications. In the absence of the specification of any particular procedure, it is assumed that Congress intended that the procedure used by INS would comport with due process:

> The constitutional requirement of procedural due process of law derives from the same source as Congress' power to legislate and, where applicable, permeates every valid enactment of that body.

*Wong Yang Sung v. McGrath,* 339 U.S. 33, 49, 70 S.Ct. 445, 454, 94 L.Ed. 616 (1950). Where, as here, the Attorney General is authorized to promulgate regulations, issue instructions, delegate his authority, and "perform such other acts as he deems necessary for carrying out his authority" under the immigration laws, 8 U.S.C. § 1103, clearly he or his designated subordinate has the power to specify procedures for granting asylum, generally subject only to the constraints of due process and the substantive provisions of the immigration statute.

The procedures specified by INS, the Attorney General's delegated authority, encompass both formal regulations and INS Operating Instructions. As they pertain to this case, the regulations require the alien

---

**23.** *See, e. g., United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 267, 74 S.Ct. 499, 503, 98 L.Ed. 681 (1954) (charge that the Attorney General's circulation of list of aliens to be deported has prejudiced Board of Immigration Appeals must be heard).

**24.** The statutory right to be represented by counsel, 8 U.S.C. §§ 152(b) & 1362, "confirm a privilege always recognized in expulsion pro-

ceedings, which unquestionably comprises an essential element of due process." C. Gordon & H. Rosenfield, *supra* n. 8, § 5.9d at 5–105.

**25.** *See generally* C. Gordon & H. Rosenfield, *supra* n. 8, §§ 5.16b(3) & 8.15 (procedure for discretionary relief need not be as formalized as deportation hearings but must allow for the exercise of discretion following a fair opportunity for an alien to present his case).

to submit his application for asylum on Form I–589 and later to appear in person before the immigration officer who will handle the application. 8 C.F.R. §§ 108.1 & 108.2.[26] When the applicant appears before the immigration officer, he is to be "given an opportunity to fully present [sic] his case" and the immigration officer is to double check that "the applicant has no additional factors he may wish to have considered." Operating Instruction [hereinafter O.I.] 108.1.

The District Director, generally operating through his subordinates, is to classify the application into one of three categories: (1) Cases clearly meriting asylum, (2) Doubtful cases, and (3) Asylum cases that do not appear to have substance or are clearly lacking in substance. 8 C.F.R. § 108.2; O.I. 108.1. The views of the State Department on the application are to be sought in all doubtful cases. *Id.* If the application is denied as clearly lacking in substance, the State Department is to be notified and the alien's departure is stayed for 30 days or until the State Department responds. *Id.*

 Although the District Director may grant or deny the application in his discretion, the regulations and operating instructions make it clear that his discretion is to be an informed one. No administrative appeal lies from the District Director's decision unless he denies an application in spite of a State Department recommendation to grant. *Id.* The State Department statement is to be made part of the record and the applicant has an opportunity to examine and rebut the State Department statement. *Id.* The District Director's decision on the application is to be made in writing. *Id.*

 As already noted, a denial by the District Director does not preclude raising an asylum claim in a later deportation hearing before an immigration judge. *Id.* Moreover, if the asylum claim was advanced between the issuance of a show cause order and the hearing thereon, the matter was to be referred to the District Director and the deportation hearing postponed. I.O. 108f(1). If the asylum claim was made during a deportation hearing, then the hearing was to be adjourned so that the District Director could process the asylum application. O.I. 108.1f(2). The rationale for these last two procedures is clear: the District Director should uniformly be given the first opportunity to rule on the asylum application and the applicant for asylum should not have to prejudice his other defenses to deportation in order to raise an asylum claim. *Cf.* 8 C.F.R. § 242.-17(d).

The procedures outlined above clearly provide a good foundation for procedural due process even if they do not necessarily exhaust the requirements of due process or are not explicitly required by the Constitution. Unfortunately there is many a slip between the cup and the lip, and proper procedures must be implemented properly before the particulars of due process are satisfied.

## II. THRESHOLD LEGAL ISSUES

The threshold legal question is whether each of the sixteen causes of action is properly before the court. The defendants have asserted several reasons why various of the plaintiffs' causes of action should be dismissed without reaching their merits. First, the defendants argue that the district court does not have jurisdiction to entertain causes of action 1, 2, and 3, asserting that the court of appeals has exclusive jurisdiction over those three claims pursuant to 8 U.S.C. § 1105a(a). Second, the defendants raise four issues which may be considered together as questions of justiciability: mootness, the timing of judicial review, the political question doctrine, and standing.

Each of the defendants' challenges will be addressed in turn. In the course of examining each of these arguments, however, it is essential to understand and bear

---

**26.** Unless otherwise specified or manifest from the text, all citations to the regulations or operating instructions on asylum refer to those provisions as they were in force during the period of the alleged Haitian program in 1978–79.

in mind the unusual nature of this case. The plaintiffs are not trying to litigate the merits of any single decision by INS or a particular immigration judge. Rather, the gravamen of the plaintiffs' complaint is that INS instituted a program "to achieve expedited mass deportation of Haitian nationals" (Complaint, ¶ 3) irrespective of the merits of an individual Haitian's asylum application and without regard to the constitutional, treaty, statutory, and administrative rights of the plaintiff class. Causes of action 1–14 each allege some aspect of this program. Cause of action 15 further alleges that the entire program constituted impermissible discrimination based on national origin. Finally, cause of action 16 alleges that the cumulative effect of all of the various practices in the program deprived the class of fundamental fairness in processing their asylum claims.

## A. Jurisdiction

The plaintiffs aver that this court has jurisdiction to hear their claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1361 (mandamus jurisdiction), and 8 U.S.C. § 1329 (jurisdiction over causes arising from the Immigration subchapter). The defendants do not contest this court's general jurisdiction,[27] but they contend that causes of action 1–3 cannot be raised in the district court because of the grant of exclusive jurisdiction to review final orders of deportation vested in the court of appeals. See 8 U.S.C. § 1105a(a).[28] In this instance, then, the question of jurisdiction becomes one of statutory construction.

Prior to 1961, Congress had specified no particular procedure for the judicial review of deportation proceedings. See e. g., C. Gordon & H. Rosenfield, 2 Immigration Law and Procedure § 8.1 (1980). As a result, the courts devised various means of reviewing deportation proceedings, including the application of the review provisions of the Administrative Procedure Act to deportation proceedings. See, e. g., Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955). In 1961, Congress added the present provision codified at 8 U.S.C. § 1105a which inter alia limited the review of final orders of deportation to the appropriate court of appeals. In doing so, Congress sought to eliminate the abuse of the prior avenues of judicial review. Primarily, Congress concluded that judicial review had been abused by aliens whose sole motives were dilatory. Exclusive review by the courts of appeals was chosen as an efficient and just means of expediting judicial review of these final deportation orders.[29]

**27.** Similarly, the court is well satisfied that jurisdiction pursuant to 8 U.S.C. § 1329 and 28 U.S.C. § 1331 encompasses all sixteen causes of action except to the extent that such jurisdiction is preempted by the provisions of 8 U.S.C. § 1105a(a).

**28.** Section 1105a(a) states:
(a) The procedure prescribed by, and all the provisions of [now 28 U.S.C. §§ 2341–51], shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 1252(b) of this title or comparable provisions of any prior Act . . . .

**29.** The repetitive use of the various avenues of judicial review which prolonged indefinitely an alien's stay in the United States following the entry of a final order of deportation troubled Congress, two Presidential administrations, and a number of judges. The House of Representatives had previously passed legislation similar to Section 1105a on three separate occasions. H.R.Rep. No. 1086, 87 Cong., 1st Sess., reprinted in [1961] U.S.Code Cong. & Ad.News, pp. 2950, 2967. The House committee noted that it

has been disturbed in recent years to observe the growing frequency of judicial actions being instituted by undesirable aliens whose cases have no legal basis or merit, but which are brought solely for the purpose of preventing or delaying indefinitely their deportation from this country.

Id. A number of examples of the misuse of judicial review by aliens seeking to stave off deportation indefinitely are set out in H.R.Rep. No. 565, 87th Cong., 1st Sess.

Both the Eisenhower and Kennedy administrations supported the proposed changes. See H.R.Rep. No. 1086, supra, U.S.Code Cong. & Admin.News 1961, at 2967–70. For Congressional reliance on several judicial opinions, see H.R.Rep. No. 565, supra.

To avoid repetitive resort to the courts, the cornerstone of the changes in the review of

The Supreme Court has construed Section 1105a in a manner which realizes the Congressional goal of efficient judicial review but does not stretch the phrase "final order of deportation" beyond its linguistic limits.[30] All of these cases have involved the review of an individual deportation proceeding. In this context, the Court opined that all determinations incident to the deportation hearing and reviewable by the Board of Immigration Appeals were committed to the court of appeals' exclusive jurisdiction. *Foti v. Immigration and Naturalization Service*, 375 U.S. 217, 229, 84 S.Ct. 306, 314, 11 L.Ed.2d 281 (1963). On the other hand, the Court later decided that a District Director's denial of a stay of deportation which is not entered in the course of a deportation hearing and is not appealable within INS does not come within the exclusive jurisdiction of the court of appeals. *Cheng Fan Kwok v. Immigration and Naturalization Service*, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968). In this latter case, the Court reasoned that the District Director's denial was not encompassed by a "final order of deportation" but rather was purely discretionary relief external to deportation hearings. As such, judicial relief would be available first in the district court. *Id.* 392 U.S. at 210, 88 S.Ct. at 1973.

The analytical framework advanced in *Foti* and *Cheng Fan Kwok* was followed, for example, in *Immigration and Naturalization Service v. Stanisic*, 395 U.S. 62, 68, 89 S.Ct. 1519, 1523, 23 L.Ed.2d 101 (1969) where a District Director's denial of a political asylum claim was properly reviewed by the district court. *See also Fleurinor v. Immigration and Naturalization Service*, 585 F.2d 129, 134–36, n.6 (5th Cir. 1978) (political asylum determination by the District Director cannot be reviewed by the court of appeals, but procedural irregularities therein are reviewable in the district court). Most of the claims now before this court allege irregularities in the procedures used by the District Director in processing asylum claims, and as such they are clearly within this court's jurisdiction. However, because causes of action 1–3 allege, at least in part, irregularities in deportation hearings themselves, the government contends they are beyond this court's oversight. The Government's interpretation of Section 1105a and the above Supreme Court cases, is neither required by the statutory language nor supported by Congressional intent.

Various statutes dividing judicial review responsibilities between the district court and the court of appeals have provoked a substantial amount of confusion in administrative law recently. *See* K. Davis Admin-

deportation orders was the inclusion of the principle of res judicata in Section 1105a. *See* H.R.Rep. No. 1086, *supra*, U.S.Code Cong. & Admin.News 1961 at 2973. Initial resort to the court of appeals provided the added benefit of "speedier disposition of cases in courts where there are less backlogs." *Id.* Of course, time is also saved by generally eliminating one step in the process: review at the district court level.

**30.** In reversing a court of appeals decision, the Supreme Court analyzed the legislative history of Section 1105a to demonstrate Congressional concern with the efficiency of judicial review, a concern which the lower court had noted but failed to apply. *Foti v. Immigration and Naturalization Service*, 375 U.S. 217, 222–26, 226, 84 S.Ct. 306, 310–12, 11 L.Ed.2d 281.

Although the Court of Appeals agrees that the basic purpose of [Section 1105a] was to expedite the deportation of undesirable aliens by preventing successive dilatory appeals to various federal courts, it fails to apply that

interpretation to the question presented in this case.

*Id.* at 226, 84 S.Ct. at 312. Later, however, in rejecting an expansive interpretation of the words "final order of deportation," the Court refused to go beyond the reasonable linguistic limitations of those words just for the sake of some assumed benefit of efficiency.

If, as the Immigration Service urges, [Section 1105a] embraces all determinations "directly affecting the execution of" a final deportation order, Congress has selected language remarkably inapposite for its purpose. As Judge Friendly observed in a similar case, if "Congress had wanted to go that far, presumably it would have known how to say so."

*Cheng Fan Kwok v. Immigration and Naturalization Service*, 392 U.S. 206, 213–14, 88 S.Ct. 1970, 1975, 20 L.Ed.2d 1037 (1968) (citation omitted).

istrative Law Treatise § 23.03–1 (1980 Supplement). Professor Davis has argued that "[t]he law on choice between court of appeals review and district court review is becoming inordinately complex, and much of the complexity stems from judicial departures from clear statutes." *Id.* at 191. Apparently, even in the face of a clear statute giving the court of appeals exclusive jurisdiction, the courts of appeal would construe the statute to vest review initially in the district court if the appeals court concluded that it would otherwise have an insufficient record upon which to base its review. *Id.* (and cases cited therein). *Compare PPG Industries, Inc. v. Harrison,* 587 F.2d 237, 244–45 (5th Cir. 1979) (review not appropriate in court of appeals because, in part, the record is inadequate for such review) *rev'd* 446 U.S. 578, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) *with United States Steel Corp. v. United States Environmental Protection Agency,* 595 F.2d 207, 212 (5th Cir. 1979) (review proper in the court of appeals because it may be based on a substantial record).

The Supreme Court's reversal in *PPG Industries* halted jurisdictional construction which is unsupported by legislative intent and which flies in the face of explicit statutory language conferring jurisdiction on the court of appeals. 446 U.S. at 589–595, 100 S.Ct. at 1896–1899. In the instant case, however, district court jurisdiction over causes of action 1–3 would not be contrary to the clear wording of Section 1105a. That section confers exclusive jurisdiction on the court of appeals only to review "final orders of deportation," as opposed to the general jurisdiction of the district courts over other causes of action arising from the immigration laws. *See, e. g.,* 8 U.S.C. § 1329; 28 U.S.C. § 1331. Causes of action 1–3 do not ask this court to review final orders of deportation. Thus, a literal construction of Section 1105a would leave no doubt that this court has jurisdiction to entertain causes of action 1–3.

Causes of action 1–3 cannot be categorized as simply as the defendants propose. Certainly, cause of action 1 "relat[es] to the decision of an immigration judge during the course of a deportation hearing to grant a continuance when a political asylum claim not previously decided by the district director is made." Memorandum in Support of Defendants' Renewal and Supplement to Motion to Dismiss at 3. The pertinent consideration, however, is *how* this cause of action "relates" to the immigration judges' decisions. The plaintiffs contend that the immigration judges *consistently refused to suspend* deportation hearings promptly— even though they were supposed to do so under I.N.S. Operating Instructions—as part of a discriminatory policy directed solely at Haitians. The object of this policy, as alleged in the complaint, was to expedite the mass deportation of Haitians. The evidence reflects that this "judicial" practice was adopted at the instigation of the INS Central Office.[31] Such a practice could never be effectively demonstrated in the record of any single deportation hearing, and so it would completely escape judicial review if— just because it "relates" to an immigration judge's decision—it cannot be raised in a class action before the district court.[32]

---

31. *See* section IV A 1 *infra.*

32. The court of appeals' review of a final deportation order is limited to the administrative record and whether that record contains substantial evidence supporting the deportation order. 8 U.S.C. § 1105a(4). The Fifth Circuit has construed very narrowly the type of evidence which is "material" to an individual's asylum claim. *See Fleurinor v. Immigration and Naturalization Service,* 585 F.2d 129, 133 (1978). In complaining to the court of appeals regarding the failure to suspend a deportation hearing upon the making of an asylum claim, one would have to show considerable prejudice before the court of appeals would act. Any one individual would be unlikely to be able to demonstrate sufficient prejudice to him alone to prevail on the court of appeals to reverse what would appear to be simply the denial of a single motion to continue the proceedings. In any particular instance, the immigration judge's refusal to suspend deportation proceedings promptly, although a technical violation of agency procedures, *see* Operating Instruction § 108.1f(1), would not appear to warrant a reversal or a remand. However, the prejudice inherent in this practice, a very real prejudice as alleged, arises from the cumulative effect of such a procedural irregularity when manifested

Causes of action 2 and 3 would similarly escape judicial review.[33]

 Congress did not intend that Section 1105a produce the anomalous result that meritorious claims of agency misconduct escape effective judicial review. Congress made it clear that Section 1105a "implements and applies Section 10 of the Administrative Procedure Act." H.R.Rep. No. 1086, 87th Cong., 1st Sess., *reprinted in* [1961] U.S.Code Cong. & Ad.News pp. 2950, 2966. The House Report explicitly sets out the pertinent provision of the A.P.A., adding that Section 1105a was drafted "precisely as is contemplated" by the A.P.A.:

> The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute or, in the absence or *inadequacy thereof,* any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus) in any court of competent jurisdiction.

*Id.* U.S.Code Cong. & Admin.News 1961 at 2971, *quoting* Section 10 of the Administrative Procedure Act now codified at 5 U.S.C. § 703 (emphasis added). The conclusion is inescapable that Congress intended that "any court of competent jurisdiction" be able to hear a claim which cannot be adequately presented to the court of appeals under Section 1105a.[34] Clearly, the district court is otherwise a court of competent jurisdiction.

 Congress' broader intent of efficient judicial review of administrative action also supports jurisdiction over causes of action 1–3 in this court. In the context of a single individual's deportation hearing, the Supreme Court has recognized that this goal of efficiency can be best realized by consolidating judicial review in the court of appeals. *See, e. g., Foti v. Immigration and Naturalization Service,* 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963). However, in the context of a proper class action contesting initial actions in deportation hearings which are alleged to be part of a plan to deprive the class of rights otherwise available independent of the deportation

as part of a single, unified program designed to deport Haitian nationals in spite of the legitimacy of their individual asylum claims.

**33.** Cause of action 2 charges that as part of the systematic program of deporting all Haitians the immigration judges required class members to apply for asylum from the District Director within ten days of the suspension of the deportation hearing. In the individual case, such a requirement might be both reasonable and fair. However, in the context of a massive program to deport thousands of Haitians, who were generally represented by a handful of diligent but completely outgunned public interest or privately retained lawyers, this practice allegedly enabled numerous applications to be dismissed as untimely *by the District Director.* This *cumulative* prejudice could never be adequately reflected in the record of any single deportation hearing and would therefore escape effective judicial review. In addition, since it is the District Director who administers the coup de grace, the court of appeals' jurisdiction is itself dubious. *Cf. Fleurinor v. Immigration and Naturalization Service,* 585 F.2d 129, 135–36 (5th Cir. 1978) (Court of appeals without jurisdiction to review District Director's decisions on asylum petitions).

Cause of action 3 alleges that immigration judges permitted INS to schedule deportation hearings simultaneously or in rapid succession with each other and with independent asylum interviews before the District Director. Again, the alleged *cumulative* effect of this practice was to deprive the class of a fair hearing with the assistance of counsel and other due process rights. Again, such a cumulative effect would never be adequately reflected in any one record of the deportation hearing of an individual Haitian.

**34.** It is important to note that Congress had no intention of cutting off any substantive rights of aliens contesting final orders of deportation when it generally restricted their review to the court of appeals. Indeed, the House committee concluded that, in general, review in the court of appeals would give "the alien *greater* rights, *greater* security, and *more* assurance of a close study of his case by experienced judges." H.R. Rep. No. 1086, *supra* note 29, U.S.Code Cong. & Admin.News 1961 at 2972 (emphasis added). Similarly, the venue provisions of Section 1105a were seen as "not lessen[ing] the alien's ability to obtain justice." *Id.* This court must take Congress at its word; Section 1105a should not be interpreted in a manner which would effectively reduce the types of complaints aliens can make in challenging their deportation hearings.

hearings, the Congressional policy of efficient judicial review can be best, and solely, realized by jurisdiction in the district court.[35] Congress conferred broad jurisdiction on the district courts to hear cases arising under the immigration subchapter. 8 U.S.C. § 1329: *see also* 28 U.S.C. § 1331. Neither the language nor the intent of Section 1105a supports the conclusion that this court has been deprived of its jurisdiction to hear causes of action 1–3.[36]

## B. Justiciability

The defendants raise four issues of justiciability: mootness, the timing of judicial review (both exhaustion and ripeness), the political question doctrine, and standing. Few areas of the law present a court with less of an understandable and coherent framework than justiciability. Although this court cannot undertake to synthesize a coherent justiciability theory from this conceptual morass, a few prefatory words are in order.

Federal courts are not roving engines of justice careening about the land in search of wrongs to right. Rather, federal courts were designed to be much like all other courts: passive entities resolving only the quarrels which are properly put before them by interested parties and which are within the competence of courts in a tripartite system of constitutional government. Questions of justiciability are all related in that the various justiciability doctrines are intended to keep the courts within their proper constitutional and prudential bounds.

At the same time, one cannot lose sight of the fact that throughout our nation's history, and increasingly in the last quarter of a century, litigants have confronted the federal courts with real and palpable cases of individual and systemic injustice for which the courts are the only realistic source of relief.[37] In the face of such litigation, the courts have—often with great re-

**35.** Although the court of appeals may consolidate a number of cases for the purpose of argument on appeal, *see* Fed.R.App.P. 27; Fifth Circuit Local Rules 10.1.9 & 10.2.1, this court is aware of no statute or rule which gives the appeals court the power to review agency decisions by class.

**36.** Because of this court's construction of Section 1105a, it is unnecessary to discuss extensively a second ground for jurisdiction over causes of action 1–3: pendent jurisdiction. The jurisdiction of this court to hear the thirteen other causes of action is undisputed by the defendants. Moreover, the fifteenth and sixteenth causes of action require the court to examine the overall effect of an alleged program designed to deprive the Haitians of their various procedural and substantive rights in asylum proceedings. The plaintiffs allege that the initial proceedings before the immigration judge were part of this very program. Since the court will be called upon to examine the practices alleged in the initial proceedings before an immigration judge in the course of deciding causes of action 15 and 16, pendent jurisdiction over the first three causes of action would seem appropriate. Clearly, causes of action 1–3 arise from "a common nucleus of operative fact" shared with the latter causes of action. *Cf. United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966) (power to adjudicate state claim pendent to federal question claim). Moreover, the principles of judicial economy and efficiency of judicial review, advanced by Congress in

1961, in addition to considerations of fairness to these litigants support the discretionary application of pendent jurisdiction in this case. *Cf. id.* at 726–27, 86 S.Ct. at 1139. Of course, pendent jurisdiction is generally applied in the context of federal court consideration of state causes of action or federal causes of action of insufficient jurisdictional amount. Nonetheless, the express Congressional intent of efficient judicial review of deportation matters counsels for the application of pendent jurisdiction to the unusual facts of this case.

**37.** *See generally Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1957); *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Griffin v. Prince Edward County School Board*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Swann v. Charlotte–Mecklenberg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Such cases in the lower courts are too numerous to cite, but the lower courts have been confronted with similarly

luctance–measured up to their historic constitutional task of declaring what the law is and enforcing the law between the parties. Although it is almost tautological to so state, questions of justiciability do not impede a case proper for adjudication.

For six years now, the black Haitian nationals who have sought refuge in Florida have protested to the courts their treatment at the hands of the Immigration and Naturalization Service. The courts–including this court–have pursued a policy of utmost restraint. The courts have continued to believe that once they declared the law, the Immigration and Naturalization Service would follow that law. For example, Haitian litigants have repeatedly asked INS and the courts to consider the political and social conditions in Haiti when deciding and reviewing, respectively, their applications for political asylum. In general, courts–including this court–have skirted such issues or determined them adverse to the Haitians.[38] Indeed, the courts have been willing to seize on the tiniest scintilla of evidence that administrative actions were justified.[39]

The allegations in the present complaint are so troubling that not to reach the merits of this case would be an exercise in judicial abdication rather than judicial restraint. Most issues of justiciability stem from the constitutional restriction of judicial power to "cases" and "controversies." As the late

Chief Justice Earl Warren observed, "those two words have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government." *Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). The defendants urge that the plaintiffs' case is as leaky and unseaworthy as most of the decrepit boats used by the plaintiffs to arrive on these shores, and can be sunk by the submerged complexities underneath the tip of justiciability icebergs they sight. However, the justiciability dangers sighted by the defendants are no more than mirages; the waters of this litigation are as free as ice floes as are the warm Caribbean waters of the Gulf Stream.

### 1. Mootness

The defendants cite a single case for the proposition that the plaintiffs' claims are moot: *Sannon v. United States*, Case No. 74–428–Civ–JLK (final order entered January 7, 1980, as amended April 11, 1980). The *Sannon* case was decided by this court and is presently on appeal to the Fifth Circuit on the limited issue of whether the additional notice required of INS by the court was within the court's authority.[40] *See* Brief for Appellants, *Sannon v. United States*, Case No. 80–5088 (filed May 5, 1980). The defendants' reliance on *Sannon* is misplaced.

complex cases which never reach the Supreme Court. *See, e. g., Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976) (unconstitutional prison conditions) *aff'd and remanded* 559 F.2d 283 (5th Cir. 1977).

**38.** *See, e. g., Fleurinor v. Immigration and Naturalization Service,* 585 F.2d 129, 133 (5th Cir. 1978) (Amnesty International Report on political conditions in Haiti not material to particular plaintiff's asylum claim) (alternate holding). *But see Coriolan v. Immigration and Naturalization Service,* 559 F.2d 993 (5th Cir. 1977) (case remanded in light of Amnesty Intentional Report).

This court declined to reach the issue of general conditions in Haiti in *Sannon v. United States,* Case No. 74–428–Civ–JLK (final order entered January 7, 1980, as amended April 11, 1980).

**39.** For example, in *Paul v. Immigration and Naturalization Service,* 521 F.2d 194, 199 (5th Cir. 1975), the court relied on a single magazine

article for the proposition that "[m]any Haitians seek refuge in this country, not for political reasons, but for economic ones." Although the Court took note of this "fact," it declined to require an immigration judge to take judicial notice of conditions in Haiti. *Id.*

**40.** In *Sannon* the government agreed that publication of its new regulations beyond publication in the Federal Register was necessary to inform Haitians of their rights under the new regulations. The court duly ordered public notice of the regulation change in all of the publications suggested by the government, although for a substantially longer period than the period initially suggested by the government. The court also ordered notice to all Haitians of their new rights verbally and in writing when they enter the United States and in advance of expulsion. Apparently, it is this last requirement to which the government objects.

In *Sannon*, the three hundred Haitians in the plaintiff class were excludable aliens whose claims for political asylum had been denied by the District Director and who had been found excludable in hearings before immigration judges. The plaintiffs complained *inter alia* that the immigration judges had refused to consider their asylum claims. This court concluded that the plaintiffs were entitled to present their asylum claims also to the immigration judges and granted relief on that basis. *Sannon v. United States*, 427 F.Supp. 1270 (S.D.Fla. 1977). Three weeks after the decision in *Sannon*, the Fifth Circuit decided *Pierre v. United States*, 547 F.2d 1281 (5th Cir. 1977), which rejected claims similar to those upheld by this court. *Sannon* was then appealed to the Fifth Circuit. Thereafter, the *Pierre* plaintiffs petitioned for a writ of certiorari from the Supreme Court. At the Solicitor General's suggestion that the *Pierre* petition was moot because INS intended to promulgate new regulations granting the petitioners the hearing they wanted before immigration judges, the Supreme Court granted certiorari, vacated the Fifth Circuit decision, and remanded the case for consideration of the mootness question. *Pierre v. United States*, 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977). *See also Pierre v. United States*, 570 F.2d 95 (5th Cir. 1978) (remanding to district court for consideration of mootness question). Similarly, *Sannon* was remanded to this court. *Sannon v. United States*, 566 F.2d 104 (5th Cir. 1977) (mem.). Upon remand, this court initially held that the new regulations were improperly promulgated by INS in violation of the Administrative Procedure Act. *Sannon v. United States*, 460 F.Supp. 458 (S.D.Fla.1978). Thereafter, the regulations were repromulgated.

In its final order, this court decided that the new regulations–once properly promulgated and with some added notice requirements–rendered the *Sannon* litigation moot. No appeal was taken from the decision on mootness.

Mootness contentions require an intensely factual inquiry. During its five year history, the *Sannon* litigation focused on one major issue: What consideration should be given asylum claims in exclusion hearings before immigration judges? With that issue effectively decided in the plaintiffs favor in the new regulations the court declined the plaintiffs' invitation to rule on various matters not squarely presented by that case. In sum, the case was adjudged moot because the plaintiffs had been *granted* by the new regulations the primary relief they had sought from the court.

In the case now at bar, the defendants argue that the new regulations promulgated by INS similarly moot the present plaintiffs' claims, contending that the difference between this case and *Sannon* "is purely a legal distinction." Defendants' Memorandum in Support of Defendants' Renewal and Supplement to Motion to Dismiss at 2. However, even in an intensely factual inquiry, "purely legal" distinctions are quite important to a court of law. Moreover, there are distinctions between the two cases which are more than "purely legal."

Under the regulations in force during the time period at issue in this lawsuit, the plaintiffs had a right to have their asylum applications considered by the District Director, whose decision was unreviewable within INS. 8 C.F.R. §§ 108.1 & 108.2.[41] A District Director's denial of asylum would

**41.** The old regulations provide as follows:
§ 108.1 Application.
An application for asylum by an alien who is seeking admission to the United States at a land border port or preclearance station shall be referred to the nearest American consul. An application for asylum by any other alien who is within the United States or who is applying for admission to the United States at an airport or seaport of entry shall be submitted on Form I–589 to the district director having jurisdiction over his place of residence in the United States or over the port of entry. The applicant's accompanying spouse and unmarried children under the age of 18 years may be included in the application.
§ 108.2 Decision.
The applicant shall appear in person before an immigration officer prior to adjudication of the application, except that the personal appearance of any children included in the application may be waived by the district director. The district director shall request

not preclude the alien from applying for asylum during the course of a later deportation hearing before an immigration judge. 8 C.F.R. § 108.2. As amended effective May 10, 1979, these regulations were changed to eliminate any application to the District Director unless the alien's presence

> the views of the Department of State before making his decision unless in the opinion the application is clearly meritorious or clearly lacking in substance. The district director may approve or deny the application in the exercise of discretion. The district director's decision shall be in writing, and no appeal shall lie therefrom. If an application is denied for the reason that it is clearly lacking in substance, notification shall be given to the Department of State, with opportunity to supply a statement containing matter favorable to the application, and departure shall not be enforced until 30 days following the date of notification unless a reply has been received from the Department of State prior to that time. A case shall be certified to the regional commissioner for final decision if the Department of State has made a favorable statement, but, notwithstanding, the district director has chosen to deny the application. If any decision will be based in whole or in part upon a statement furnished by the Department of State, the statement shall be made a part of the record of proceeding, and the applicant shall have an opportunity for inspection, explanation, and rebuttal thereof as prescribed in § 103.2(b)(2) of this chapter. A denial under this part shall not preclude the alien, in a subsequent expulsion hearing, from applying for the benefits of section 243(h) of the Act and of Articles 32 and 33 of the Convention Relating to the Status of Refugees.
>
> 8 C.F.R. §§ 108.1 & 108.2 (1978).

**42.** The amended regulations provide, in part, as follows:

> § 108.1 Application.
>
> An applicant who is seeking admission to the United States at a land border port or preclearance station who wishes to apply for asylum shall be referred to the nearest American consul. In all other cases, application for asylum shall be submitted on Form I–589, "Request for Asylum in the United States." Except as otherwise provided in this paragraph, an application for asylum by an alien who is applying for admission to the United States at an airport or seaport of entry shall be submitted to the docket clerk for the immigration judge who shall consider that application in connection with an exclusion hearing as provided in § 236.3 of this chapter. A crewman or stowaway or alien temporarily excluded pursuant to section 235(c) of the

in the United States "is authorized" by INS,[42] or other exceptions not pertinent here. Under the new regulations, then, asylum applications are to be considered by the immigration judge only. The defendants contend that this new procedure is available to all members of the class.[43]

> Act who is at a seaport or airport shall submit his application for asylum to the district director. An application for asylum by an alien who is within the United States and who is maintaining a lawful status or whose presence in the United States is authorized by the Service may be submitted to the district director having jurisdiction over his place of residence in the United States, except that an alien who has been paroled into the United States under section 212(d)(5) of the Act may only apply for asylum as provided in § 236.3 of this chapter. After an order to show cause has been issued, the application for asylum and relief under section 243(h) of the Act must be submitted to the immigration court. The application for asylum if filed on Form I–589 will be considered in accordance with § 108.3(a). The request for relief under section 243(h) of the Act will be considered under § 242.17(c) of this chapter. The applicant's spouse and unmarried children under the age of 18 years may be included in the application.
>
> 44 Fed.Reg. 21258 (April 10, 1979).
>
> The plaintiffs have raised the question of whether many of them come within the terms of aliens whose "presence in the United States is authorized by the Service." If so, then their asylum applications would still be processed by the District Director under the new regulations. The court does not reach this question. *Cf.* note 21a *supra.*

**43.** In their memorandum, the defendants state: "[A]ll the named plaintiffs and virtually all the potential class members have available to them the new procedures established by the amendments to 8 C.F.R. § 108 for the determination of their asylum claims by an immigration judge." This result is not apparent on the fact of the new regulations nor would it appear to find support in the INS directive of May 23, 1979 (Exhibit C to Plaintiffs' Response to Defendant's Motion to Dismiss). The INS directive notes that "applications filed prior to May 10, 1979 with the Service will continue to be processed under the procedures in effect prior to that date." Under the terms of the directive, only those applicants who have been served with an Order to Show Cause but have not yet appeared before an immigration judge have a choice of proceeding under either the new or old procedures. Nonetheless, the court accepts the representation of defendants' coun-

Unlike *Sannon*, which turned on the question of what an immigration judge should consider in an exclusion hearing, the essence of the complaint in this case is that the procedures before the District Director were contrived to deny the Haitians' asylum applications despite their individual merits. *Sannon* was rendered moot because the new regulations granted those excludable plaintiffs the right they sought, the right to present their cases to immigration judges. In contrast, the amended regulations no longer afford a deportable alien the right to a District Director's determination of his asylum claim prior to any litigation before the immigration judge. Because the defendants' state that the plaintiffs can elect to have their asylum applications reprocessed under the new unified procedure before an immigration judge, the defendants argue that the plaintiffs' claims are moot. In essence, the defendants assert that because these plaintiffs can elect *to give up* a right they had, a right which INS now denies new applicants for asylum, their claims of past wrong are moot. The logic of this position escapes the court.

 Mootness is a constitutional doctrine which has both mandatory and discretionary applications. *See generally* C. Wright, A. Miller & E. Cooper, 13 *Federal Practice & Procedure* § 3533 at 263 (1975). In its mandatory aspect, it ensures that disputes in the federal courts–throughout their passage in those courts–remain the "live" disputes envisioned by the "cases" or "controversies" limitation on judicial power contained in Article III of the Constitution. On the other hand, its discretionary aspect often leads courts, based on considerations of judicial administration, to dismiss as moot litigation which otherwise meets the "cases" or "controversies" test. Consequently, there is no precise rule to be applied in determining whether a particular case has been rendered moot. The court is unpersuaded by the defendants' mere reference to *Sannon*. On the contrary, the court finds the following four considerations persuasive.

 First, the rights which the plaintiffs seek to vindicate have not been in any manner extinguished by the new regulations. The new regulations are not on their face retroactive and this court should not interpret them to deprive the plaintiffs of their vested rights. *See Greene v. United States*, 376 U.S. 149, 158–60, 84 S.Ct. 615, 621–22, 11 L.Ed.2d 576 (1964). The plaintiffs in this case all applied for political asylum prior to the effective date of the new regulations; and the prior regulations gave them the right to have their applications considered by the District Director before undergoing the rigors of proceedings before an immigration judge. This right vested upon the making of the application for asylum.[44] This court does not understand the defendants' contention that the plaintiffs may *elect* to be reconsidered under the new procedure as an assertion that their right to fair consideration under the old procedure has somehow vanished.

 Second, this case is not one in which the defendants have voluntarily ceased the allegedly illegal activity and can show that (1) the allegedly illegal activity will not recur and (2) events have eradicated the effects of the alleged violations. *See County of Los Angeles v. Davis*, 440 U.S. 625, 630–31, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). The plaintiffs complain that the defendants adopted a systematic program designed to deport Haitians without regard to the merits of their individual asylum claims through initial proceedings before immigration judges and later actions by the District Director. The mere fact that the plaintiffs are now offered the opportunity to proceed entirely before the immigration judges does not indicate that the defendants have abandoned any plan to effect deportation of Haitians despite their assert-

sel that the new procedures are available to the class members.

**44.** Apparently, INS agrees that the date of the filing of the asylum application determines

which procedure an asylum applicant receives. *See* INS Directive of May 23, 1979 (Exhibit C to the Plaintiffs' Response to Defendants Motion to Dismiss).

edly valid asylum claims; the plaintiffs may properly suspect that the defendants have merely shifted the focus of their plan to a new setting: the hearings before immigration judges. Moreover, even if the defendants' conduct might somehow be deemed a voluntary discontinuance of allegedly illegal activity, they have not met the "heavy" burden of demonstrating "that there is no reasonable expectation that the wrong will be repeated." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). If this case were deemed moot, the defendants would be able to return to their old ways, either under the altered procedure or under still more recent regulations promulgated pursuant to the Refugee Act of 1980, Pub.Law 96–212 (March 17, 1980.)[45] Also, it would be incredible to contend that the plaintiffs are no longer suffering the effects of the defendants' alleged misconduct. As alleged by the plaintiffs, the District Director failed to consider fairly their applications for asylum which resulted in those applications being arbitrarily denied. Had those applications not been so denied, as alleged, some number of the plaintiffs would now be enjoying political asylum in the United States rather than facing deportation hearings and possible return to a nation where they contend they may be beaten or killed.[46] Clearly, the effects of the defendants alleged misconduct persist.

Third, while it is true that a challenge to a statute or to administrative regulations may be mooted by the enactment of a new statute or the promulgation of new regulations if the new statute or regulations satisfy all the bases for the attack on the old regulations, such is not the case here. *See generally* C. Wright, A. Miller & E. Cooper, *supra* at 276–79. Rather than *challenging* the regulations which were amended by the defendants, the plaintiffs here *rely* in part on those regulations to challenge the *practices* of the defendants. To hold that subsequent changes in the regulations moot this case would be one sure way to insulate from judicial review INS actions which are in derogation of its own regulations. *Cf. id.* at 279 (legislature should not be able to contrive methods for avoiding Supreme Court review). Any time anyone challenged such actions INS could simply amend its regulations. Moreover, as noted above, the amended regulations do not satisfy the specific challenges to agency practices which could easily be transferred to the new asylum procedures.

Fourth, courts have often examined whether any remedy they could grant would be meaningful in cases challenged as moot, and this court concludes that it could grant meaningful relief if the various alleged violations–which include constitutional violations–are proved. Although remedial measures must be carefully tailored to the past violations proved, *see, e. g., Dayton*

---

**45.** The yet more recent interim regulations published by INS pursuant to the Refugee Act of 1980 state, in part:

§ 208.1 Jurisdiction.

Jurisdiction over any request for asylum made by an applicant for admission at a port of entry shall lie with the district director having jurisdiction over that port of entry. Jurisdiction over any request for asylum made by an alien in the United States shall lie with the district director having jurisdiction over the applicant's residence, except that jurisdiction over an asylum request made by an alien after he/she has been placed under exclusion proceedings pursuant to 8 C.F.R. 236.2, or served an order to show cause pursuant to 8 C.F.R. 242.1, shall lie with the immigration judge.

45 Fed.Reg. 37392, 37394 (June 2, 1980).

**46.** Courts have recognized that the collateral consequences of a case may save it from being

moot despite the absence of a "live" controversy over the primary consequence of the litigation. Although this doctrine was originally developed to ensure the review of expired criminal sentences, it has been applied to the review of civil proceedings as will. *See* C. Wright, A. Miller & E. Cooper, 13 *Federal Practice and Procedure* § 3533 at 280–82 (1975). In particular, the Fifth Circuit has held that the possible "continuing practical consequences" of a damaged reputation keep alive a civil case seeking to review the Army's determination that an individual had discriminated in apartment rentals. *See Connell v. Shoemaker*, 555 F.2d 483 (5th Cir. 1977). Although the alleged possibility of persecution in Haiti may be only a "collateral" consequence of an arbitrary denial of an asylum application, that very possibility is enough to keep this controversy live.

*Board of Education v. Brinkman,* 433 U.S. 406, 419–20, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 85 (1977), this court believes that Chief Justice Burger's forceful admonition remains good law and applicable to this case:

> Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies. ...
>
> [A] school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right.

*Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Although a rehearing of asylum claims before immigration judges rather than the District Director might be one method of remedying proven constitutional violations by the District Director, such an option might be particularly inappropriate in this case if it is proved as alleged in causes of action 1–3 that the immigration judges participated in the systematic denial of the class members' rights.

In sum, this court can see no possible constitutional or prudential rationale for holding that this case has been rendered moot by INS's amendment of its own regulations. This case of manifest public importance has been vigorously contested by advocates representing the opposing parties. The parties contest alleged violations of the plaintiffs' unextinguished rights to fundamentally fair consideration of their asylum applications by the District Director. The court can think of few cases or controversies more "live" or more deserving of judicial resolution.

## 2. *Timing of Judicial Review*

In their original motion to dismiss, the defendants sought the dismissal of the entire action on the grounds that (a) the plaintiffs had failed to exhaust their administrative remedies and (b) this litigation was otherwise unripe. In their renewal and supplement to their motion to dismiss, the defendants appeared to abandon their claim that the litigation was unripe and they narrowed their exhaustion of administrative remedies claim to causes of action 1–3.

The doctrines of ripeness and exhaustion of administrative remedies, though distinct, are clearly interrelated when courts are called upon to review administrative decisions. Professor Davis has written:

> When a court determines at what stage of administrative action judicial review may be sought, the court is either applying the requirement of ripeness, the broad doctrine that governs the kind of functions that courts may perform, or the relatively narrow doctrine of exhaustion, which focuses not upon the functions of courts but merely upon the completion or lack of completion of administrative action.

K. Davis, 3 *Administrative Law Treatise* § 20.01 at 57 (1958). Since the defendants have raised both issues of ripeness and exhaustion in arguing that judicial review is inappropriate at this time, the court will address both issues, taking the more narrow question of exhaustion first.

### a. *Exhaustion*

By not pressing their exhaustion argument with respect to causes of action 4–16, the defendants have implicitly admitted the obvious: the exhaustion contention with respect to those causes is frivolous. Causes of action 4–16 assert unlawful conduct in the District Director's consideration of asylum applications. Under INS regulations, "no appeal shall lie" from the District Director's decision on asylum applications. Hence, with respect to decisions of the District Director, there exist no more administrative remedies for the plaintiffs to pursue and the plaintiffs have exhausted their administrative remedies on causes of action 4–16. Moreover, this same rationale applies to cause of action 2. As alleged in cause of action 2, immigration judges required Haitians to present their asylum claims to the District Director within ten days. As alleged, if the applications were not filed within the ten day period, *the District Di-*

*rector* dismissed the applications as untimely. Because it was the District Director who dismissed the application, a Haitian could obtain no review of the dismissal within INS and his administrative remedies are exhausted.

■ With respect to causes of action 1–3, the defendants contend that the plaintiffs have failed to appeal within INS the actions of the immigration judges in allegedly refusing to suspend deportation hearings upon the making of an asylum claim (cause of action 1), allegedly requiring the presentation of asylum applications to the District Director within ten days (cause of action 2), and allegedly scheduling deportation hearings *en masse* (cause of action 3). As an initial matter, the court concludes that these causes of action are so intimately entwined with the other fourteen causes of action as to make the application of the exhaustion requirement improvident, even if technically permissible. *Cf. NLRB v. Industrial Union of Marine and Shipbuilding Workers*, 391 U.S. 418, 426 n.8, 88 S.Ct. 1717, 1723 n.8, 20 L.Ed.2d 706 (1968) (exhaustion requirement "is a matter within the sound discretion of the courts"); *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 865–66 (5th Cir. 1975) (exhaustion is a flexible concept tailored to administrative statutes and circumstances).

■ Exhaustion of administrative remedies is generally required to avoid the premature interruption of the administrative process.[47] By letting the administrative process run its course several policies are advanced: (i) a more complete record is developed, (ii) the agency is allowed to exercise its discretion or expertise, (iii) the agency is given the chance to correct its own errors, and (iv) the agency is not weakened by easy circumvention of its procedures. *See generally McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969); *Ecology*

*Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 866 (5th Cir. 1975). Of course, these cases recognize that the exhaustion doctrine is subject to numerous exceptions. For example, a plaintiff need not exhaust administrative remedies if such remedies would be inadequate to resolve his complaint. *See, e. g., NLRB v. Industrial Union of Marine and Shipbuilding Workers*, 391 U.S. 418, 426 n.8, 88 S.Ct. 1717, 1723 n.8, 20 L.Ed.2d 706 (1968). *See generally* K. Davis, 3 *Administrative Law Treatise* § 20.-07 (1958). This court has already concluded that traditional judicial review in the court of appeals would be inadequate to detect the violations of law alleged in causes of action 1–3. This court similarly concludes that the limits of internal agency review would be inadequate to resolve a class–wide complaint such as alleged in causes of action 1–3.

The Supreme Court has recognized a second exception closely analogous to the inadequate administrative remedy exception. An individual challenging the Social Security Act's administrative procedures as violative of constitutional due process need not present his constitutional challenge to the administrative agency or exhaust his administrative appeals to the Secretary thereon. *See Mathews v. Eldridge*, 424 U.S. 319, 328–30, 96 S.Ct. 893, 899–900, 47 L.Ed.2d 18 (1976). The Court noted:

> It is unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context. The Secretary would not be required even to consider such a challenge.

*Id.* 424 U.S. at 330, 96 S.Ct. at 900. This rationale applies to the case at bar as well. Here, although the complaint is ambiguous, the evidence reflects that individual class members sought to have their deportation hearings suspended (cause of action 1), pro-

---

**47.** Pursuant to 8 U.S.C. § 1105a(c), exhaustion is specifically required before a court may review an order of deportation or exclusion. Although, for the reasons outlined in the discussion of Section 1105a(a) above, this particular statutory provision does not apply to the case at bar, the court agrees that the exhaustion doctrine generally applies to immigration matters.

tested the ten day limitation on presentation of asylum applications to the District Director (cause of action 2), and protested the mass scheduling of hearings and interviews (cause of action 3). Their objections received short shrift. The plaintiffs allege that they were treated thus as part of a single unconstitutional plan and a systematic practice of accelerating their deportation proceedings in such a manner as to have them deported regardless of the merits of their individual asylum applications. Even if the internal appeal procedures were adequate to consider such a claim, the court believes that it is unrealistic to expect that such a challenge would receive serious consideration by INS. Indeed, the Board of Immigration Appeals refuses to hear constitutional challenges or challenges to INS regulations. *See* C. Gordon & H. Rosenfield, 1 *Immigration Law and Procedure* § 1.10e at 1–77 (1980). *See also Greene v. McElroy*, 360 U.S. 474, 507, 79 S.Ct. 1400, 1419, 3 L.Ed.2d 1377 (1959).

For these reasons, causes of action 1–3, as well as causes of action 4–16, come within clear exceptions to the doctrine of exhaustion of administrative remedies. In addition, even if the exhaustion doctrine might otherwise be applicable, the balancing approach outlined by the Fifth Circuit in *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 865–66 (1975) would make a dismissal on that basis unwise.

b. *Ripeness*

In their renewed motion to dismiss, the defendants did not renew their earlier contention that the issues in this case were not "ripe" for adjudication. Again, the implicit abandonment of this contention arises from good cause. The claim that this litigation is not ripe for adjudication is patently frivolous.

■ The Supreme Court has outlined a two step process for determining whether a

particular case is ripe for adjudication: "The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). However, the Court did not intend that every federal court had to apply this two step procedure in every case; before a court is obligated to explore "the intricacies of the ripeness doctrine," *id.* at 148, 87 S.Ct. at 1515, the party suggesting unripeness ought to be able to articulate why the case may be unripe.

To test whether the party suggesting unripeness has articulated a proper reason to arouse judicial concern that the litigation may be unripe, a court need look no further than the late Justice Harlan's summary of the ripeness doctrine:

[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.*, at 148–49, 87 S.Ct. at 1515.

■ As alleged by the plaintiffs, there is nothing unripe about this case. The procedures leading to the decisions of the District Director denying asylum to the members of the plaintiff class are final decisions from which no appeal lies within INS. Judicial review is obtainable only in the district court.[48] Hence, this case does not involve "abstract disagreements over administrative policies" but real life complaints about past agency actions. The administrative policy challenged has not remained unformalized; rather this case involves an alleged agency policy of depriva-

---

**48.** The defendants asserted in their original motion to dismiss that the complaint was unripe "because final administrative action has not occurred, and because other appropriate review is available if and when it might occur." Motion to Dismiss and Memorandum of Law at

2. Clearly, however, the District Director's denial of an asylum claim is a final order for which appeal lies solely in the district court. *See, e. g., Fleurinor v. Immigration and Naturalization Service*, 585 F.2d 129, 134–36 (5th Cir. 1978).

tion of the rights of aliens *allegedly put into practice.* Moreover, the plaintiffs allege that they have felt the effects in a concrete way: they complain that they have been rushed through processing before the District Director at a rate and in a manner which prevented any reasonable consideration of their asylum claims. They charge that the resultant denial of their asylum applications now subjects them to deportation proceedings and likely deportation. In short, this is a concrete controversy about past agency conduct which the plaintiffs challenge as unconstitutional.

■■■ Ripeness doctrine has evolved into a "stable and satisfactory" body of law. *See generally* K. Davis, *Administrative Law Treatise* § 21.00 (1980 Supplement). Generally, it is applied when some party wants to challenge prospective administrative action, and the doctrine assists courts in determining which such challenges to *prospective* conduct should be entertained. Ripeness doctrine has no application to cases contesting *past* administrative action against the very individuals who challenge that action.

### 3. *Political Question Doctrine*

The defendant Secretary of State has moved that he be dismissed from this litigation and, implicitly, that cause of action 11 be dismissed as well. In support of this motion, the Secretary urges that the performance of his duties as challenged in cause of action 11 fall within the scope of the political question doctrine and thus are immune from judicial review. In addition, all defendants in this case have urged the court to refrain from making any findings of fact on conditions in Haiti. Although the defendants have made no formal motion to this effect, their counsel has repeatedly argued that to make such findings would be beyond the bounds of the judicial role. To

the extent that this latter argument rests on one particular doctrine, it would appear to rely upon the political question doctrine.

■■■ Basically, the political question doctrine holds that some questions by their very nature are beyond the competence of the courts to decide because they have been committed to Congress and the President, the "political" branches of our government. As such, the political question doctrine encompasses much more than questions about politics. Clearly the conduct of foreign affairs has been committed to the President and to Congress.[49] As was stated over sixty years ago:

> The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—the "political"—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.

*Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918). This court could no more order the President to sign a treaty or the Secretary of State to negotiate an international agreement than the President could direct the court to decide an issue in his favor. *See United States v. Nixon,* 418 U.S. 683, 704–05, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974).

■■■ Immigration and naturalization matters implicate the conduct of foreign relations and thus pose the subtle risk that a decision on such questions might intrude on the political domain of the President and the Congress. *Cf. Mathews v. Diaz,* 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976) (considerations underlying the political question doctrine also dictate a narrow standard of review of congressional and presidential decisions in im-

---

**49.** The Constitution vests the President with all "executive Power" and with such specific foreign relations powers as making treaties, appointing and receiving ambassadors, and being the commander–in–chief of the nation's armed forces. Art. II. Congress is given the power to regulate commerce with foreign nations and the power to declare war. Art. I. Arguably,

the President's powers in foreign relations predominate. The Supreme Court has justified legislative deference to the President in foreign relations to a degree which would be unconstitutional in domestic matters. *See* L. Tribe, *American Constitutional Law* § 4–2 (citing *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936)).

migration and naturalization matters). However, all review by the courts is not improper. For example, although the federal government may discriminate against aliens and amongst aliens in various contexts, *id.* at 80–84, 96 S.Ct. at 1891–93, to be constitutional such discrimination must be approved by the proper executive or legislative body. *See Hampton v. Mow Sun Wong,* 426 U.S. 88, 103–05, 96 S.Ct. 1895, 1905–06, 48 L.Ed.2d 495 (1976). Just as clearly, immigration officials must comply with their own regulations, the various statutes enacted by Congress, the treaties adopted by the President and the Senate, and the limited constitutional protections afforded aliens in this country.[50] To ensure that individuals are not injured by unlawful action in the immigration and naturalization context, courts rarely apply the political question doctrine when such challenges are brought. As one treatise notes:

> Finally, the pervasive influence of the political question doctrine in fields touching on foreign affairs has not led courts to surrender their power to protect individuals against government action. To the contrary, individual rights are protected carefully, although within a framework that takes account of the broad substantive powers of the other branches. *Harisiades v. Shaughnessy* [342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952)] provides a much-invoked illustration. Ultimately, the Court upheld the challenged deportation order, and it spoke tenderly of the threads weaving policy toward aliens into the pattern of political judgments dealing with foreign affairs. But it decided on the merits challenges based on due process, the First Amendment, and the ex post facto clause. Respect for the political branches affects, but does not preclude, decision on the merits.

C. Wright, A. Miller & E. Cooper, 13 *Federal Practice and Procedure* § 3534 at 314 (1975) (footnotes omitted).

Cause of action 11 sweeps broadly. As read by the defendant Secretary of State, it asserts that the Secretary improperly let foreign policy considerations influence the State Department review of political asylum applications when referred by INS. The defendants "strenuously oppose any efforts to subject the State Department's role to judicial review. That is too much. The actions of the State Department bear too directly on foreign affairs and too indirectly on the adjudication of INS to permit judicial review." Memorandum in Support of Defendants' Motion to Dismiss Cyrus Vance at 2–3. This court agrees with the defendants that it should not be in the business of instructing the Secretary of State on how to conduct foreign affairs. However, cause of action 11 can be read much more narrowly. To the extent that cause of action 11 claims that the State Department has violated the procedures, regulations, and laws *to which the Secretary concedes the Department is bound* in participating in political asylum decisions, it survives a political question challenge. *Cf. United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (Attorney General will be bound to delegation of power extant in his departments' regulations); *United States v. Nixon,* 418 U.S. 683, 695–96, 94 S.Ct. 3090, 3100–01, 41 L.Ed.2d 1039 (1974) (same).

Because the defendants only argued orally that the court should not make findings of fact on the conditions in Haiti, the court does not have the benefit of any detailed analysis of the government's argument. Presumably, it too rests on the contention that to do so would violate the political question doctrine by usurping the function of either of the coordinate branches of

---

**50.** *See, e. g., United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (Attorney General bound by own regulations); Gordon & Rosenfield, *supra* n. 8 § 8.17(b) at 8–113–14 ("Like other discretionary determinations, the Attorney General's finding may be challenged for error of law in applying the statutory standards"); *id.* at § 8.15(a) (same); *Yick Wo v. Hopkins,* 118 U.S. 356, 368–69, 96 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886) (the rights of aliens are protected both by treaty and by the Constitution).

government. The issue, the court concedes, is one not free from difficulty.

The litigants concede that the general political and social conditions in Haiti should be considered by the District Director when he evaluates an asylum application made by a Haitian refugee.[51] In this case, the plaintiffs allege that the District Director and his subordinates arbitrarily and capriciously denied virtually all of the asylum claims of thousands of Haitians because of the cumulative effects of an alleged INS accelerated deportation program and because the District Director's subordinates were allegedly unschooled or erroneously schooled on conditions in Haiti. The plaintiffs charge that, as a result, unequivocally meritorious asylum applications were summarily dismissed as completely lacking in substance. To ascertain whether the alleged INS deportation program caused the District Director to deny arbitrarily and capriciously Haitian asylum claims, one must examine the alleged stark results of that program against the evidence presented in the District Director's proceedings. However, to understand the evidence before the District Director, one must have a grasp of the general conditions in Haiti.

The defendants contend that this background inquiry is barred. They nonetheless concede that this court is supposed to review the decisions of the District Director on asylum applications.[52] With all due respect to the defendants, the court does not comprehend how it is to review the District Director's decisions without some under-standing of the conditions in Haiti. The government appears to reply that the court may only consider the evidence the government presents on conditions in Haiti, i. e. the State Department report.

A hypothetical example exposes the untenable nature of the government's position. Let us suppose that there exists a nation X whose leaders have decided to exterminate all members of one religion. Some members of the religion manage to flee such genocide and make their way to the United States. Relying in part on information from the State Department, the District Director decides that no persecution exists in X and rapidly denies all asylum applications. These denials are appealed to the district court. The refugees from X argue to the court that they can prove that deportation to X means certain death despite the assurances of the government to the contrary. The government argues that the court cannot consider and evaluate such evidence because to do so is a political question. This court doubts that the hypothetical court would have to assist in possible genocide by denying the refugees their offer of proof.

The political question doctrine is founded on the judiciary's refusal to interfere with activities committed wholly to the other branches of government. By definition, the court cannot offend the political branches of government when they have provided for judicial review of the arguably "political" administrative decisions.[53] The presenta-

---

51. The present District Director conceded as much during his in court testimony. *See, e. g.,* Tr. at 243–48. The acting District Director at the time of the alleged Haitian program similarly conceded as much. *See, e. g.,* PX 94.

52. *See, e. g.,* Memorandum in Support of Defendants' Motion to Dismiss Cyrus Vance at 2: "[T]he INS readily admits that the INS decision, within certain limits, may be subjected to review even though it may bear on a matter affecting foreign affairs."

53. One analogous aspect of the political question doctrine is the act of state doctrine. In a nutshell, the doctrine holds that "the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recog-

nized by this country at the time of suit, in the absence of a treaty or other ambiguous agreement regarding controlling legal principles." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964). Lower courts have recognized, and at least three members of the Supreme Court have approved, an exception to the act of state doctrine, i. e. the doctrine need not be applied when the executive branch requests that it not apply. *See First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (Rehnquist, J.) (announcing judgment of the Court).

By analogy, when Congress and the President intend that an administrative decision be subject to judicial review, they cannot be offended when that review occurs.

tion of evidence on conditions in Haiti flows from the command of both statute and treaty. The United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, to which the United States is a party, incorporates the United Nations Convention Relating to the Status of Refugees. The Convention prohibits the deportation of "a refugee ... to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group of political opinion." Article 33. Refugees are defined *inter alia* as having a "well–founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion." Article 1. Similarly, 8 U.S.C. § 1253(h) authorizes the Attorney General to withhold the deportation of any alien "to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion." Both the protocol and the statute are implemented, in part, in 8 C.F.R. §§ 108.-1–.2 (1978) which prescribes the procedure before the District Director. Both the protocol and the statute on their face require an examination of the conditions in the country from which the applicant fled and to which his deportation is sought. The District Director's decision is reviewable solely in the district court.[54] Judicial review presumes some limited examination by the district court of the evidence on which the District Director based his decision.[55] Examining that evidence and opposing evidence to ensure that the District Director's decision was neither arbitrary nor capricious and that the procedures were fundamentally fair is the duty of the district court.[56] Since that duty rests upon a solid statutory and treaty foundation, it is outside the political question doctrine.[57]

In short, it cannot offend the coordinate branches of government for the judiciary to review administrative decisions in a manner contemplated by the statutory and treaty provisions adopted by the legislature and the executive. One cannot be said to have usurped that which one has been told to do.

### 4. *Standing*

The defendants move to dismiss the Haitian Refugee Center (HRC) as a plaintiff on the ground that HRC lacks the requisite standing to assert causes of action 13 and 14. Although questions of standing produce some of the most esoteric issues in the federal courts today, no such puzzling problems are posed by the present motion.

The court need not reach the defendants' argument with respect to cause of action 14. This cause of action alleges that the defendants engaged in the practice of intimidating Haitians who sought to exercise their Fifth Amendment right to remain silent, including but not limited to the incarceration of Haitians who sought to exercise that right. The defendants reason that named plaintiffs Dormeus and Sennecharles are barred by *res judicata* from presenting this cause of action. In turn, the defendants contend that HRC has no standing to

---

**54.** *See, e. g., Immigration and Naturalization Service v. Stanisic*, 395 U.S. 62, 89 S.Ct. 1519, 23 L.Ed.2d 101 (1969); *see generally* p. 15, supra.

**55.** For example, when courts review agency decisions under the Administrative Procedure Act to determine whether the agency decision was not "arbitrary, capricious, an abuse of discretion, or otherwise in accordance with the law," the court must consider "whether the decision was based on a consideration of the relevant factors." *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

**56.** *See generally* Gordon & Rosenfield, *supra* n. 8 § 8.17(b).

**57.** Returning again to the analogy to the act of state doctrine, it has already been noted that the act of state doctrine need not apply when the executive requests that it not apply. *See* note 53 *supra*. Moreover, the formulation of the doctrine in the *Sabbatino* case contains a built–in exception to its application when there exists "a treaty or other unambiguous agreement regarding controlling legal principles." 376 U.S. at 428, 84 S.Ct. at 940. The more general political question doctrine is likewise inapplicable where a treaty or statute directive exists to guide judges.

**474**

litigate this cause of action on behalf of unnamed class members and therefore the cause of action should be dismissed. This court has already ruled from the bench that Dormeus and Sennecharles are not barred from litigating cause of action 14 in their own right and on behalf of the class.[58] Thus, cause of action 14 should not be dismissed irrespective of HRC's possible standing to assert this cause on behalf of unnamed class members.

Cause of action 13 alleges that the defendants have declined to inform indigent Haitians of the availability of free legal services and have prevented HRC from so informing Haitians in the INS waiting room. The plaintiffs contend that this practice violates HRC's free speech and its members' associational rights. The defendants' argument that HRC lacks standing to litigate an arguable violation of its free speech is frivolous.

HRC is an unincorporated association of more than 1200 Haitians who seek to assist themselves and other indigent Haitians with the problems faced by Haitians in this country. At this time, the primary problems faced by Haitians revolve around their uncertain immigration status and therefore the work of HRC focuses on the representation of members and prospective members before INS. HRC is supported by the National Council of Churches and donations from private persons. It also collects a three dollar membership fee from those of its members who can pay such a fee. Most cannot. For several years HRC had had an application pending before INS for official recognition as a non–profit entity endeavoring to represent Haitian indigents in immigration matters.

Corporations enjoy independent first amendment rights. *See First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). This court concludes that unincorporated associations similarly enjoy such first amendment rights. Clearly, HRC has the standing to assert its own free speech rights in federal court. Of course, whether HRC has proved a violation of those rights is another matter. In addition, given the fear Haitians have of being deported to Haiti where they allege they will be persecuted for having sought asylum in the United States, HRC has standing to assert the associational rights of its members. *See NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

## III. FINDINGS OF FACT: CONDITIONS IN HAITI

Each of the plaintiffs in this case has sought asylum, and none have received it. They have been told they have no "well founded fear of persecution" on return. Yet the evidence is uncontradicted that those among them whom the Haitian government classifies as political opponents face grave dangers.

> *Serge Donetien ... had fled the country by boat, and he was deported to his country of origin; that is to say Haiti.*
>
> . . . . .
>
> *He was coming back from the torture chambers of Casernes Dessalines, covered with wounds.*
>
> *The accusation that was pending against him was traitor because he asked for asylum abroad.*

---

**58.** The defendants' argument that Dormeus and Sennecharles are barred from litigating cause of action 14 rested on the "merger" doctrine of res judicata. Dormeus and Sennecharles sought and were granted a writ of habeas corpus to secure their release from illegal confinement by INS. *See Dormeus v. Immigration and Naturalization Service*, Case No. 78–3681-Civ–WMH (S.D.Fla.1978) (Order entered August 12, 1978). The merger aspect of res judicata prevents a plaintiff from splitting a cause of action and relitigating it in successive proceedings. *See generally* C. Wright & A. Miller, 6 *Federal Practice and Procedure* § 1583 at 795

(1971). However, habeas corpus is an extraordinary writ and this court concludes that it would be antagonistic to its historic purposes to require a petitioner for the writ to join at the time of his petition all other possible claims arising from the allegedly illegal incarceration. Moreover, cause of action 14–in alleging a practice of INS intimidation in many forms–goes well beyond the limited allegations which Judge Hoeveler heard at the time of the habeas petition. Thus, cause of action 14 is not part of the same cause of action as was alleged in the habeas petition and its present litigation is not barred by the merger doctrine of res judicata.

*The word camoquin is used by the Ton Tons Macoutes, to designate all of those against which they can find to abuse, according to the order of the National Palace.*

*The man stayed at the prison, which with his wounds, which progressively became infected, he died of the consequence of his torture chamber by the absence of medical care and by the common treatment inflicted upon all prisoners incarcerated at Fort Dimanche.*

*Marc Romulus, Tr. at 83–84.*[59]

No asylum claim can be examined without an understanding of the conditions in the applicant's homeland. Similarly, the uniform rejection of the claims of the present 5,000 member class cannot be reviewed, regardless how lenient the standard of review, without inquiring into the conditions in Haiti. The evidence on that topic has been stark, brutal, and bloody.

The central question can be rather specifically drawn: How would these plaintiffs be treated if returned to Haiti? But that question cannot be fully answered without a more searching inquiry. The treatment of returnees in Haiti is part of a systematic and pervasive oppression of political opposition which uses prisons as its torture chambers and "Tonton Macoutes" as its enforcers. The extent of that political oppression must be established in order to review the INS' uniform conclusion that the plaintiffs are economic refugees.

Haiti has been accurately described as "the most oppressive regime in the hemisphere." Dx 25 at 10 (quoting Jerry De-Santillana, State Department Country Officer for Haiti); *accord* Dx 74 at Tab E (International Commission of Jurists, *The Review* 3, 4 (Dec. 1977)) ("the most ruthless and oppressive regime in the world").

*(My husband) was working at Customs in Port–au–Prince, . . . He kept telling me that they were talking to him about politics, that he should join the Ton Tons Macoutes. . . .*

*In '75 at midnight he left work. . . . Night had come and it was time to go to bed. They came and got him, the Ton Tons Macoutes came and took him away. . . .*

*. . . They left with him. They left with him. They took him on Wednesday night. Thursday at 1 o'clock I went to Fort Dimanche. I went to the police station. . . .*

*They told me they knew of no such person.*

*I knew that if he was not released, he would be killed. So I didn't go anymore. I never saw him. . . .*

*My son (was) in school. He was finishing up.*

*He was complaining while he was in school. He kept complaining that if his father was still alive, his mother would not suffer so much and go through such misery. . . . He was complaining that his father was there, and that the Ton Tons Macoutes took his father away.*

*They took him. His schoolmates came and told me that they had picked him up at school.*

*I started screaming, saying that the child's father had died. They took my child away from me. I have no more hope.*

*The next day three Macoutes came and arrested me. They started knocking on the door. . . . They didn't allow me to speak. They took me and stuck me in a dungeon.*

---

**59.** The court finds this testimony worthy of belief despite the introduction of certifications that INS has no record of Serge Donetien. The Court notes that there are continuing problems with translation (and therefore correct spelling of names) and that government counsel conceded that overall inadequacy of INS record-keeping. The court finds that the circumstances surrounding Donetien's statements to Romulus guarantee their trustworthiness. *See* Fed. R.Evid. 804 & 805.

*... They took me before the Chief of the Ton Tons Macoutes. ... When I got there, he asked me what was wrong with me, what was my problem that I was screaming at the top of my lungs like that. ... He said okay, and then he would send me home if I would shut my mouth and never wanted to hear anything out of me. ... Well, if I did not shut my mouth, I would have gone the same way my child went.*

. . . . .

*I could not go selling anymore because I was scared. I did not have a husband or child. I was scared. I stayed there and spent a month.*

*After a month, I saw I could no longer live.*

*Augusta Germain, Tr. at 1219–27.*

The story of present–day Haiti is the story of Francois Duvalier and his son Jean–Claude. Francois became President of Haiti in 1957, and was succeeded by his son, who rules to this day, in 1971. Of Francois Duvalier, it has been said: "This rather short, mild, soft–voiced physician, harmless and even unattractive in appearance, vague in personality, bears within himself a genius for tyranny that has astounded the world." Px 339 at 304 (Crassweller, *Darkness in Haiti,* Foreign Affairs 315, 317 (Jan. 1979)). Amnesty International recently concluded that "the apparatus of repression established by Francois Duvalier remains in place under Jean–Claude Duvalier." Px 339 at 277. The dimensions of this tyranny, and its impact on the plaintiffs, were explored at trial.

*I have problems. ... when Duvalier and Desire were first trying to take power, my father voted for Desire and after my father voted for Desire–my father voted in 1956. After voting, in 1964 ... they sent a truck full of Macoutes to my father's home.*

*At that time, I was there, my mother was there, and they told my father, "Let's go." At that time, my father got up. They took my father and put him in a truck and they took off with my father.*

*My mother was crying. ...*

. . . . .

*In 1965, she became gravely ill. She returned to the hospital. When she got to the hospital, they did not give her anything. They did not give her any tablets until she died.*

*When she died, my mother's sister was crying. She went to the hospital and there a nurse told her–she told my mother's sister there was no need for her to cry because Port–au–Prince had written to the doctor and told them not to take care of my mother.*

*After that, my mother was buried. ...*

*Two months after my mother died in '65, there was a Mother's Day party at the Baptist School where I was attending. I went to the party.*

*When I got there, all of the children were giving gifts to their mother. They were giving gifts to their father. I had no mother, no father.*

*The children started bothering me. They asked where my mother was. They asked me where my father was. Because of that when they were saying these things to me, I became angry and I said to them: "Okay. Next month I am going to take my revolver. I am going to go to Port–au–Prince to shoot Duvalier, because of my mother and father."*

. . . . .

*After three days, they came to my aunt's house, three Macoutes. They came to pick me up. When they came to pick me up, I was not there. ...*

. . . . .

*And my aunt cried. She told me that I had to leave the house. At that time I left. ...*

*Merilien Mezius, Tr. at 1174–78.*

A. *Haitian Refugees: Treatment on Return.*

1. *A Pattern of Persecution.*

Hundreds of thousands of Haitians have fled their country during the twenty–three years of the Duvalier regime. This flow of

humanity has led to many places, including the United States and, more importantly, South Florida. For a variety of reasons, some of those Haitians have been returned to their country: some have returned voluntarily; many have been deported. This case involves the potential deportation of several thousand more. The flow of humanity thus runs full circle, from Haiti to the United States, and back. And whatever conditions those Haitians experience on return are ultimately conditions to which they are exposed by INS.

Substantial evidence was presented at trial concerning treatment of returnees in Haiti. A largely uncontradicted pattern emerged. Upon return to Haiti, persons whom the Haitian government views as political opponents will be mistreated. Persons who have fled Haiti and sought asylum elsewhere are seen as opponents of the Duvalier regime. They are taken to Casernes Dessalines for questioning. Many are further imprisoned and persecuted. Of those allowed to return home, many more are later imprisoned or persecuted.

One piece of evidence stands in stark contrast to this pattern. The State Department sent a Study Team to Haiti to interview returnees in 1979. The team concluded there was no pattern of abuse. This Court, however, has concluded that the Study Team report is unworthy of belief. It is the subject of a separate section below.

Daniel Voltaire was a member of the Presidential Guard until he fled Haiti in 1979. He was stationed at the Presidential Palace in Port–au–Prince. To him, persons returned from abroad were described by the use of the Creole word "Camoquin." That word, to Duvalier and his followers, describes a traitor, spy, or invader.[60] Nonetheless, those who oppose Duvalier consider the term a badge of honor, "[i]t means you are against the injustice of the country." Tr. at 1948.

*... They said that they have been deported from the United States, it's not true, they came over to spy. They received money from the traitors in Miami.*

. . . . .

*... everybody that comes from abroad is a Camoquin.*
*Daniel Voltaire, Tr. at 1924, 1969.*

Voltaire stated that it was his duty to spy on everyone talking two–by–two, and that if he was "even suspicious" of a returnee, he should report it. Tr. at 1970. He stated that it was in his interest to denounce someone from the United States, that he would be rewarded for doing so. Tr. at 1968–69.

Similarly, a former member of the Tonton Macoutes said that everyone entering Haiti illegally was to be arrested and sent to Fort Dimanche.[61] Tr. at 414. Moreover, he stated that those who had claimed asylum while abroad were treated worse than other returnees. They were guilty of insulting the Duvalier family. Tr. at 420–21.

The policy of treating returnees as traitors did not originate with these two men. It came from a higher source, and was communicated to many. The Tonton Macoutes received orders from their local commanders, communicated through the echelons from the President, to arrest everyone from foreign countries. This order came secretly, while the Government simultaneously announced over the radio that Haitians abroad were free to return. Tr. at 414. The Presidential Guard received their orders in groups as large as 500, gathered in the palace courtyard to hear speeches by General Jacques Garcia, their Commander. *See* Tr. at 1920, 1942.

*When General Jacques holds his conference, he says that everyone returned from the United States, they were not returned but came to prepare the grounds–they have money that they received from the camoquin in the United*

---

**60.** A Camoquin is apparently a type of snake. Tr. at 1948. Its application to Duvalier's enemies apparently stems from its use as a name by a band of invaders in 1964. PX 334 at 638.

**61.** This witness testified on the condition that his identity be revealed only to the parties and the court. Everyone involved, including all members of the news media present at the time, agreed to this condition. Tr. at 395–406.

*States to come and spy in the country, and the reason is that these people themselves that are the heads of the camoquin abroad, they have come to invade, and it is the duty of those returned to spy. Tr. at 1969.*

The existence of orders such as these was corroborated by a witness who worked from 1961 to 1975 as an archivist at the Greater General Headquarters of all of Haiti's armed forces. Tr. at 455–56. One of the documents which came across his desk for storage in 1974 was an order written by Luc Desir, Chief of the Secret Police, to General Jean Baptiste Hilair. Tr. at 458. The order stated that persons returning to the country after an illegal exit were to be arrested, sent to Casernes Dessalines for interrogation, and then to Fort Dimanche. Tr. at 460.

Both Voltaire and the former Macoute observed, even participated in, the execution of these orders. The Macoute personally arrested a returnee by the name of Sylvain Martin. Tr. at 417. Martin was arrested in October of 1978 because the witness had heard a "rumor" that he was a returnee. *Id.* After he was imprisoned and beaten at the Macoutes barracks, Martin was transferred to a larger prison in Cayes, and then to Fort Dimanche. Tr. at 418. He was never taken before a judge or given an attorney. Tr. at 423–24.

The witness registered those brought into the Macoutes barracks, and testified that he received two or three returnees per month. Tr. at 421.[62] Aside from Martin, the witness remembered the name of two other returnees who were arrested: Herman Landiche and LeShay Belford. Dx 58 at 65. Belford was one of several persons who attempted to leave the country in the same boat as Martin; they were all arrested at the same time. *Id.* at 61–64. Landiche was arrested upon his return to Cayes even though he had already been imprisoned at Fort Dimanche. Tr. at 422.

Although Voltaire did not participate in any arrests, he witnessed several events which demonstrate that detaining returnees is a widespread practice.

*I have a friend that is working on the wharf. I went to see him to discuss something personal with him. He told me that he could not speak to me that day because he was expecting a boat to come in, and that I should come to his home later.*

. . . . .

*I saw a bunch of S.D. in front of a boat with a whole lot of people handcuffed, tied with rope and handcuffed, and I asked the S.D. what the matter was with the people. He said, man, these are people that are making them talk badly about the President in all countries.*

*During that time I was interested and I went to talk to one of them that was tied up with a rope. I asked him where do you come from, and he said, "This boat was in distress, we had almost arrived to Miami and the boat was going to Port–au–Prince, and our food was finished, and they took us and put us here. Right now, this rope I am tied with is almost cutting into my hands." He asked me if he could give me his address to go tell his family that he had not arrived and that he was arrested in Haiti. I said no, as I left, I could not do him that favor.*

*I went home. As soon as I left home at 2 o'clock, I went to answer roll call. As I was passing by in the room of the musicians at Casserness Dessalines, where they hold rehearsals, I saw that very same man point his finger at me. He pointed his hand at me and told me that what are they going to do with him?*

*I said, man, I don't know, and I left. Tr. at 1973–74.*

Voltaire's observations are essentially uncontroverted. The State Department Study Team concluded that returnees are detained and questioned for some period of time upon arrival, often at the Casernes Dessa-

---

**62.** Although this might seem a small number, it should be noted that most returnees encounter Haitian authorities immediately upon their ar-

rival in the country, see discussion below, and not after they have returned to other areas.

lines. Dx 20 at 9–10. The interpretations of those actions differ, however. While the State Department concluded that the detention constituted only minor information gathering by Immigration officers, Voltaire saw it as apprehension of the Camoquin.

*I myself have lived the fact that the big trucks used to come back from the airport.*[63]

.　　.　　.　　.　　.

*(W)hen I was at the palace, sometimes on my way home I would stop at the Cassernes and sometimes I would see four or five trucks filled with people in the courtyard.*

*These people would come out of the trucks and sometimes they would have a chance to come with a radio. Some would come with other things.*

*This is one of the reasons why I took a chance, because I was curious as to what these people were doing in the Cassernes.*[64]

*I took a chance and spoke to one at the Cassernes and I asked them, "Where are you coming from?" and they told me that they came from Nassau, "And they started beating me up ever since." I glanced and I saw that they were in handcuffs. And when I saw that they were in handcuffs, the one that I spoke to, he told me that the handcuffs were hurting his hands.*

*As a soldier, you're not allowed to speak to (Camoquin), and these people are (Camoquin). I wasn't supposed to continue the conversation with them.*

*If I had been seen, I would have been judged in front of a court–martial.*[65]

The evidence presented at trial demonstrated that a substantial number of returnees suffered abuse following their initial detention. Two witnesses–Solives Romet and Merilien Mezius–fled Haiti for what they believed were political reasons. Both were living in the Bahamas for better than ten years before seeking to return to Haiti, and both returned voluntarily to aid ailing relatives. Tr. at 1120, 1179. Although both received permission to return to Haiti and assurances that they would not be mistreated, Haitian officials were waiting when they arrived. Their stories are identical in most every detail, and stated most succinctly by Merilien Mezius.

*As soon as I arrived and got off the plane, Immigration in Haiti took my passport. They called Mezius. I said present. They told me, sit down here.*

*After a few minutes, they called Cassernes Dessalines. When I looked around, the police car had arrived there. They took $1,700 from my wallet. They took my radio system, they took my suitcase, they took my clothes.*

*They went with me to Cassernes Dessalines.*

.　　.　　.　　.　　.

*It was when I arrived at Cassernes Dessalines they told me that my father was into politics, that they didn't believe that I could leave and come back to this country one more time, that God had sent me to them.*

*When they told me that, I didn't say a word. I just stayed there mute.*

*After a few minutes, they removed me from Cassernes Dessalines, they took me to Fort Dimanche.*

*When I arrived at Fort Dimanche, they started beating on me twice a day.*

Merilien Mezius, Tr. at 1180–82; <u>accord</u> Tr. at 1125–1130.

The ultimate issue here is what percentage of returnees receive the type of treatment experienced by Mezius. The defendants do not dispute that some returnees may encounter some form of governmental action; but they conclude that only a very *few* persons *may* face trials. This conclusion is founded on two broad categories of evidence: interviews conducted by the Team with returnees in Haiti; discussions with Haitian government officials. The interviews will be the subject of extended discussion below.

---

**63.** Tr. at 1946.

**64.** Tr. at 1954–55.

**65.** Tr. at 1946–47.

Officials of the Haitian government informed the Team that persons who had been actively involved in political resistance prior to leaving Haiti might be subject to prosecution before a security tribunal upon return, and that claims of asylum made abroad by those persons might be considered defamation of the Haitian Nation. Dx 20 at 12. In reaching the conclusion that this statement demonstrated a risk of abuse for only "a very small number" of returnees, the Team relied on two further representations. First, the Team noted that no cases had been brought or were pending before the security tribunal. Second, the Team accepted the notion that the average refugee "[b]y virtue of lack of education ... is viewed as politically unaware and therefore excluded from actual or potential participation in anti–government political activities." *Id.* at 12. The problem with these assertions, and therefore with the Team's conclusions, should be apparent.

The absence of trials of returnees from the security tribunal does not mean that no returnees have been imprisoned. The evidence at trial clearly showed that the Haitian legal system lacks any form of protections.[66] The logical conclusion from the absence of trials is that the returnees are being sent to prison following their initial questioning without trial. That is precisely the treatment given to Solives Romet, Merilien Mezius and many others. For example, one witness testified that during his two years at the National Penitentiary returnees sometimes "came from the Casernes by a group of 20, 15, and sometimes 30 in a day." Tr. at 472.

The Team's conclusion on what constitutes "political resistance" in Haiti is even more troubling. To the Team, only the intellectuals and the leaders of political parties would be so classified. The fallacy of this presumption is abundantly clear. The uncontradicted evidence at trial, evidence which the State Department has often recognized, demonstrates that the "political opposition" is quite broadly defined. Moreover, the Team's conclusion fails to consider the possibility that the claim of asylum itself may cause one to be classified among the political opposition. The Haitian Government conceded that an asylum claim may be regarded as defamation of the nation. The evidence is clear that returnees are regarded as traitors, and that asylum claims are regarded as an insult to the Duvalier government. In a country where talking bad about the government is a crime, those who have fled the country are considered guilty of making the rest of the world talk bad about the President. In this context the statements made by the Haitian government lead logically to a conclusion opposite from that reached by the Study Team–returnees who have claimed asylum encounter a substantial risk of abuse.

Nearly every person who testified regarding Haitian jails recalled observing returnees who had been incarcerated. Aside from telling the story of Serge Donetien, Marc Romulus testified regarding the population of Fort Dimanche during his stay there from 1974 to 1977. He stated that approximately 40 percent of the prisoners were there solely because they had requested asylum abroad, and slightly more than one–third of that group, or 14 percent of the total population, had been returned from the United States. Tr. at 89. Daniel Voltaire testified that during a disciplinary stay at the National Penitentiary, he spoke with about 20 persons who had been returned from the Bahamas. Tr. at 1947, 1953. Patrick Lemoine recalled the names of four fellow prisoners from his stay at Fort Dimanche whose only offense had been leaving Haiti. One of those men died while in prison. Tr. at 503–08. Paul DeJean brought the Court affidavits from an individual who, during 1979, was incarcerated at Fort Dimanche with two persons returned from Miami. Finally, Jocelyn Marcelus recounted the following story of a returnee brought to his cell in early 1978.

---

**66.** The State Department has repeatedly noted this lack of protection. *See* DX 34; DX 43;

DX 60. *See also* section III D *infra.*

*Q While you were in Fort Dimanche, did you meet anyone who said they had been returned from the United States?*

*A Yes.... Franklin Jocelyn.*

*Q Could you describe his condition when he arrived in your cell?*

*A The man was normal. He was in pretty good physical condition.*

*Prison finished with the men completely, completely.*

*Q When he arrived at your cell, did he appear to have been beaten?*

. . . . .

*A His whole body was covered with blood and he was totally disfigured in his face. His eyes could not be seen at all. His ears were swollen and his neck was swollen.*

. . . . .

*When he thought he was really going to die is when he got diarrhea and kept losing consciousness and with the things he was breathing into his brain.*

. . . . .

*He said while he was returned from Miami, accompanied by thirty–four people, he was the thirty–fifth. The other people, he did not know where they put them, but he, himself, this is where they put him.*

*He said that when he arrived, they blindfolded him and handcuffed him.*

. . . . .

*For myself, I don't know if he is alive or dead. But in the physical condition that I left him in, even if those criminals don't shoot him, he will die of disease, regardless.*

Tr. at 1281–88.

Although some returnees are released after their initial questioning, that does not mean they have absolute freedom. For example, Sebastian Francois testified that when he arrived in Haiti after deportation from the United States he was taken into custody, questioned for half a day, and re- leased. Tr. at 1888. Significantly, however, that was not the end of Francois' troubles with the Haitian authorities. He further testified to continuing suspicion: "those guys in the Tonton Macoutes ... kept questioning me and talking to me." Id. This testimony corresponds with Daniel Voltaire's explanation of what happens following the denouncement of a returnee:

*For example, people come from the United States and sometimes they don't arrest you right away. But five or six days later, nobody sees you. Your family never sees you.*

Tr. at 1970.

Constant Louis, whose encounter with the Macoutes is quoted at length below, apparently experienced the consequences of such a denouncement several days after his return to Haiti. Tr. at 1196–97.[67]

The pattern of harassment and abuse described in this section has been found by every group which has investigated the treatment of returnees, with the notable exception of the State Department. Michael Posner, Executive Director of the Lawyers Committee for International Human Rights, testified regarding a report his Committee is preparing for publication. Preparation of the report has involved interviews with eighty Haitians presently living outside of their country. On the basis of that research, he has concluded that "it is quite possible" that those who have claimed asylum will be considered to have defamed the Haitian Nation. Tr. at 1043. He further stated that "a significant percentage of [returnees who have claimed asylum] may be subject to the system of arbitrary arrests, prolonged detention [and] mistreatment." Tr. at 1042. He stated that asylum applicants would be viewed with considerable suspicion and, most troubling to him, confronted with a system of justice which offered them no protection. Id. at 1042, 1043–44.

**67.** His testimony did not mention any contact with Haitian authorities upon his arrival at the airport.

Amnesty International (AI), a group which State Department witnesses agreed was "quite reliable," Tr. at 848, has consistently criticized human rights practices in Haiti. *See* Px 334 at 273–81. Most notably, AI published two position papers in the fall of 1978 after the beginning of the speed–up of Haitian deportations in South Florida. In the first report, AI stated that, in view of conditions in Haiti, the United States should "not deport any of these persons to Haiti without fully assuring itself that they will not face imprisonment or persecution on their return." *Id.* at 275A. In December of 1978, AI issued its observations specifically on the treatment of returnees. Although it did not find that returnees were "systematically" abused, it did find cause for great concern.

> *Repeated assurances by the Government of Haiti that no retaliation will be taken are not persuasive in light of the evidence which (AI) has obtained, and we are concerned that many Haitian returnees and their relatives may be liable to arrest, detention, and persecution in Haiti.*

*Id.* at 277.

Against this wealth of evidence, only the statements of the Haitian government offer solace to returnees. But those statements clearly can be given little weight. Two of the witnesses at trial returned to Haiti only after receiving permission to enter the country, and personal assurances that they would not be harmed. Both were met with brutality. Past statements by the Haitian Government have not been carried out.

This court cannot summarily conclude that each and every returnee will be imprisoned and abused. The evidence presents a pattern one step removed from that. Returnees, particularly those who have claimed asylum abroad, will be greeted with great suspicion upon their arrival. The political climate in Haiti is such that they will most likely be viewed as opponents of the present regime. Given the Haitian legal system, that status means they face a substantial danger. Many will go to prison, their sole offense having been an attempt to gain asylum. In prison, many will be beaten, perhaps even tortured, and some will die as a result. See Section III B *infra.* Even those who are not imprisoned will not be entirely free. They will undergo harassment, and live with the continuing threat of a midnight visit from the Macoutes.

### 2. The State Department Report.

The State Department Report stands out in stark contrast with all other evidence presented on the treatment of returnees. It is the only evidence suggesting that returnees are not mistreated. The defendants relied upon the Report during the hearings on the preliminary injunction to argue that the plaintiffs would suffer no irreparable injury if returned to Haiti. Again, at trial, the Report served as the defendants' sole evidence on the treatment of returnees.

The State Department organized the mission to Haiti for the purpose of reviewing "the situation of these [Haitian] returnees and to assure continued conscientious observance of U. S. obligations under the United Nations Protocol Relating to the Status of Refugees . . . ." Dx 20 at 1. The goal of the mission was to develop as much information as possible through face to face interviews with returnees on the situation surrounding their return to Haiti. This information was then, in turn, to be used by the State Department in reviewing political asylum claims filed by Haitian refugees. Tr. at 735. In addition, the Team held two days of discussions with Haitian officials.

Based upon the data collected during a twelve day mission, the State Department issued a Study Team Report reaching two conclusions on Haitian refugees. First, the report concluded, there was no evidence of a pattern or policy of mistreatment or punishment of returnees from the United States. Second, it concluded that Haitians come to the United States for economic as opposed to political reasons.

Despite the honorable intentions of the State Department and the Study Team members, the conclusions drawn by the Team lack foundation. The statements

made to the Team by members of the Haitian government, as noted above, lead inexorably to the conclusion that returnees face great danger. The evidence obtained through interviews with returnees is neither reliable evidence on how they were treated nor an accurate predictor of what would happen if the plaintiffs should be deported.

The idea of a Haitian human rights assessment project originated within the State Department's Bureau of Human Rights and Humanitarian Affairs. In light of allegations it began receiving on the mistreatment of Haitians upon their return to Haiti,[68] the Bureau became concerned with whether its own information was reliable. Tr. at 719. The United States Embassy in Haiti had conducted a limited follow-up investigation on returnees in the Port-au-Prince area; however, there was no available means of verifying the treatment or mistreatment of returnees in outlying areas. Following discussions between the Bureau for Human Rights and Humanitarian Affairs and the Inter-American Affairs Bureau, the decision was reached to send a team of State Department personnel to Haiti. Tr. at 719-721.

Patricia Darian, Assistant Secretary for Human Rights and Humanitarian Affairs, selected six members of the State Department to be members of the Study Team.[69] Tr. at 723. In preparation for the mission, several of the Team members and Secretary Darian held a number of organizational meetings in which they discussed the method for collecting the data sought by the Team. Px 310, Vol. II, at 39-40. They decided to conduct face to face interviews with returnees in Haiti.

In April of 1979 further meetings were held with nongovernmental human rights organizations. Px 331 at 65, 67, 71. As a result of the criticism and opposition to the Team's proposed trip voiced at these meet-

ings, the mission was postponed until further meetings could be held with groups in Florida. Tr. at 724, 725, Px 275, Px 276, Px 310, Vol. II, at 32-34. The groups in Florida also opposed the proposed mission. Their primary objection was the likelihood that the lives of the individuals interviewed would be placed in jeopardy once the Team departed Haiti. The criticisms of other organizations centered more around the methodology the Team planned to utilize. Specific criticisms and recommendations were made by two prominent organizations: Amnesty International [AI] and the Lawyers Committee for International Human Rights.

Michael Posner, Executive Director for the Lawyers Committee, advised the Team to reconsider their plan to interview returnees. In his experience, he had found it very difficult to obtain accurate information from Haitians because they were often extremely cautious and suspicious, particularly of persons in positions of authority. Posner stated in a letter to Robert Maxim, Human Rights Officer for the Bureau of Human Rights and Humanitarian Affairs, that "[i]t is quite possible that you will find some of these people are unwilling to speak to you, while others may tell you things that are in fact not true in order to protect themselves from perceived future reprisals by the Haitian Government." Px 275 at 1. In addition, he suggested emphasis on areas of inquiry, including in-depth discussions with United States Embassy officers presently monitoring returnees and an investigation of the procedures used by the Haitian Immigration Department for handling returnees. He also suggested an inquiry into the role of Weber Guerier, former Commandant of Fort Dimanche, now reportedly the Chief of the Haitian Immigration Department. Px 275 at 2.

Stephanie Grant, Director of the Washington Office of AI and an expert in the

---

**68.** These reports were furnished by organizations including Amnesty International, International Commission of Jurists, Anti-Slavery Society and the Ad Hoc Committee to End Repression in Haiti, Tr. 664-665, 668.

**69.** The following people comprised the Study Team: David Martin, Bob Maxim, Lawrence Arthur, Phil Chicola, Chris Norred and Edward McKeon.

area of human rights research, attended one of the Team organizational meetings. Px 331 at 2–4, Tr. at 723. In a letter to Maxim subsequent to this meeting, Grant related four specific areas of concern with the proposed Haitian mission. First, she pointed out that the treatment of returnees in the past is not a conclusive predictor or indicator of the policy towards present returnees, especially those who have sought political asylum. She suggested that a more reliable predictor of treatment of returnees would be the present policy and practices of the government with respect to returnees and the present law in this area. She also expressed her concern with the method chosen by the team for the collection of data, that is, face to face interviews with Haitian returnees. She also pointed out that inherent problems lie in the use of a self–selected sample. Due to the sensitivity of the matter, she therefore recommended that the State Department publish their results only if they were confident that the investigation had yielded adequate data on which to base a conclusion of a clear pattern of treatment. Further, the letter contained a strong recommendation for obtaining the fullest assurances that interviewees would incur no repercussions for speaking with Team members. Finally, she stated that the proposed 30–60 minute interviews were inadequate to retrieve reliable and accurate information. Px 276.

These suggestions and recommendations went unheeded.

> We took account of the concerns raised. They were valid ones, about the ability of people in our situation to come rolling into a town in another country and elicit accurate information.

> We were aware of the concerns made. We did not incorporate all of the suggestions, but we worked hard on developing the series of questions we were going to use, and deal with the concerns as much as possible.

> We decided to be explicit about our procedures in the final written reports. We were aware of some of the drawbacks in that kind of venture.

> David Martin, Tr. at 725.

> Q Is it your testimony that prior to the mission's departure to Haiti you discussed with other members of the mission possible alternative approaches to assessing the treatment accorded Haitian Nationals returned to Haiti from the United States?

> A Well, I'm not certain whether the word "alternatives" is really the appropriate word to use. Discussions were held as to a number of concerns that were raised regarding the proposed trip. I don't think that there was any intention, since it had already been decided that a trip would take place and that it would be the best way of eliciting information as to the treatment of the returnees. There were discussion as to how that would be most effective. I don't recall that there were any alternative methods of obtaining that kind of information. Lawrence Arthur, Px 310, Vol. II at 39.

In the face of grave opposition to the mission, the Team traveled to Haiti on May 10, 1979 with a list of 600 names and addresses of Haitians returned to Haiti from the United States and a list of 100 names of those returned from Guantanamo. Tr. at 737–38, 743. The list was compiled by INS and supplied to the State Department by the Justice Department; the list contained the names of Haitians returned from the United States during 1977, 1978, and early 1979, and others returned from Guantanamo in September of 1977 and August of 1978. Dx 20 at 5, Tr. at 736, 737, Px 310 at 138.

The first two days of the mission were spent in meetings with Haitian government officials. Dx 20 at 4, Tr. at 736. It was during these meetings that the Haitian officials related their policy on returnees. Haitian officials stated that the emigrants are "generally allowed to depart freely from official custody, within hours of their return to Haiti, following processing that is limited to filling in a brief questionnaire." Dx 20 at 12. The Haitian government believed that most Haitian nationals who departed Haiti illegally were motivated en-

tirely by economic factors and the government had little interest in these people, as a group. The Haitian government did point out that there were Haitians in the United States who had been actively involved in "political opposition" to Duvalier and would be subject to "prosecution" upon return. In fact, Officials went so far as to say that the government would "feel obliged" to take action against "real opponents" even at the risk of intense international criticism. Dx 20 at 11–13, Tr. at 161, Dx 49 at 82.

Following these meetings, the Team split into two groups, with one traveling to the provinces in North Haiti, and the other to South Haiti. Tr. at 736. Edward McKeon, a Team member, served as the interpreter for one group, and the wife of the Country Desk Office (A Haitian National) was the interpreter for the other group. Tr. at 734, Px 310 at 172. The groups spent approximately five to six days interviewing returnees in the outlying areas of Haiti before rejoining in Port–au–Prince. Tr. at 936.

The list of returnees was broken down by geographical areas between the two groups. Each group excluded the names of individuals in remote areas and made no attempt to locate them. The groups then traveled to areas in which they felt the greatest number of returnees could be located. Tr. at 138–39. For example, Lawrence Arthur testified that his group's list of returnees originally contained 200 to 300 names and that 100 to 250 of the names were eliminated because they were not accessible. Out of the names remaining, the group attempted to locate 35 to 50 returnees. Tr. at 138–41. The other group attempted to locate 65 to 70 and was successful in contacting approximately 50 to 55. Dx 49 at 61.

*Well, your usual practice–it varied a little bit. It is laid out in the report.*

*I suppose the most common method was to take the address we had and ask people where the street or region of town was and go to the area and simply ask questions. "Do you know so–and–so, where do they live". We would have two*

*or three names and we would ask about that and frequently were able to find them through those names.*

*The other way we used would be, sometimes, to go to the local community figure such as a priest and ask that person's help in locating the individuals. There were other ways also.*
*David Martin, Tr. at 744.*

On two occasions, once in the North and once in the South, messages were broadcasted over the radio announcing the names of the returnees sought to be interviewed and requesting them to meet with the State Department Team. Tr. at 789–90.

*The announcement was in Creole and I believe it said–it would say something like, "Attention, attention. For the following people, the American Consul is in Port de Paix and wishes to speak to you about your trip to America. Please contact the radio station," and then it read a list of names of people from that area. Edward McKeon, Dx 49 at 71.[70]*

Once contacted, each returnee was interviewed according to an established outline. One Team member asked the questions, the interpreter translated the question and then the answer. Notes were recorded in English by the interviewer. Tr. 749, Px 310 at 171.

Each interview followed the same procedure. First, the interviewer explained the nature of the mission and promised that any information provided would be kept confidential. The respondents were then asked identifying demographic questions including name, age, occupation, and family information. Then each was asked a series of questions designed to have the interviewee relate chronologically his or her departure from Haiti, arrival and treatment in the United States or Guantanamo, and their return to Haiti and treatment upon return. The interview ended with an instruction to contact the United States Embassy should they incur any reprisal for speaking with the Team. Dx 20 at 6–7, Tr. at 745, 746.

---

**70.** The other broadcast was less obtrusive. It asked people named to "Please come to the local church, the priest has a message for you." PX 331 at 79.

The length of each interview averaged approximately 20 to 30 minutes with some lasting more than one hour. Px 310 at 42, Dx 49 at 61.

Eighty–six returnees were interviewed. Family members of 11 returnees "who were not themselves immediately available when the Team was in their area" were questioned. Dx 20 at 7. Thirty of those interviewed had returned from Guantanamo. Tr. 739.

The collection of data on human rights violations is a delicate process. It is especially delicate when the sources of the information are the very ones who may have suffered the violations, and are consequently reluctant to recount their experiences. The process is complicated even more when those persons remain subject to reprisals. These problems are compounded when the interviewees are Haitian–people who are by their very nature secretive and suspicious, and who are by experience fearful of their government. Exhibit 23 to Px 331, Px 275 at 1. The State Department project fell considerably short of dealing with this delicate process with any amount of expertise. Specific criticisms of the research are discussed below.

### a. *Composition of the Study Team.*

The selection of interviewers is critical to survey research. Interviewers must be able to establish a relationship of trust with the respondent. If the respondent is unable to confide in the interviewer, especially when there is a risk of reprisal, then the interview results will be inadequate. Linguistic skills, for example, are particularly important because reliance upon an interpreter complicates communication and discourages trust. Exhibit 22 to Px 331 at 32. Moreover, the interviewer must be perceived as neutral, with no allegiance or connection to the government being investigated. Px 331 at 29–30. Amnesty International, a group with a great deal of experience in human rights research, selects researchers on the basis of knowledge of a particular country or region, linguistic skills, and ability to arrive at objective judgment. Exhibit 22 to Px 331 at 28.

Great discrepancies in the status or characteristics of the researcher and the subject may inhibit the researcher's ability to elicit information; on the other hand, studies indicate that interviewer–respondent similarity increases the validity of interview data. Discrepancy in race has been found to inhibit responses from blacks when interviewed by whites. Exhibit 23 to Px 331 at 21–22.

The composition of the State Department Study Team reflects a critical lack of expertise in human rights and social research. All six members were white males with no training in survey research; this has special significance in Haiti, a country with a long history of racial distrust. None of the Team, with the exception of McKeon, had any significant prior contact with Haiti, any particular knowledge of the country, or any linguistic skills in Creole. Perhaps more important, the Team represented a Department of the United States–the primary supplier of aid to Haiti, Dx 49 at 80, and the same government which had threatened these returnees with "life imprisonment" and returned them to the watchful eye of Duvalier.[71]

It is hard to imagine two groups more dissimilar than the Study Team members and the Haitian returnees. The Team members were white, in positions of authority, well educated and unable to communicate without an interpreter; the returnees were black, poor, and uneducated. In a situation in which the interviewer must be viewed as trustworthy, neutral and objective, these differences could serve only to thwart efforts to adduce information of the delicate nature sought.

---

71. Stephanie Grant of AI, an expert in human rights research, suggested that it would be hard for the Haitians to distinguish between the Team members and the INS officials in Miami; the result of the earlier encounter was return to Haiti. PX 331 at 87. The court agrees with this observation. Coming from a country with a one person government, it must be difficult for Haitians to conceptualize a government with autonomous departments.

b. *The Sample.*

The returnees interviewed by the Study Team are not a representative sample of the entire returnee population. The Team attempted to locate only 17 percent of the people on the INS list. Therefore, only 12 percent of the returnees were interviewed and only 9.3 percent of the Haitians returned from the United States were interviewed.[72]

The response rate was characterized by AI's Stephanie Grant as "entirely unrepresentative." The Court agrees. The returnees interviewed were not a large enough group upon which to base a conclusion on no "pattern" of mistreatment. A response rate of 12 percent is simply too low to form the basis for the sweeping conclusions found in the State Department Report.

The sample was unrepresentative not only because of the low response rate, but also, and perhaps more importantly, because it was self–selected. Inherent problems exist in using a self–selected sample because only the people who are willing to speak about their experiences volunteer to be interviewed. Those with the most traumatic experiences are the least likely to volunteer their stories.

This inherent problem reveals a critical flaw in the Study Team research methodology. The Team depended upon persons who reportedly had been physically punished to *volunteer* to tell another governmental body–a government friendly with their own–about those abuses. Moreover, the Study Team depended upon these persons to volunteer at the risk of reprisal by their own government. Logic dictates that people who feared reprisals would simply not volunteer information or would lie to protect themselves.

The Study Team attempted to explain away this failing. They reasoned that even if the allegations of returnee mistreatment were true and people were afraid to talk

because of the threat of further reprisals, there would always be someone brash enough to speak out. Dx 49 at 89. Yet, when someone did speak out, the Team treated his case as the exception--an isolated instance of abuse.

Returnee "X" was interviewed. He mentioned nothing about being beaten. In subsequent interviews with other people, accounts of the beating of "X" were reported. The Team went back to "X" and in a secret interview learned his story. Tr. at 750. At least one conclusion which could have been drawn from that experience was that returnees were simply not willing to report their mistreatment because of the risk of retaliation. The Study Team, however, chose to treat this as an isolated instance of abuse.

In addition to these problems with the sample of returnees interviewed, the method used to locate returnees posed problems. Returnees were not provided with anonymity. The use of public inquiry and radio broadcasts focused attention upon the returnees and alerted the local Tonton Macoutes to the people the Study Team sought to interview. In light of the political conditions in Haiti, such exposure would certainly be unwelcomed by returnees and may well have inhibited truthful responses. The Study Team apparently did not recognize or appreciate the danger of public exposure. The Team members did not even discuss the dangers that radio broadcasts might pose. Px 310 at 145, Tr. at 792. The Team even failed to inquire into the ownership (governmental or non–governmental) of the radio stations used for the announcements. Dx 49 at 71, Px 333 at 72.

One of the most serious defects in the selection of the sample, and one this Court finds critical, was the failure of the Team to determine if any of the returnees were in prison. Px 331 at 20, Tr. at 856. The allegations which prompted the mission

---

72. These calculations are based upon the testimony of McKeon and Arthur. McKeon testified that his group attempted to locate 35 to 50 returnees; Martin's group attempted to locate 65 to 70. Taking the witnesses' highest estimate, a total of 120 returnees were sought for interviewees–17% of 700. Eighty–six returnees were interviewed, 12% of 700, and 56 of these returnees were from the United States, 9.3% of 600.

stated that returnees were being transported to Caserne Dessalines where some were mistreated or imprisoned. Would not the prisons be the first place to seek returnees, especially if the returnee may have been viewed as a "political opponent"?

### c. Assurances to Returnees.

Assurances that interviewees would not be punished for speaking truthfully is essential to obtain accurate data on mistreatment. See Px 331 at 20. Notwithstanding a strong recommendation by Amnesty International and the expressed concern for the safety of returnees by other organizations, the Study Team secured no formal guarantees or written assurances from the Haitian government that returnees would not be punished for supplying information. Px 331 at 20. What is more disturbing is that the Team did not even discuss the need to obtain written assurances. Px 333 at 98. This failure suggests a real lack of understanding of the regime under investigation.

The record does indicate that the Haitian officials agreed to let the surveys take place without governmental presence or participation.

*Q When you met with the Foreign Minister, did he give you assurances that returnees were not being mistreated?*

*A No. He wasn't asked for assurances, and he didn't give any.*

*Q Did he give you assurances that the people the Team met with would not be mistreated?*

*A He gave me assurances that the Team would receive the fullest cooperation from the government.*

*Q Was he specifically asked: The people that we talk to, can we get your assurance that they won't be mistreated when we leave? Was that topic brought up?*

*A I don't recall that it was.*

*Q Do you think the Team did, in fact, receive the full cooperation of the Haitian Government, as he said it would?*

*A Yes.*

*Frazier Meade, Dx 20 at 4.*

Because no specific guarantees were obtained from the Haitian Government, the Team could relay to interviewees only the assurances that the government had agreed to cooperate fully with the survey efforts and that they were unaccompanied by anyone from the Haitian government. Tr. at 747. Such an assurance could well have worked to the Team's disadvantage. If the Haitian government was perceived as supporting the Team's efforts to collect information, there could have existed a basis for distrust and perhaps fear of the Study Team. Returnees may have reasoned that if the government trusts the Study Team, the Team should be distrusted.

In any event, it is rather doubtful that any assurances from the Haitian government would have been taken with confidence by the returnees. Only assurances from Duvalier would have had the force of law, and from past experiences, the people would have had little or no confidence in a promise by Duvalier. In a country where there exists no judicial system outside the major cities, where "justice" is carried out on a local level by the Tonton Macoutes, and where violations of human rights is notoriously widespread, a promise from the government or even Duvalier would have been meaningless.

The record indicates that the Haitian government's promise of cooperation and no surveillance was not kept.

*Q Could you explain to the Court the description of how they interviewed the people?*

*· · · · ·*

*· A The people were sitting at three tables. The investigators were sitting with the person. The others were sitting with some other people. And they were questioning them.*

*There was a guy by the names of Jean Claude Pierre Louis. He is the Assistant Commander of the Tonton Macoutes. He is the correspondent for the national radio, which is the government radio station. He was there to listen to the people's statements and write them down and send them to the national radio.*

*· · · · ·*

*Q Did you observe as to whether or not he was anywhere near the interviewers while they were interviewing the returnees?*

*A Yes, he was there, because he was listening to what the people were saying and writing it down to send it.*

*Q You stated that there were three different tables?*

*A Yes. He was going back and forth, back and forth. He was trying to hear a little bit of everything that was being said.*

*Q ... How do you know this gentleman was a Tonton Macoutes?*

*A Because I saw that sometimes he wore a Tontons Macoutes uniform and I have seen him sitting at his office.*

*Q Do you know if other people were afraid to talk because he was there?*

*A Yes.... I arrived at 8 o'clock in the morning.... When I got there, I was standing waiting my turn because they started questioning others. After that, after those had spoken, they kept on calling our names.*

*Besides that, there were people that had got there and became afraid to talk because they saw the assistant of the Tontons Macoutes was present. They knew what they were stating, the assistant to the commander of the Tontons Macoutes would write it and send it to the national radio. They were afraid that he would take their names and put it before the President.*

*Q Why were they afraid of that?*

*A They were afraid of being arrested.*
Sebastien Francois, Tr. at 1866–1867, 1871.

The assurances that were provided by the Study Team were given at the *conclusion* of the interview. The interviewer "requested" that the returnee contact the United States Embassy if the returnee "met with harassment" as a result of speaking with the Team. Dx 20 at 7. No specific information was provided on how to contact the Embassy nor were any names of particular Embassy officials provided. Px 333 at 96, Tr. at 748.

Assurances to returnees that they would not be harmed was necessary to motivate truthful responses. Fear is not easily overcome, and telling a person that if he or she is mistreated they can report it to the Embassy of a foreign government does absolutely nothing to quash that fear. Retaliation by the Tonton Macoutes or other government force would be quick, and perhaps final; there would be no chance to travel to the Embassy in Port–au–Prince to *prevent* the retaliation. Once the incident occurred, what good would reporting it to the United States Embassy do? Probably nothing more than provoke another, and perhaps more serious, confrontation with the government. In any event, because the assurances were offered at the end of the interview, they could not have motivated truthful responses during the interviews.

Not only were adequate assurances not obtained, but no follow–up program was conducted by the State Department to determine if interviewees were in fact, harassed. Px 333 at 88–92.

*After that (the Study Team interview), particularly in Haiti when you do an interview like that with a delegation, they always come by and question you, to find out what it was that you said, and when that happens, you are a person that is like, you know, unbalanced, because you may be sitting there and they come and arrest you.*
Sebastien Francois, Tr. at 1889.

An effort to follow–up and re–interview these returnees was attempted by a nongovernmental group, and the results were alarming.

Raymond Alcide Joseph, publisher of the *Haiti Observateur*, in conjunction with a television station, sent underground reporters to re–interview some of the returnees the State Department had interviewed. The purpose of these follow–up interviews was to determine whether the interviewees had met with any mistreatment as a result of their conversations with the Study Team.

*A ... (A) major television station here was concerned about the State De-*

partment report, and came to ask, because they know we have underground reporters in Haiti, and said let's work together to find out what happened to these people. We will foot the bill.

We sent our reporters to talk to some of them. In everyone—they went to about five people, they said we cannot talk to you because we have been told not to say anything. And they have tried to find out who told them; and they would not answer.

They said, we won't talk to you at all.

Q Have you received any other reports concerning either the fate of returnees or the fate of those persons who have spoken to people who have come to Haiti to investigate matters concerning the conditions in Haiti, for example, in terms of the OAS (Organization of the American States)?

A In the OAS—that's something else. People who have spoken to the OAS—quite a few of them have been arrested after that, two months after the OAS left Haiti. A house was machine—gunned, because some of the people in there—they were young people—had spoken to the OAS. And three of them were killed. This is a matter of record, newspaper record, at least.

Q Now, the OAS reports and those incidents occurred prior to the time the State Department—

A Yes. That is between the OAS and the State Department Team visit to Haiti.

Tr. at 310–11.

Sebastien Francois was forced to flee from Haiti as a direct result of his interviews with the Study Team.

Q Did anything happen to you subsequent to your interview by the American Study Team?

A After that, the Tonton Macoutes called me into the office to question me. He called me approximately three times. He kept on questioning me and kept asking me what kind of secret story I was discussing with the delegates, and why was it that he could not listen to it.

I had to tell him—I told him it was nothing important, he was just asking me information which I gave to him.

He asked me if I was not afraid of what could happen to me, so that if I did not really tell him what happened, he could cause something to happen to me. It was after that that I became afraid, and I exiled myself.

. . . Exiled myself. That is how come I went into hiding until I managed to leave. I knew they were looking for me.

They hid me and my family sent word to me to go to such—and—such place so I could leave, because they were looking for me, to arrest me. . . .

Q When you had the interviews with the Tonton Macoutes, did he say to you why he was interviewing you?

A Yes. He said that to me, that he would like to know what serious matters I was discussing.

. . . . .

He said I was saying bad things about Haiti. He said that I was speaking of the government, and that is why he was so interested in me, and was I not afraid of what could happen to me. . . .

He asked me, wasn't I afraid they would throw me in jail and never release me, or even kill me.

The first time he spoke to me he said he was going to talk to me seriously, and I had to tell him, and if I didn't want to tell him, anything could happen to me. He said that I had to tell them truly what I was discussing with the man.

He called me many times to his office.

. . . . .

Q On the day the Americans came, did you speak to the Americans at any time alone, even if it was for a few minutes, and outside of the presence of the Macoutes?

A Yes.

Q But was it for a short period of time?

A Yes.

Q Okay.

*A That is exactly what caused him—like, because he saw—he was even upset with the person that was talking to me. After that he was quite angry and told me to stop by his office, and I did not stop by, and the next morning he saw me going by in a car. He stopped me and he asked me was I not afraid, and didn't I fear after he told me to stop by his office and I did not stop by, and who was I that he had told me to stop by his office, and who was I not to.*
*Tr. at 1905–11.*

### d. The Interviews.

The interviews of the returnees were not privately conducted. "Most interviews . . . were held in a relatively private setting, although in a few instances privacy could not be arranged and the interview was held within earshot of a number of bystanders." Dx 20 at 7. Because the Team became the focus of attention as soon as they arrived in a village, the interviews were held while curious and interested villagers (and perhaps others with motives more than mere curiosity) stood nearby. Tr. at 1880.

*Q Now, is it true that you weren't able to have total privacy in the interviews you conducted?*
*A Yes.*
*Q Why is that?*
*A Well, I would say it was because the towns we went to were very backwards and anything outside of the day-to-day routine is an event. And our presence was an event.*
*Q Would townspeople kind of hang around to just observe?*
*A They would hang around, yes.*
*Edward McKeon, Dx 49 at 61.*

The lack of privacy could only inhibit responses. These people were asked to reveal mistreatment by their government; such statements would shed an unfavorable light upon Duvalier, something which Haitians know could be dangerous. What is more, they were asked to make these statements publicly. Even if the respondents

felt they could have trusted the members of the Team, it is not at all clear that they felt they could have trusted other members of the village.

*Q Approximately how many people were there being interviewed by the American Team?*
*A Oh, there were a lot of people.*
*Q Could you give us a rough estimate of how many?*
*A The number of people?*
*Q Yes, approximately.*
*A There were approximately 30 or 40 people. But there were a whole lot more that were afraid to come. They were afraid by that business of Tonton Macoutes, because if they had seen them talking they could later on call them to the office and ask them about the questions they were being asked.*

. . . . .

*Q During the time that you were at the hotel that morning, how many Haitians did you personally see talking to Americans?*
*A I saw people standing, but I did not take notice or count how many people talked, because they came with a list. They had called the names of a number of people to appear. Some they found and some they did not find.*

*They asked where the other people were, and some people answered. They said they did not know which way they went. They did not know if they were there or had gone with the number of people that they had cited that they had wanted to see. They could find approximately three out of those, because I think when they came, they called the names off of 20 or more people. . . . Perhaps they found maybe three, and they asked where the rest of the people were. They could not find them. They could not do anything.*
*Sebastien Francois, Tr. 1868, 1883–85.*

The length of the interviews was totally inadequate to gather reliable information. Each interview lasted 20 to 30 minutes,[73] Dx 20 at 7; the use of an interpreter re-

---

73. The Report indicates that in "many cases" the Team devoted "up to several hours," with their initial contact, explaining the nature of the mission.

duced the interview time by one–half. Px 331 at 88. Therefore, the actual time spent exchanging information was 10 to 15 minutes. It is difficult to believe that within the span of 15 minutes the Study Team interviewers could gain the confidence of a returnee to the extent that he or she would provide life threatening information to total strangers, and also gather a complete story of the returnee's experiences. The experts with whom the Team consulted considered two hours the minimum amount of time necessary to elicit truthful and complete information. Px 331 at 36–37.

Not only was the length of the interviews inadequate, but the questions asked were not designed to provide a method to check the truthfulness of the returnee's responses. In survey research, one question which requires the respondent to provide "threatening" information which can be verified, should be asked.[74] This provides an objective method to check the accuracy and truthfulness of the responses. The Team did not intentionally include such a question. However, Stephanie Grant testified that there was an accidental accuracy check in the questions asked: whether the respondents applied for political asylum in the United States.[75]

Every returnee interviewed answered that they had not applied for political asylum. Yet, the Report indicates that the State Department knows that some of the

returnees did apply. Dx 20 at 9. Unfortunately, the State Department has conducted no follow–up to determine which returnees filed and which did not. The Department has failed its one (accidental) opportunity to verify the truthfulness of the interview responses.

Because the Study Team was gathering information from people of another culture, the questions should have been designed to compensate for social or cultural responses. They were not. For example, two social researchers collecting data from Haitian villagers concluded that Haitians will distort their histories to give the impression that they have not deviated from the cultural ideal. Exhibit 23 to Px 331 at 39–40. The State Department's conclusion that Haitians come to this country solely for economic reasons was based upon the responses to the question of why the returnees left Haiti. The response given was that they wanted to find a job. This may well have been the response the Haitians thought the researchers wanted to hear and the response which they thought would deviate least from the American, and perhaps the Haitian, cultural ideal. Only careful questioning could have distinguished between a true and a cultural reply.

e. *Conclusion.*

In short, the State Department Study Team members did not achieve the goal

---

[74] Questions characterized as "threatening" require the respondent to give personal information which he or she might not want anyone else to know. Exhibit 23 to PX 331 at 23.

[75] Perhaps the most extraordinary thing is, none of the points I mentioned so far, but that no accuracy check was built into the questions.

It's normal practice in any survey work to put in one question which is designed to provide an answer which can be checked. Mr. McKeon did obviously endeavor to do this.

He asked the name of the father. And he explains very intelligently, that in a society in which many children are born of parents who were never married, the name of the father would never be known.

This, as I understand, was to check for imposters, people presenting themselves who were not returnees. I would not see this an accuracy check for our purposes.

It would come under the category of non–threatening information, the name of the father.

As it happens, there was an accuracy check in the questions, but it seems to be one which was accidental, and, that is, that we know that a portion of the 86 had sought asylum. We also know that none of the 86 had admitted seeking asylum.

Therefore, on the one issue, where it's possible to assess whether the replies were–I don't want to use the word truthful. I want to use the word adequate, or comprehensive, the answer is, they were not. Stephanie Grant, PX 331 at 91–92.

they set out for. They failed to obtain accurate, objective information on the treatment of returnees, and failed to comprehend the implications of that which they did learn. Ultimately, their conclusions can be given little weight, and do not provide a substantial contradiction to the pattern of mistreatment shown by the evidence.

## B. *Haitian Prisons: Persecution Exemplified.*

To be marked as a political opponent in Haiti is to be sentenced, in most cases, to prison. In each of the stories told to this Court, the conclusion was death, flight, or imprisonment. The full consequences of opposition, therefore, are only revealed by examining the treatment of prisoners in Haitian jails. These are the conditions to which returnees are exposed when deemed part of the political opposition.

*Fort Dimanche Prison, where I was incarcerated, myself, where I lived with prisoners which were deported from the United States, we lived in cells measuring nine square meters or ten square meters—square feet, pardon me.*

*The cells kept between 22 and 33 prisoners. These prisoners are detained in the nude, with no medical help. The receive a totally abject food.*

*At night no prisoners were allowed eight hours sleep. The absence of necessary vital space obligated them to rotate in order to lay down.*

*This great promiscuity, and the absence of medical care, condemned to a certain death, the majority of the prisoners. They suffered from tuberculosis, malnutrition and even vermin got them.*

*At the prisons, a great percentage of the prisoners died either of tuberculosis or the consequence of torture or wounds inflicted during their time there. Another method of torture utilized at the prison was that at night the cadavers were not buried. They were devoured by dogs in the back of the jail and the sinister barking of the dogs would take sleep away from all prisoners.*

*I could describe more definitely the conditions of tension, but I can only tell you, simply, that only during the year 1976, from a number of 150 prisoners, 96 died at that prison.*
Marc Romulus, Tr. at 81–82.

There are three major prisons in Haiti, as well as a network of local jails. The major prisons are Fort Dimanche, Cassernes Dessalines, and the National Penitentiary. Of these three, by far the most notorious is Fort Dimanche. It was referred to by witnesses as a place of execution, Tr. at 455, and has a history of unrivaled cruelty dating to the first days of the Duvalier regime. *See* Px 334. The common presumption among the people of Haiti is that when someone is sent to Fort Dimanche, they will not be seen again. Tr. at 1194, 1221. According to the Duvalier government, Fort Dimanche was closed in 1977. The State Department failed to confirm this assertion when a study team it sent to Haiti did not request permission to visit the prison. *See* Tr. at 856. The testimony at trial clearly showed that Fort Dimanche remains open. One witness who had held various positions in the Haitian armed forces, including employment at Fort Dimanche from 1969–71, testified as follows:

A The prison at Fort Dimanche is a prison for political prisoners and a place of execution.
Q What year did you leave Haiti?
A February 8, 1979.
Q Was it your understanding that Fort Dimanche is still a prison for execution and a political prison?
A Yes, to this day.
Anonymous # 2, Tr. at 455.

Jocelyn Marcelus testified at trial he was imprisoned at Fort Dimanche until March 17, 1979. Tr. at 1255. There was also testimony regarding two persons who reported that they were imprisoned at Fort Dimanche during 1979. *See* Tr. at 2055–57; 2076–77; 2085–87.

The prisons of Cassernes Desslaines and the National Penitentiary are fundamentally the same as Fort Dimanche. While the Cassernes was described as a place for in-

terrogation, Tr. at 460, it is clear that interrogation in Haiti is normally accompanied by physical abuse.

> *Serge Donetien is a young peasant. He came to my cell at Fort Dimanche during August 1976. He was coming from the torture chambers at Cassernes Dessalines, where he was covered by wounds.*

Tr. at 83; *accord* Tr. at 1946.

And while the National Penitentiary had somewhat better facilities for military personnel sent there for disciplinary purposes, Tr. at 1944–45, others were treated so badly that they died. Tr. at 1945.

> *Q While you were held as a prisoner at the National Penitentiary, did you have any contact with people who had been returned to Haiti from the Bahamas?*
>
> *A Quite a few people I saw.*
>
> *Q Were these people being held prisoners?*
>
> *A Yes, they were held as prisoners.*
>
> *Q Can you describe the physical condition of these people that were from the Bahamas?*
>
> *A ... These people are being taken such bad care of that they have boils on them....*
>
> . . . . .
>
> *They sometimes died.*
>
> . . . . .
>
> *Every morning the ambulances would come from the General Hospital and pick them up. They would find them dead on the floor sometimes.*
>
> *If you don't have between 1,000 and 1,050 dollars to pay, you stay in jail.*
>
> *Either they die or they transfer them to another prison.*

Daniel Voltaire, Tr. at 1944–45.

The conditions in Haitian jails are inhuman. There is almost never sufficient room for the persons in a cell. Single persons are placed in individual cells as small as two feet by three feet, Tr. at 1131, and ones in which they can neither sit nor lie down, Tr. at 1183. Larger cells are overcrowded. Marc Romulus was held in a ten foot by ten foot cell containing between 22 and 33 persons, so crowded that they had to sleep in rotation. Tr. at 81, 97. One witness lived for two years in a twelve foot by twelve foot cell with as many as 40 persons. Tr. at 470–71. The testimony of all the witnesses was substantially the same. *See* Tr. at 512, 1279. Aside from the absence of space, the cells also lacked sanitary facilities. Prisoners were provided with metal cans for toilets, *see* Tr. at 1225, 1255, or else they were provided with nothing at all, Tr. at 1132–33, 1187–88. The food was inadequate; most of the witnesses described having one meal a day of watered–down corn meal. *See* Tr. at 515 (practically no food at Fort Dimanche), 1263–64 (two meals: Biscuit in the morning and corn meal in the afternoon), 2064 (watery corn meal once a day), 2081 (watery corn meal once a day). One former prisoner testified that when he was given water it "had little things in it, little toads." Tr. at 1264. The prisoners were kept in the nude. Tr. at 81–82, 513, 1179, 1257. When asked if he ever had any visitors while at Fort Dimanche, Jocelyn Marcelus stated, "For me, it was rats, all kinds of insects, mice, roaches, vermin, all kinds of bugs...." Tr. at 1278. The effect, and perhaps intent, of this treatment is undeniable.

> *Q For how long were you held at Fort Dimanche?*
>
> *A I spent three years and a month, approximately.*
>
> . . . . .
>
> *Q Was there any room for beds in you cell?*
>
> *A There was no way, in such a small cell, to put a bed.*
>
> *Q Would all of the prisoners in your cell be able to sleep at one time?*
>
> *A We had to rotate.*
>
> *Q Why was that?*
>
> *A The cell was very small. It was twelve feet long and ten feet wide, and sometimes there were 30 of us in that small cell.*
>
> *Q Did the prison provide you with clothing to wear?*

*A Well, when I was transferred from the Cassernes to Fort Dimanche, I had clothes, in fact. But since we had almost no paper—excuse the expression—to wipe ourselves, we had to cut these clothes in small pieces and use them. And since for the most part we suffered of diarrhea, these clothes went by very fast. So, in fact, we spent most of the time—we were naked.*

*Q How much did you weigh when you went to prison?*

*A I would say approximately between 185 and 190 pounds.*

*Q How much do you weigh today?*

*A Approximately I would say the same weight, 180 pounds.*

*Q How much did you weigh just before you got out of prison at Fort Dimanche?*

*A In February of '77, upon leaving Fort Dimanche, I estimate that I weighed about 80 or 85 pounds. I was in the state of a skeleton.*

Patrick LeMoine, Tr. 512–13.

These conditions are not limited to Haiti's major prisons. They appear to exist in each of the small police station jails throughout the countryside.

*I was driving to a coastal town in the South. We were stopped at a police checkpoint. . . . The person who stopped us turned out to be a friend of one of my traveling companions, so he invited us in for coffee and we sat in the prison area and had coffee with this person, who was referred to as a Commander. . . .*

*He, obviously, had control over this jail. It was a two–room and I'd say each room was approximately nine by twelve. It was not a very large structure.*

. . . . .

*. . . being in the prison, you know, local prison, . . . was something not many Americans had the opportunity to do. And also, . . . sitting with him, we could see inside the cells. So we could see what the conditions were. And that was something we discussed among ourselves at the Embassy.*

*Q When was this, approximately?*

*A It was in May of '77.*

*Q Just generally, what was your perception of the conditions in this particular jail?*

*A Well, I don't know if I'm choosing the right word, but the word I think of in that sense is fetid. It was a very small— there were all men in each room and they were very, very crowded. I'm not good at guessing numbers but I'd say perhaps there were 40 people in each room. Certainly not enough that I don't think everyone could have sat down at once. It would have been difficult. And they all looked pretty scraggly, like they had been in there for a while.*

Dx 49 at 11–12 (deposition of Edward McKeon).

The mistreatment of prisoners includes torture and beatings. Four witnesses testified at trial concerning the beatings they received, Tr. at 88–89, 1130, 1182, 1247; three plaintiffs included stories of beatings in the sworn statements they gave INS, Dx 2 at 27–31, 100–01, 278; and several witnesses reported observing beatings or their effects, or hearing reports of beatings, Tr. at 83–86, 424, 2057, 2075. The details of a number of the cruelties were described to the Court. Merilien Mezius told how he was beaten twice a day during a five–day stay at Fort Dimanche. Tr. at 1182. Some aspect of this beating so damaged Solives Romet that to this day he is able to speak with only the greatest effort, and then with a pronounced stutter. Tr. at 1143–44, 1192. Marc Romulus learned by experience of several methods of torture.

*A . . .*

*This method consists of tying the arms and legs of the prisoner and to introduce between his arms and knees a stick, and then roll him up in a ball. They lift him between two tables and sometimes a pulley and they balance him according to the movement of a clock and the two extremities of the movement.*

*There are four groups of executioners. What I mean to say is two groups of four executioners; one armed with clubs and*

the other with whips. The whips are made out of cows nerve. The prisoners are balanced thus between the two types of whips.

The length of torture depends on his physical resistance.

Second of all, he is kept standing without food, without the right to sleep, his arms tied behind his back, 24 hours upon 24 hours.

They kept me 15 days without sleep or eating and without drinking. During that time period one is kept in certain, specific cells at Cassernes Dessalines. The conditions are such that it seems after three months I did not have one black hair left.

Marc Romulus, Tr. at 88–89.

The treatment of prisoners is equally stark in rural jails. A State Department employee recalls observing the following event:

I went to a prison to see an American citizen who had been arrested. And while I was there ... I didn't talk to these particular Haitians. But approximately six women were brought in–poor women–dressed in somewhat raggy fashion. I had the thought that they were market women who were arrested for some infraction. And they were whipped with very large, ugly–looking–well, I believe they were horse whips.

Dx 49 at 8–9 (deposition of Edward McKeon).

The cumulative effect of the conditions in these jails is often death. In 1975, sixty persons died in Fort Dimanche. Tr. at 517. In 1976, the number of deaths was between ninety and ninety–six, out of a total population of 150. Tr. at 82, 101, 517. Amnesty International concluded in 1977 that, "Haiti has one of the world's highest mortality rates among detainees...." Px 339 at 275 (press release issued November 14, 1977). The statistics are not surprising.

... They hit me with their hands and then they hit me with the clubs. Their hands were loaded with rings and things....

When my teeth came out, I put my head down.

I was looking at a lot of blood that was coming out of my nose, my mouth and my ears.

It was not only my teeth. My eye, also. To this day I have something wrong with my eye.

My vision is blurred, blurred, blurred. That was completely swollen, the eyelid was swollen out to here. My whole face.

For myself, the way I see it, I must have spent five, six, seven minutes laying on the ground, rolling in the blood.

When they came to pick me up, they picked me up from the back of my neck. They saw I was in bad shape. They saw I was like agonizing and they pushed me.

When I regained consciousness, that is when they started beating me fresh, once more.

They spent over two or three hours beating this guy.

They quit beating me when they saw I could not take any more at all, when they saw they were beating on a dead man.

Jocelyn Marcelus, Tr. at 1248–52.

There is substantial evidence that inhumane treatment continues to this day. Indeed, the quote immediately above comes from an individual who was not released from Fort Dimanche until March 17, 1979. Tr. at 1255. The State Department concluded, in its report issued February 4, 1980, that reports of torture in Haiti during 1979 were credible. See Dx 60 at 341. Furthermore, it concluded there was reason to believe that beatings were still being used for punishment, to extract confessions, and to improve prison discipline. Id. at 341. It also found seriously deficient medical care and diet. Id. There can be no doubt that someone imprisoned in Haiti is subjected to persecution.

Q ... when you regained consciousness, was your body sore? Did you feel whether you had been beaten on other parts of your body?

A It is not that I felt they had beaten me. I felt like I was not alive. I felt like I was dead.

Solives Romet, Tr. at 1131.

C. *Haitian Power: The Rule of the Duvalier Security Forces.*

The occupants of Haitian prisons are the political opponents of Jean–Claude Duvalier. Invariably, they arrive there through the actions of one of the several paramilitary security forces operating in Haiti. Those forces are an integral part of the Haitian political system.

Francois Duvalier's rise to power in 1957 was accomplished with the aid of the military. His predecessors were removed from office through the use, or threat, of military force. Indeed, the military supervised the election by which Duvalier gained office. Tr. at 12–13. Much as Haiti's military had helped bring Duvalier to power, however, it presented his greatest threat. The only consistent center of power in Haiti was the military; Duvalier was now subject to the actions which had unseated his predecessors. The inadequacy of the military's support for Duvalier was demonstrated when it failed to resist an attempted invasion and overthrow in 1958. See Px 334 at 593–95. Duvalier's solution was simple: Weaken the military. He disposed of the very military commander who had helped him obtain office, *id.* at 591–92, and set about creating a force loyal to him which could counterbalance the military.

> Duvalier himself knew all his predecessor who'd been overthrown by the military and he set about (as) one of the–of his main tasks to make sure that didn't happen to him by dividing the military, by shifting military officers around, sending them off, by setting up his own private (army) militia–as a counterbalance for military. This was the origin of the Tonton Macoutes which were basically set up by Duvalier, to counterbalance possibility of the military coup against him.

Dx 25 at 10 (transcript of State Department briefing to INS employees) (quoting Jerry DeSantilliana, State Department Country Officer to Haiti).

"Tonton Macoute," literally translated, means Uncle Knapsack, and is the character from Haitian fable counterpoised to Uncle Christmas, of "Tonton Noel." Px 334 at 596 n. 9. Whereas good children receive presents from Tonton Noel at Christmas, bad children are carried off in the knapsack of Tonton Macoute, never to be seen again. *Id.* The name was quite appropriate, for the Tonton Macoutes, as the quotes above indicate, did indeed make persons disappear. The bad persons visited by the Macoutes, however, were not criminals, but enemies of Duvalier.

> *A I worked for the Government of Haiti as a Macoute.*
>
> . . . . .
>
> *Q Were you still a member of that organization when you left Haiti in 1979?*
> *A Yes.*
> *Q Could you tell us briefly what the purpose of the organization is?*
> *A Organization is a body that watches over the security of the Haitian Government.*
> *Q . . . Do members of the Macoutes have the power to arrest people in Haiti?*
> *A Yes.*
> *Q For what kind of reasons would the Macoutes arrest someone in Haiti?*
> *A People that talk bad about the government.*
>
> . . . . .
>
> *Q As a member of the Macoutes did you wear a uniform?*
>
> . . . . .
>
> *A The uniform was blue shirt and blue pants.*
> *Q . . . were you given a weapon to carry with you?*
> *A Yes.*
>
> . . . . .
>
> *Q Who is the head of the Tonton Macoutes in Haiti?*
> *A Jean–Claude Duvalier.*
>
> . . . . .
>
> *Q Did (the Macoutes) arrest any people who were charged with murder?*
> *A People that are accused of murder do not have anything to do with the body of the Macoutes.*

*Anonymous # 1, Tr. at 413–15, 425, 432.*

Originating as the Tonton Macoutes in 1958, the paramilitary in Haiti has expanded and diversified over the past twenty–three years. The Macoutes, at least officially, are now referred to as the Volunteers for National Security (VSN).[76] Indeed, the individual quoted above is a member of the VSN. Dx 58 at 34. His identification of himself as a Tonton Macoute rather than a VSN was echoed by every Haitian witness at trial; they all referred to the Macoutes.

The Macoutes are perhaps the single most pervasive influence on Haitian life. The evidence indicated that they are present in every township of Haiti, and that their method of operation touches nearly everyone. Although many are not actually paid, the Macoutes are rewarded for their loyalty to Duvalier. There is continuing credible evidence that the Macoutes have, and exercise, the power to extort money and crops in rural areas, Dx 49 at 28 (deposition of Edward McKeon, former U.S. Embassy official in Haiti), and to dispossess the lands of peasants,[77] Dx 48 at 122–24 (deposition of David Martin, Office of Human Rights and Humanitarian Affairs, State Department). See generally Tr. at 14–20. They recruit, and control, through extortion.

*Q How did you become involved with the Tonton Macoutes? Did you seek them out or did they seek you out?*

*A Well, they were sabotaging the business for the business people, big or little, and I didn't want my business to be sabotaged, so I joined.*

*Anonymous # 1, Dx 58 at 20.*

Each township group of Macoutes is somewhat autonomous. General orders come from the Palace, but the decisions to arrest or imprison are made on a local level. Tr. at 415–17. In addition, there is almost no communication between groups of Macoutes. This local independence prevents

any concentration of force, lest the Macoutes themselves become a threat to Duvalier's power. Tr. at 12–22. When a former Macoute was asked how many other members there were in the organization, he stated he had no way of knowing. Dx 58 at 21.

As a result of their means of operation and independence, the Macoutes essentially determine who is an enemy of the government. There is no appreciable judicial system in Haiti, see Section D, *infra*; their actions are accordingly unchecked and unreviewed.

*Q Had you been charged with committing any crime in Haiti?*

*A What do you mean, accused of a crime?*

*Q Had you been charged with robbing someone, shooting somebody, or anything like that?*

*A If I shot somebody they couldn't have accused me.*

*Q Why could they not have accused you if you had shot some?*

*A Because whatever a Macoute does in Haiti is well seen by the Government. Anonymous # 1, Dx 58 at 77.*

Because the Macoutes are an organization created for political purposes, they bring politics to the villages of Haiti. To challenge the extortion by which the Macoutes exist is to challenge the underpinnings of the political system. Accordingly, to resist extortion is to become an enemy of the government. Moreover, it is not unreasonable to assume that when a single individual has the unfettered power to determine who is an enemy of the government, the individual's enemies are soon classified as the government's enemies. Several of the plaintiffs found themselves in such a situation. Solomon Jocelyn sought to stop expropriation of land, and found himself in prison for his efforts.[78] Odilius Jean sought only to protect his personal property:

---

**76.** Frank LaRaque testified that the name change was solely for the purpose of improving Haiti's image among foreign countries, notably the United States, on which Haiti was dependent for aid. Tr. at 18–19.

**77.** Further evidence of this practice was provided by plaintiff Solomon Jocelyn, see text accompanying note *infra*.

**78.** His story is set forth at note 87 *infra*. Jocelyn was finally granted asylum after the United

*Well, what happened to me (in 1965) was–it was a Macoute that came to rent a bicycle from me for one dollar.*

*When I looked around, I didn't see him. I never saw him at all. I looked for him all over the place. I found him standing somewhere leaning on his bicycle. I went in and told him, "How come you didn't bring the bicycle back to me?"*

*He told me, "Don't you know that I bought it from you for a dollar?"*

*I thought he was kidding. I held the bicycle and took it away from him. Right away he hit me with a club. He had already hit me.*

. . . . .

*After that, when I was forcing to see if I could get away, four more came and started beating on me.*

*They started beating on me. They break my head over here to—*

*I ran. I went. I ran and hid in the woods.*

. . . . .

*While I was hiding in the woods, one of my cousins knew where I was hiding. He came and told me they had taken one of my brothers.*

. . . . .

*He said they were pressuring (my brother) to tell them where I was. When he couldn't tell them where I was, they took him to a public place in front of everybody and they killed him.*

. . . . .

*I spent another two or three months, and the way I left–the reason I left the place was–I had another little brother. My cousin came and told me they held him and cut his throat with a knife, but he did not die.*
Odilus Jean, Tr. at 1345–49.

Two other paramilitary groups are worthy of note for the role they play in Haitian society.[79] The "Service Detective," more commonly referred to by its initials (S.D.) is Haiti's secret police force. The S.D. operates principally from the Casernes Dessalines, a detention center in Haiti's capital city of Port–au–Prince. Tr. at 89–90. Another group, the Presidential Guard (also referred to as Palace Guard) are headquartered at the Presidential Palace, also in Port–au–Prince. Tr. at 91. Unlike the Tonton Macoutes, these groups do not have country–wide impact; their actions appear limited to Port–au–Prince and its environs. Otherwise the groups are indistinguishable. The forces clearly work together, and one member of the Presidential Guard testified that they receive orders and attend speeches together. Tr. at 1942, 1988–89. All of the groups serve the sole purpose of protecting Duvalier.

A *I was a musician in the National Palace.*

Q *Were you in the Presidential Guard?*

A *Yes.*

. . . . .

. . . *The interest that I have each time that a person is denounced–you denounce a person, excuse me, either coming from the United States or some conspiracy against the government, not only are you given money but they also increase you in rank.*

. . . . .

*For example, if I see two young men speaking, I go and tell (my superiors) that they were speaking against the government, and they said to me, "You did your job." They give you money.*

*Sometimes when you do that, they give you privileges. They send you to school. They say you should go to the academy, and you are going to be a Duvalierist.*
Daniel Voltaire, Tr. at 1919, 1938–39.

---

Nations High Commission on Refugees (UNHCR) reviewed his request. The UNHCR concluded that Jocelyn's problems were "political" on essentially the same analysis as that set forth in this paragraph. See DX 53.

**79.** A third group, the Leopards, was also mentioned at trial. The Leopards are an elite military force, officially formed for anti–Guerilla purposes. Tr. at 18. No evidence of actions taken by this group was offered at trial.

The defendants have taken the position throughout this litigation that the conditions in Haiti are improving. The excesses of Francois Duvalier have faded, it is alleged, under his son Jean–Claude. But the evidence is clearly to the contrary. The State Department country report for 1980 stated bluntly that "[t]he influence of the relatively undisciplined militia increased" in Haiti in 1979. Dx 60 at 341. Indeed, throughout that report it is indicated that human rights declined in the past year. The testimony supports this conclusion. Edouard Franck stated that he was arrested by the S.D. on August 28, 1979 for his political opposition to Duvalier. Bernier Pierre, a Haitian national presently a naturalized Canadian citizen, testified that he visited Haiti in August of 1979, because he had heard such a trip would be safe. He met with friends in Port Salut, the city of his birth. After noticing persons listening to his conversations at a party, he decided "the atmosphere was unhealthy" and returned to the capital city of Port–au–Prince. When he attempted to leave the country, however, the following events ensued.

> *Well, when I arrived at the airport with my wife, . . . we had our luggage weighed, and the passport controlled the same way they control everything.*
>
> *And at that moment, they gave my wife her passport back and they kept mine. They made me go into the cabin of the Immigration officers behind the glass doors, supposedly for a last minute control. But they reassured me I would not miss my plane, it was just a little control, nothing at all.*
>
> *. . . . .*
>
> *After I stayed in and waited three or four hours. Nobody spoke to me until such time they gave me the order to follow a man, a civilian, that appeared. He didn't identify himself.*
>
> *Immediately afterwards, another came and followed me, and together they took me to a Jeep that was parked in the back of the airport.*
>
> *. . . . .*
>
> *They took me directly to Cassernes Dessalines.*
>
> *. . . .*
>
> *When I arrived at the Cassernes Dessalines, where the political police of Duvalier is kept, they took me in front of a major, who let me know they accused me of inciting a revolt, because of the way I was speaking to my friends.*
>
> *. . . . .*
>
> *He asked me what I had to answer. I told him I denied the whole thing, because I didn't know anything about it. . . . After that, they took me to the National Penitentiary.*
>
> Q *Were you ever given the assistance of a lawyer?*
> A *No.*
> Q *Were you ever officially charged with a crime?*
> A *No.*
> Q *Were you ever taken before a judge?*
> A *No, I never saw any judge.*
> Q *How long did you remain in the National Penitentiary . . . ?*
> A *Well, altogether, I spent six days. . . .*

Bernier Pierre, Tr. at 535–41.

The Rule of the Duvalier Security Forces is important to this case for two reasons. First, it must be understood that virtually any encounter with a member of the security forces is a political encounter. When determining whether someone has been politically persecuted, this must be kept in mind. Second, the security forces will determine whether someone is persecuted on their return; accordingly, their understanding of how returnees are to be treated is more important than the public statements of the Duvalier government. The uniform rejection of the plaintiffs' claims for asylum must be viewed in this light.

D. *Haitian Legal Systems: The Absence of a Rule of Law.*

The existence of the Duvalier Security Forces is a clear indication of the lawless-

ness of Haitian society. The freedom of the forces from review or restraint is a measure of the absence of law. Where there are no limits placed on the actions of certain individuals, there is no law. Haiti has inverted a famous quotation: Haiti is a nation of men, not laws.

The Constitution of Haiti is a good one, containing provisions for the guarantee of important liberties. But it is little more than a theoretical model. In practice, the Constitution is undermined by exceptions and neglect. Each year, the legislature enacts a Plein Pouvoir or "full powers." This action effectively eliminates a number of articles of the Constitution for the seven or eight months a year during which the legislature is not in session. When the legislature is in session, a "state of siege" provision of the Constitution allows the President, with the approval of the legislature, to suspend constitutional protections. This exception was employed during the decade of the seventies, though not since 1977. Finally, and perhaps most insidiously, recent years have seen the emergence of a practice by the President of simply suspending selected provisions of the Constitution. Tr. at 1030–33. The implementation of these exceptions is somewhat redundant. The legislature is loyal to Duvalier; only one non–Duvalier candidate has ever been elected. *See* Section 3 *infra*. As the State Department has concluded, "The legislature plays no independent role in formulating national policy." Dx 60 at 346; *accord* Dx 49 at 30. The effect of this system is quite clear. The law in Haiti on any given day is what the President says it is.

The Haitian Constitution provides for a system of justice much like that in the United States. For example, a criminal suspect may only be arrested upon a proper warrant, and must be brought before a magistrate within forty–eight hours of arrest.[80] Dx 60 at 343. These provisions are not undermined by exception, they are simply ignored.

> *Q What happened to you when you were arrested? . . .*
>
> *A They took me to Cassernes Desslaines.*
>
> *Q Were you then in prison from '71 until 1977?*
>
> *A Approximately, yes.*
>
> *Q Were you ever released during these years?*
>
> *A No.*
>
> *Q In any of the six years you were in prison in Haiti, were you ever taken before a judge?*
>
> *A (No).*
>
> *Q At any time during the six years, were you allowed to see an attorney?*
>
> *A No.*

*Patrick LeMoine, Tr. at 509–10.*

Edward McKeon studied the Haitian judicial system while he was employed at the United States Embassy in that country. He stated that there was effectively no judicial system outside of Haiti's major cities: Port–au–Prince, Cap Haitian, and Cayes.[81] Those persons who are swept up by the Tonton Macoutes, according to McKeon, are outside any judicial system. Dx 49 at 19.

> *Q The people who were arrested by the Macoutes for leaving Haiti, were they ever taken in front of a Judge?*
>
> *A No.*
>
> *Q Are there any judges in Haiti in the countryside?*
>
> *A No.*
>
> *Q Were these people provided access to attorneys?*
>
> *A No.*

*Anonymous # 1, Tr. at 423–24.*

The absence of a judicial system extends to all persons accused of "political" crimes. In 1977, a law was promulgated providing,

---

**80.** These protections do not apply to arrests made immediately following the occurrence of a crime. DX 60 at 343.

**81.** It should be noted that the portion of testimony quoted directly below, stating that there are no judges in the countryside, comes from a former member of the Tonton Macoutes who was stationed in Cayes. Apparently the judiciary is even more limited than Mr. McKeon concluded.

for the first time, political prisoners with a trial before a State Security Tribunal. Although the establishment of the tribunal was greeted with some reservations, it was seen as a commendable step. See Px 345 at 4 (International Commission of Jurists, The Review No. 19 (Dec. 1977)). The step, however, was never taken. In February, 1980, the State Department reported that the tribunal had not yet convened.[82] Only one witness at trial reported seeing a judge, and he apparently misunderstood the role of the judiciary.

*Q You said earlier that you thought that you remembered you had seen a Judge.*

*A Yes. There was a Judge, a person that investigates, that was conducting the investigation on me at that place where they took me where all of the big athletes were breaking men.*

. . . . .

*Q So the Judge or someone you thought was a Judge was asking questions in the room where you were being beaten?*

*A No. That man himself was the one giving the orders to the people to hit you.*
*Jocelyn Marcelus, Tr. at 1253.*

Crime in Haiti is loosely defined. Not only is it illegal to talk bad about the government,[83] but the criminal statutes are so broad and ambiguous as to encompass virtually any act (or thought). For example, the law "anti–Communiste" makes punishable by death "any declaration of belief in communism, verbal or written, public or private," or the propagation of any "communist or anarchistic doctrines." Px 339 at 275A; see Tr. at 1031. As recently as last October, a new press censorship law was enacted, creating "broad, vague categories of offenses," Dx 60 at 345, and providing prison sentences for any journalist insulting the President. Dx 339 at 171.

A system of broadly defined crimes, unchecked by due process, results in an essentially lawless society. Guilt is a determination made exclusively by the person empowered to arrest. That person's perception of what constitutes a crime, and what is necessary to commit it, controls. Arbitrariness is the rule. Guilt is often founded on association.

*Q What reasons did they give you for your arrest?*

*A The first reason was that I was a friend of Ander Seraphin.*

*Q Do you know why your friendship with this person caused you to be arrested?*

*A Well, it is a common thing in Haiti, when a person is involved in something, that his friends are arrested.*

*Q What did they say that he was involved in?*

*A According to the accusation made by the government, he was the leader of a group.*

*Q To your knowledge, did any such group exist?*

*A . . . positively, I would say no.*
*Patrick LeMoine, Tr. at 510.*

The system of justice in Haiti allows the Duvalier Security Forces to be all powerful. It is their decision who should be punished, for what offense, and how the punishment should be carried out. They may act on orders, or on arbitrary whim. But their actions are conclusive. There is no law in Haiti, there is only the forces of Duvalier.

*I was laying down. It was nighttime. I had finished saying my prayers at 7:00 o'clock, myself, 7:30 I was already in bed, because it was dark outside, and I didn't have a flashlight.*

*And about approximately around 7:30 I heard a knock on the door. When my mother started to get up to open the door, they had already opened the door a long time ago. I saw four men appear in*

---

**82.** McKeon's conclusion that persons arrested in the major cities of Haiti did receive hearings before judges, DX 49 at 19, clearly did not refer to persons arrested for political crimes. The State Department recognized that some hear-

ings before magistrates were being held, DX 60 at 343, while simultaneously noting the absence of any trials for political prisoners, *id.*

**83.** See Section III C *supra*

*front of me. They pulled out a piece of paper and asked me if I was Constant Louis. I said it was me, yes.*

*One of them took me by the right hand and flipped me as in judo; another one told me in '62 I had attacked the President and I had killed a Macoutes; and in '78 again I killed five people in the Bahamas, and I took $12,000 that my wife had. I couldn't find an answer to that that will come to my lips to tell them.*

*I said wait a minute. One of them answered, are you insulting the man? One of them hit me in the face there, and another one hit me again on the other side.*

. . . . .

*I felt like I was on fire.*

. . . . .

*One hit me again. I lost five teeth. One of them, kicked me below my belt. I felt–I didn't know anything else. I felt like my bottom half was going up to my heart.*

*When I regained consciousness, I found out my mother was screaming and she had a bucket of water and was wetting me.*

*Constant Louis, Tr. at 1198–99.*

The absence of a legal system in Haiti has several implications. Crime is defined on an individual level: One man's argument is another man's treason. Accordingly, the Haitian legal system is institutionally incapable of protecting any person's rights. The absence of a rule of law renders unenforceable claims that persons returned from the United States will not be harmed. Careful distinctions between those who might be persecuted on return and those who will not cannot be made. In the Haitian legal system, such assurances and such distinctions do not exist.

E. *Haitian Politics: Suppression of the Opposition.*

Politics may be defined as the public discussion of ideas on a country's government

and future, the advocacy of one's views. To speak of politics in Haiti is therefore somewhat misleading: It presumes that there is public discussion, and that anyone other than Jean–Claude Duvalier might effect the country's future. The contrary is true. The Duvaliers have systematically and thoroughly eliminated all dissent and opposition.

Two of the plaintiffs in this case are examples of that effort. Theodore Cadet was arrested and imprisoned in June of 1975 for his membership in "Le Ralliement Des Opposes." [84] He came to the United States after escaping prison. Dx 2 at 323–37 (Administrative Record, Sworn Statement of Theodore Cadet). Prosper Bayard was arrested three times between 1962 and 1974, each time because he "was for a different party than Duvalier's Party...." Dx 2 at 99 (Administrative Record, Sworn Statement of Prosper Bayard). In fact, his arrest in 1962 was for his vote in 1957, a story remarkably similar to that of Merilien Mezius, quoted above. Clearly there is a pattern of suppression.

The success of this pattern of activity is shown by the present status of Haitian politics. The State Department recently stated that, "Participation in the political process is severely restricted. Haiti is an authoritarian state and the President is chosen for life." Dx 60 at 346.

*Q Based on the two years that you spent in Haiti, what is your perception of the degree of political dissent that is allowed in that country?*

*A I'd say that there is not much political dissent allowed....*

*... Many of my friends who were in groups that I would normally consider to be more politically aware expressed very strongly a desire to just keep away from anything political. So I don't know that there was so much a lack of political opposition in terms of the government not permitting it, as it was a question of*

---

**84.** This is the spelling reported in the INS transcript of Mr. Cadet's sworn statement though at variance with the spelling plaintiff's post–trial brief. See p. 11.

*people knowing that they'd just best not get involved.*

*Q Would the VSN be likely to play a role if somebody surfaced as a political opponent of the Duvalier regime?*

*A I would think they would be the most likely person to take control of the situation.*

*Q While you were there, was there ever an opposition political party to the Duvalier regime?*

*A I never sensed any political opposition to the Duvaliers while I was there. What opposition there was was very mild. It was just things that came out in the press, nothing serious.*

*Edward McKeon, Dx 49 at 28–29.*

It is a measure of the political oppression in Haiti that independent political parties were not allowed to exist in Haiti until 1979. The appearance of those parties did not, however, signal any change in the basic nature of Haitian politics. The activities of parties were tightly controlled. Dx 60 at 346. Although legislative elections were held in February of 1979, they indicated more about the power of Duvalier and his forces than the will of the populace. Only one non–Duvalier candidate was elected, and he reportedly has been threatened and now requires bodyguards. Tr. at 139–40.

*On January 1st, 1978, Jean–Claude Duvalier directed his speech to the nation. He said that he would hold legislative elections, a free election. But before that, the election was never free. They always proceeded by nomination.*

*After he made that statement on the air in his speech, many citizens in the Republic of Haiti decided to become candidates for the legislature.*

*For instance, there was Alexandre LeRouge in the north. There was Sylvio Claude in Mirebalais, as well as in Cayes we had Hughes B. Verrettes. Hughes B. Verrettes in Cayes is the President of the Soccer League in Cayes and he is also the President of an orchestra called Meridional. He is recognized in the population.*

*He felt that with the popularity he had behind him he could have access to the legislature.*

*When they decreed the election, there were many candidates that appeared, that I remember their names.*

*It was Anthony Milord, Hughes B. Verrettes, Willy Rameau, Willy Roland, Dieuveille Neptune, and Anthony Milord was the outgoing deputy. But among those five candidates, the most popular of them all was Hughes B. Verrettes.*

*A few weeks before the election the Government published a message through the Volunteers for National Security Barracks to the commander Gerard Valet, that he should give force and security to candidate Willy Roland secretly.*

*During the election, every time Willy Roland held a meeting they always sent the militia to go attend the meeting, and I myself used to go.*

*A week before the election, to the eyes of the people, everybody had already seen Hughes B. Verrettes as deputy. A week before the election, as I say, President Duvalier sent a message saying this is the person that will be deputy. That was Willy Roland. Secretly.*

*The election took place on Sunday, February the 11th. They closed the ballot box around 2:00 in the afternoon, but all of the mass of the people that was for Hughes B. Verrettes, they already knew and they acknowledged the fact that their candidate was the deputy.*

*They started manifesting their joy in the streets. The local security police started putting pressure on them and they went home.*

*In Sunday evening they gave the results in all other parts of Haiti, but they didn't give them for the town of Cayes. But us militians, a week prior to that, we already knew that Willy Roland was deputy.*

*Dx 58 at 83–85 (deposition of Anonymous # 1).*

The emergence of political parties, while on the surface a liberalization, ironically caused greater repression. It is undisputed that the leader of at least one of the parties was arrested, see Dx 60 at 341; Tr. at

1096–97. Silvio Claude, leader of the Christian Democratic Party, was arrested on August 28, 1979, along with members of his party including Edouard Franck, a witness at trial. Tr. at 1096–97. Since the time of his arrest, Claude has been imprisoned without formal charges or a trial. The State Department has deemed reports that Claude has been subjected to "severe beatings and torture by electric shock" plausible. Dx 60 at 341. Despite the concerted efforts of various international agencies, see Tr. at 1038, nothing is presently known about the whereabouts or condition of Mr. Claude. Evidence submitted at trial indicated that two other party leaders had been arrested. Tr. at 1037.

The absence of information available on Mr. Claude has several implications. First, it indicates that Haiti is essentially closed to information gathering from the outside world. Accordingly, it is quite difficult to determine at any time what is occurring there. Second, it is impossible to make effective inquiries regarding the treatment of individuals within or returned to Haiti. It would therefore be impossible to protect them.

One need not join a political party to be viewed as an opponent of Duvalier and potentially receive the same treatment as Silvio Claude. Indeed, one need do very little. Solives Romet testified that his paralytic grandfather and sick father were arrested and disappeared after they failed to attend a public celebration honoring Duvalier. To "talk bad" about the government is a crime.

> Q Did they tell you anything at the time you were actually arrested?
>
> A When they came, they said, "It is the club of traitors that are speaking badly of the government.
>
> . . . . .
>
> Q What were you doing at the time they arrested you?
>
> A We were talking and things like that. We were in a group chatting.
>
> . . . . .

Q Do you remember what you were talking about, the specific things you were talking about at the time you were arrested?

> . . . . .

A (We were) saying that that man took power. Every since he took power, he didn't do anything for the country.

> . . . . .

We were saying, well, look at it, people are sleeping in the streets. Look at all the money that he received as loans and he sends it to hideout in Switzerland. Jocelyn Marcelus, Tr. at 1238–42.

The declaration of political freedom which caused the rise of independent political parties was obviously hollow. There is no political freedom in Haiti, its absence self-perpetuating. A counterbalancing political force might have required Duvalier to provide the free elections he promised. But there is no such force, and as a result, from day to day Duvalier's word—effectively, the law—may change. Duvalier declared an amnesty for political prisoners in Haiti in 1977, but as the quotes in this opinion and the defendants' own evidence illustrate, that declaration was hollow. See Dx 60. In concluding that deported Haitians would not be mistreated on return, the defendants rely, in part, on the assurances by government officials that the returnees will not be harmed. Dx 20 at 2. That statement has the eerie sound of statements made before, statements proclaiming freedoms and liberalizations. Each such statement has proven to be an empty promise.

Duvalier's assurance that returnees would not be mistreated had one exception. According to the State Department, those "who had been actively involved in political opposition might be subject to imprisonment or surveillance if they returned." Dx 20 at 2. This is an exception which swallows the rule. The definition of "political opposition" in Haiti is potentially all inclusive.[85] One student of Haitian politics has commented that the opposition could be

---

**85.** Cf. section III D infra (vague and ambiguous criminal statutes).

defined as "the whole conscious population minus one citizen–the President." Px 334 at 602 (quoting Remy Bastien).

### F. *Haitian Society: Suppression of Free Voices.*

In a country where political opposition and dissent have been effectively outlawed, the repression inevitably turns to the vehicles by which such views are normally voiced. Free speech quite obviously has been curtailed, and the freedoms of press and assembly have likewise given way to the pressures of Duvalier's rule.

The press was among the first institutions which Francois Duvalier sought to bring under his control upon seizing power. Within a year of the start of Duvalier's presidency, "*Haiti Miroire, Le Patriote, Le Martin,* and *L'Independence*; each for its own reasons out of tune with the regime, underwent midnight visitations or bombings that wrecked their plants." Px 334 at 592 (R. Heinl & N. Heinl, Written in Blood: The Story of the Haitian People 1492–1971 (Boston 1978)). "The papers that were left were easily controlled by government subsidies (or lack thereof); by assignment of TTMs (Tonton Macoutes) to editorial positions; by access to electricity, newsprint, and labor; and by the force–feeding of boiler plate editorials and articles." *Id.* at 602. The press was thus another victim of a familiar pattern: That which was not Duvalier's was destroyed.

For a time it seemed that a liberalization would take place under Jean–Claude Duvalier. But each appearance of freedom has been cut short. In early 1978, the State Department reported that the news media had become more outspoken over a period of two years, only to have the Tonton Macoutes beat up the publisher of a paper which had accused the militia of abuses. Dx 34 at 175. In 1975, the State Department again noted improvement in press freedoms over the preceding year. Dx 43

at 275. This liberalization was also short–lived. In October of 1979, the government enacted a new press law. Dx 60 at 345. It legalized censorship, provided for prior review of publications, and made illegal a broad variety of statements. *Id.* at 345. The press is now prohibited from insulting the President, his mother, or other Haitian authorities. Px 339 at 171. Also included in the new law is the requirement that all journalists obtain an annual press card, to be issued by an apparently government controlled association. Dx 60 at 345. The obvious effect of this law is to destroy freedom of the press, and the Inter–American Press Association has stated that this would be the effect. *Id.* Although the law has not been implemented, it hangs as a threat over the Haitian press. Given the broad interpretation of other laws in Haiti, the effect of this one would be clear: To dissent is to invite a visit from the Macoutes.[86] This has, of course, happened in the past; the new statute is simply a reminder of how things work in Haiti.

> . . . *I recall there was one newspaper that sprang up–I don't recall its name–that was going to print an article on human rights, I believe, and the editor was beaten several nights before the issue went to press and the issue never, in fact, came out.*
>
> *The paper subsequently folded.*
>
> *Dx 49 at 28 (deposition of Edward McKeon).*

Warnings and reminders were also directed at another potential dissenting voice in 1979: The arts. A statute was enacted requiring prior approval of plays and films. Dx 60 at 275. Although the decree has not been "vigorously enforced," *id.*, it understandably need not be–the threat is enough.

The enactment of censorship laws could almost be seen as a liberalization, a touch of formality and due process when there had been only random brutality in the past. But the brutality continued to occur as

---

**86.** Six weeks after the close of evidence, the defendants submitted for the court's consideration a summary of a new Haitian press law, enacted March 31, 1980. While the new law is milder in some respects than the one discussed here, it retains all of the provisions noted in the text. DX 82.

recently as November of 1979. Freedom of association is predictably restricted in Haiti. Organizations with membership larger than twenty may not exist without government approval. Dx 60 at 345. In November 1979, the Haitian Human Rights League called a meeting to inquire into the disappearance of Silvio Claude. Tr. at 1045. The League was characterized at trial as a "cautious and not outspoken" group. Tr. at 1044. The events which transpired at the meeting are best described by one who attended.

*Q Have you ever attended any meetings of the Haitian Human Rights League?*

*A The last meeting I attended was in November 9, 1979.*

*Q Could you describe to us who—how many people were at that meeting and who they were, if you know?*

*A To tell the truth, I know very many Tonton Macoutes in Haiti. I saw from 200 to 250 of them in civilian clothes in this room.*

*Q Approximately how many people in total were in the room?*

*A 500 to 600 people.*

. . . . .

*Q Could you describe to us what happened at the meeting?*

*A Well, it was a meeting that had been announced over the radio and over the newspaper for eight months.*

*On that particular Friday, I was free at 5:00 o'clock . . .*

*When I was free, I went home and then I went to assist. When I got there the speaker was going to start talking and I saw two Tonton Macoutes that told me, the military people are not Duvaliers. Look at the type of thing they are attending.*

*During that time, the speaker started to talk—*

. . . . .

*. . . He was talking for about two minutes. The Tonton Macoutes had come along with a cassette recorder with a song say, "Go Get Them, Duvalier." They put it behind the speakers.*

*Well, then, Gerard Gourgue (the President) said, the soldiers that came in assurance of peace, he was asking there be peace in the room.*

*At that time, a Tonton Macoutes whistled and everybody in the room started getting beaten.*

*When the Ambassador and the president entered the president's place, they went in there and beat them up. They went inside of the priest's place and beat them up.*

. . . . .

*Q I believe you referred to Ambassadors that were also beaten.*

*Do you know who the people were?*

*A I did not know their faces, but when their cars were coming in, they came in with their flags. There was one from Canada, France, America and German(y).*

*All these people were victims.*

Daniel Voltaire, Tr. at 2006–09.

If those who try to inquire into the disappearance of a politician are beaten for their effort, then clearly there can be no group within Haiti capable of monitoring or protecting returnees. Moreover, the treatment of the League again demonstrates how little one need do to offend the Duvalier regime. If attending a meeting to inquire into human rights is a crime, then surely claiming asylum abroad because of human rights violations would be similarly treated.

G. *Haitian Economics: The Economics of Repression.*

The Duvalier family has maintained its rule by weakening its opposition. As the discussion above indicates, "opposition" is an all inclusive term, encompassing real, potential, and perhaps even imagined enemies. Consequently, the efforts to weaken others have been wide-ranging, even random. Haiti's weak economy must be seen as part of this practice, its political implications understood.

Haiti is a country of dramatic poverty. It is one of the thirty poorest countries in

the world, Dx 33 at 3, and has the lowest per capita national income of any nation in the Western Hemisphere, Dx 56 at 12. The causes of this poverty are varied and complex. To be sure, Haiti has few exploitable resources, and the quantity of arable land per person is less than any other Western Hemisphere nation. Dx 33 at 5. But a recent Congressional Research Service Study–entitled "Impediments to Economic and Social Development in Haiti"–concluded that the natural causes of Haiti's poverty could be overcome, were it not for sociological and political problems. *Id.* at 6. Those problems are the manifestations of oppression, their consequences the economics of Duvalier.

The Congressional Research Service report identified five socio–political causes of Haitian poverty, and was substantiated in several respects by other evidence. Those five causes are as follows: Inadequate structure and planning of public administration; an absence of skilled professionals; an inadequate educational system; problems with aid from external sources; a disorganized and probably corrupt fiscal system. Each of these problems is demonstrably an outgrowth of Duvalier politics. *See* Dx 33.

It is safe to generalize that Haiti's economy has been neglected while the Duvaliers concentrated their primary energies on maintaining power. *Id.* at 9; *see* Px 334 at 226–27. The emphasis on power above all else has had several more direct effects on the economy, however. First, there is a consensus that the reign of the Duvaliers caused a mass exodus of intellectuals and professionals from Haiti. Tr. at 15; Dx 33 at 13. While many of these persons may have left because they had supported other candidates, Tr. at 15, and therefore appropriately feared Duvalier, it is also true that Duvalier saw Haiti's elite as his enemy. In part this animosity was racial: Duvalier was the black candidate in a country where the elite of society were largely mulatto. But it was also because the elite were perceived as the logical source of future opposition. To oppress the elite was to take yet another step toward assuring his power.

Accordingly, noted members of the elite were visited with terror very soon after Francois Duvalier gained power. One author whose work is in evidence reports unprovoked beatings and savage, unexplained destructions of property. Px 334 at 602. These actions were not directed at revolutionaries or dissidents, but at historians and doctors, the very absence of rationale for the violence probably designed to stimulate fear among the elite.

*The measure of the exodus was that, in 1976, 250,000 Haitians were in New York City alone, with large colonies in Montreal, Chicago and Washington. Robert Rotberg said that, by the mid–1960s, 80 percent of Haiti's qualified professionals (doctors, lawyers, engineers, teachers, and public administrators) were in the United States, Canada or Africa. By the same year, 1963, over a thousand Haitian professionals were in the Congo. . . . Of 70 schoolteachers trained by U.S. AID, none of whom Duvalier would hire, 38 went to the Congo–to fight illiteracy. . . . By 1963, over 300 Haitian professionals were working in Guinea. . . . Over 300 Haitian specialists–primarily doctors, teachers, public health nurses, engineers, and even judges–had been hired by or through the United Nations for jobs in the Congo, Dahomey, Guinea, Togo, Rwanda, and Burundi. With the lowest per capita income and literacy rate in the Western Hemisphere, Haiti nonetheless was contributing more technicians to the U.N. Technical Assistance Program than any other Latin American Nation.*

*. . . By 1970, there were more Haitian physicians in either Montreal or New York than Haiti. Montreal had ten times more Haitian psychiatrists than Port–au–Prince. Of 246 medical school graduates from 1959 to 1969 from the University of Haiti, only three could be found in practice in the country in 1969. Some 50 public health nurses, trained by the United States, were all lost to Africa. The Organization of American States and the U.N. had more Haitian economists on their payrolls than the government of Haiti.*

*One could go on but the point has been made.*

*Px 334 at 648–49.*

The results of this exodus obviously permeate the crippled Haitian economy. It wholly explains the absence of professionals, which in turn helps explain the inadequacy of the educational system and the public administration. In a country desperately in need of education, medical care, and skilled workers in all fields, *see* Dx 33 at 12–14, those best able to provide that help have fled.

The pattern established by the Duvaliers of eliminating potential opposition affected the economy beyond forcing so many of the most able Haitians to flee. Virtually all decision–making in Haiti is concentrated at the highest levels. Dx 33 at 12 (quoting Organization of American States, *Haiti: Mission d'Assistance Technique integree* xi (Washington, D.C. 1972)). While this undoubtedly preserves Duvalier's control and prevents establishment of centers of power elsewhere, it is terribly inefficient. *Id.* For similar reasons and with similar results, civil service agencies were placed in the hands of persons whose loyalty to Duvalier was their primary qualification. Dx 33 at 13 (quoting Agency for International Development, Development Assistance Program FY 1979: USAID Haiti 139 (1977)). As a result, the economy of Haiti suffered so that Duvalier could maintain power.

The clearest problem in Haiti's public administration is its fiscal system. The system is complex. Although there is a Ministry of Finance, it has influence over only 50 percent of public revenue. Dx 33 at 17. The uncontrolled 50 percent is unbudgeted and not subject to any form of accounting. *Id.* at 18–19. The result is disorganization, inefficiency, and charges of corruption. It is widely believed that substantial public funds in Haiti are used for personal, not public enrichment. Dx 33 at 19 (quoting various newspapers); Dx 43 (State Department Report for 1979); Dx 60 (State Department Report for 1980); Px 334 at 615–16. Although the Haitian government has announced its intention to account for all the money it receives, Dx 43 at 273–74, the plan has not yet been fully implemented. In early 1980, the State Department stated that, "Corruption is traditional at all levels of (Haitian) society, and significant amounts of domestic revenues continue to be diverted for personal enrichment." Dx 60 at 344. Aside from draining the country's already limited resources, this alleged corruption discourages foreign aid, an important portion of Haiti's annual income. *See* Dx 33; Px 334 at 616–17. Of course, an equal discouragement of foreign aid has been the reputation of the Duvaliers for terrorizing their own citizens. *See* Dx 33 at 10; Px 334 at 623.

The purpose of this discussion has been to show the degree to which Haitian economics is a function of the political system. Much of Haiti's poverty is a result of Duvalier's efforts to maintain power. Indeed it could be said that Duvalier has made his country weak so that he could be strong. To broadly classify all of the class of plaintiffs as "economic refugees," as has been repeatedly done, is therefore somewhat callous. Their economic situation is a political condition.

There are, of course, limits to the conclusions which may be drawn from the proposition. It would certainly be inappropriate to conclude that all poor Haitians are entitled to political asylum. Virtually the entire country could make such a claim. But against the background of this discussion, certain governmental actions (and therefore asylum claims) take on a political color.

In 1963, for example, Solomon Jocelyn was the head of a farmers syndicate (labor union) at Plantation Dauphin outside of Fort Liberte, Haiti. Dx 2 at 25–27. The organization sought, among other things, to prevent members of the Tonton Macoutes from expropriating the lands of farmers.

*I had written a petition to the Minister of Justice and also sent a copy to the President against the Prefect of the Macoutes that was taking away the land ... from the farmers. The Prefect put me in jail and beat me up. I spent five months in jail (and) two months in the jail's hos-*

*pital. When I was released I did not have any security left in Haiti. By security I mean that they told me I couldn't return to my home in Fort Liberte, Haiti. I had to spend different nights at different houses in different places.*

*Dx 2 at 6.*

Without background evidence, this claim might be seen as a mere personal dispute between Jocelyn and a certain Macoute Prefect. Indeed, that is precisely the conclusion reached by the INS hearing officer who classified Jocelyn's claim as "clearly lacking in substance." Tr. at 2926–27. This is a remarkably shallow analysis.

Labor unions are another of the many institutions which Duvalier broke apart in his quest for total power. The reason for his action is obvious: A labor union exists to make individuals more powerful through group action. Duvalier could not tolerate such a concentration of power. Accordingly, in 1959, Francois Duvalier is reported to have said, "All popular movements will be repressed with utmost vigor. The repression will be total, inflexible, and inexorable." Px 334 at 603. The process which ensued is now familiar: "One by one, unions were destroyed, driven underground, or simply taken over by Macoute leaders. By 1960, Haiti's weak unions were paralyzed or moribund; by 1963, they were dead." *Id.* Interestingly, it is precisely within this time span that Jocelyn's arrest took place. As a leader of a union, he was undoubtedly identified as "opposition." The complete suppression of organized labor continues to this day.

*Organized labor accounts for less than one percent of the work force and the few unions have been permitted little freedom of action. The Labor Code gives considerable authority to the Ministry of Labor and Social Affairs in mediating disputes. Union–sanctioned strikes, but not wildcat strikes, are permitted. Since late 1977, there have been sporadic strikes and increased labor activity.*

*Dx 60 at 346.*

There could be few persons more clearly the victim of "political persecution" than Solomon Jocelyn;[87] he was the subject of an organized system of oppression. Yet the activity for which he was sanctioned was essentially economic. His illustrates the cause of the disheveled Haitian economy, and the breadth of the political opposition. In rejecting Jocelyn's claim, the INS demonstrated its failure to grasp the fundamental rules of Haitian politics and economics.

### H. Conclusion.

The case is now well documented that the Haitians in this class deserved something more than they received from INS. Clearly their claims were more political than recognized, and the uniform rejection of their claims demonstrates a profound ignorance, if not an intentional disregard, of the conditions in Haiti. It is beyond dispute that some Haitians will be subjected to the brutal treatment and bloody prisons of Francois Duvalier upon their deportation. Until INS can definitely state which Haitians will be so treated and which will not, the brutality and bloodletting is its responsibility.

### IV. FINDINGS OF FACT: INS TREATMENT OF HAITIAN ASYLUM CLAIMS

The INS established a Haitian Program during the Spring and Summer of 1978 for the purpose of disposing of a backlog of asylum claims filed by Haitian immigrants. The existence of the program, and its impact, are uncontroverted. All of the asylum claims were denied.

Plaintiff's Exhibit 393 is a copy of INS records indicating, on a weekly basis, the disposition of deportation cases. On each weekly form, one line accounts for the disposition of asylum claims filed with the District Director. Perhaps the most revealing inference which can be drawn from those entries, reproduced in their entirety below, is that, on occasion, only the total number of dispositions was entered. The denial of all claims was understood.

---

**87.** See text accompanying notes 77 & 78, *supra.*

Disposition of I–589 [Asylum] Claims

| Week of | | Total | Granted | Denied |
|---|---|---|---|---|
| 9/2/78 | – 9/8/78 | 0 | 0 | 62 |
| 9/8/78 | – 9/15/78 | 104 | 0 | 104 |
| 9/16/78 | – 9/22/78 | 147 | | 147 |
| 9/25/78 | – 9/29/78 | 117 | | 117 |
| 10/2/78 | – 10/6/78 | 99 | | |
| 10/7/78 | – 10/13/78 | 109 | | 109 |
| 10/14/78 | – 10/20/78 | 122 | | |
| 10/21/78 | – 10/27/78 | 130 | | 130 |
| 10/30/78 | – 11/3/78 | 149 | | 149 |
| 11/4/78 | – 11/10/78 | 126 | | |
| 11/11/78 | – 11/17/78 | 149 | | 139* |
| 11/18/78 | – 12/1/78 | 242 | | 237* |
| 12/1/78 | – 12/8/78 | 119 | | |
| 12/9/78 | – 12/15/78 | 108 | | |
| 12/16/78 | – 12/22/78 | 70 | | 70 |
| 12/23/78 | – 12/29/78 | 55 | | 55 |
| 12/30/78 | – 1/5/79 | 88 | | 88 |
| 1/6/79 | – 1/12/79 | 15 | | 15 |
| 1/13/79 | – 1/19/79 | 57 | | 57 |
| 1/20/79 | – 1/26/79 | 38 | | 38 |
| 2/3/79 | – 2/9/79 | 38 | | 38 |
| 2/10/79 | – 2/16/79 | 19 | | 19 |
| 2/17/79 | – 2/23/79 | 18 | | 18 |
| 2/23/79 | – 3/2/79 | 17 | | 17 |
| 3/3/79 | – 3/9/79 | 46 | | 46 |
| 3/10/79 | – 3/16/79 | 28 | | 28** |
| 3/24/79 | – 3/30/79 | 21 | | 21 |
| 3/31/79 | – 4/6/79 | | | |
| 4/7/79 | – 4/14/79 | 15 | | 15 |
| 4/28/79 | – 5/4/79 | 25 | | 25 |
| 5/4/79 | – 5/11/79 | 23 | | 23 |

* Transfers account for the difference between total dispositions and denials on these two lines.
** This entry includes adjustments to show all cases back to 1972.

These numbers imply more than a coincidental uniformity. But results, in and of themselves, do not always signal unfair treatment.[88] Unfairness arises when such results are the intended result of prejudicial discriminatory actions,[89] and when the adjudication of claims violates due process.[90] That is precisely the case here. The Haitian asylum claims were prejudged as lacking any merit. Accordingly, they were reviewed with dispatch. An expedited process was set up for the sole purpose of expediting review of Haitian asylum applications, and expelling Haitians from the United States. By its very nature and intent, that process was prejudicial and discriminatory. In its particulars, the process violated the Haitians' due process rights.

### A. The Haitian Program: Intentional Discrimination

#### 1. The Haitian Problem.

The Haitian Program had its roots in the "Haitian Problem." The presence and processing of Haitians in Miami was initially perceived as a problem by INS in approximately June of 1978. In large measure, this perception was due to the burgeoning number of unprocessed Haitian asylum applicants.[91] According to Richard Gullage, Deputy District Director in the INS Miami office,[92] by June there were six or seven thousand Haitians who had not been processed. PX 311 at 101–04; see PX 320 at 2 (six thousand pending deportation cases). It is important to examine the perceived causes of this backlog, for they shaped the "remedies" which INS would later seek to implement.

In November of 1977, the INS entered into an agreement with the National Coun-

88. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

89. See authorities cited in note 88 supra.

90. See Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In such cases the unfairness is independent of any showing of unequal impact.

91. The problem was also, in part, due to a sudden influx of Haitian refugees that Spring. PX 311 at 104. The influx was the result of a decision by the Bahamian government to deport Haitians to Haiti. See, e. g., id.; PX 368. Because that influx received a great deal of public attention, it increased the pressure on INS to take some action. PX 311 at 104. But the influx was not part of the backlog: it brought excludable, not deportable aliens to Florida. See PX 311 at 104; PX 307 at 1. Moreover, Richard Gullage testified that newly arrived Haitians fit into the normal flow of processing. PX 311 at 41.

92. Richard Gullage became Deputy District Director of INS District 6 in August 1977. He has held the position of Acting District Director a number of times, most importantly for the first two weeks of September 1978, and again from November 8, 1978 to March 6, 1979. PX 311 at 1–4.

cil of Churches regarding the treatment of Haitians claiming asylum: those in detention were to be released; work permits would be issued during the pendency of asylum claims. *See* PX 362; PX 364, PX 365. The agreement resulted in the release of approximately 120 persons from jail. PX at 103. No longer faced with imprisonment, a large number of Haitians began seeking work permits. Gullage estimated that over the course of several months four to five thousand Haitians came to INS offices seeking such permission. *Id.* at 103–04. Many of those persons are among the plaintiffs in this case. INS could not keep up with the influx.

While the number of Haitians requiring processing increased, however, INS sat on its hands. Gullage testified that until June of 1978 INS "had not been processing the deportation [cases] to a great extent." PX 311 at 38. Processing was only "sporadic," and Gullage concluded that, at least with reference to Haitians in deportation proceedings "we were not doing our job." *Id.* at 39.

Gullage offered several explanations for this administrative inactivity. First, the Central Office had informed the Miami office that regulations on asylum procedures for excludable aliens were in the process of revision. *Id.* at 37–39; *see* PX 364. This created uncertainty. The Immigration Judges responsible for holding deportation hearings were reluctant to do so for fear their actions would be mooted or overturned by the new regulations. PX 311 at 39; PX 307 at 2; *see* PX 362 (indicating that the new regulations would provide excludable aliens processed after November 1977 with the opportunity to reopen their proceedings in accordance with the new regulations). They feared the new regulations would have some spillover effect on deportation proceeding. PX 311 at 39. As Gullage summed up the effect of the impending regulation change, "we didn't know which way to proceed so we didn't proceed at all." *Id.* at 37.

Gullage identified a second cause for the malaise at INS. He stated that a series of actions in late 1977 by immigration judges adjudicating Haitian deportations discouraged INS trial attorneys from initiating proceedings. PX 311 at 39. Apparently, the immigration judges were frustrated by going through lengthy proceedings, only to have asylum claims raised at the end. Their response was to inquire at the beginning of hearings whether the Haitians were planning to request asylum. As characterized by Gullage, this practice "invited" asylum claims, and left the trial attorneys with the sense that pursuing Haitian deportations would be fruitless. *Id.* at 158–59.

Aside from the backlog, Gullage testified, the actions of attorneys for the Haitians over the several years preceding 1978 had helped focus Central Office attention on the Haitian "situation." PX 311 at 157. Although less than clear, this would appear to be a reference to the efforts in *Sannon* and *Pierre* to obtain greater due process for Haitians claiming asylum. Of course, *Sannon* caused delays in Miami because it enjoined exclusion proceedings, and it received sufficient attention at INS to prompt the regulation change noted above. But it also appears that the struggle of the Haitians in Miami to have their claims heard was perceived as part of the Haitian problem.

In summary, the INS was burdened by a backlog of cases in June of 1978, and concluded that the asylum process as it had been administered up to that point was the cause. In attempting to work out from under the backlog, the treatment of Haitian asylum claims would have to change.

### 2. *The Goals of the Haitian Program.*

The Haitian Program was planned during July and August of 1978. Through the memoranda and transcripts of meetings which recorded that planning, the goal of the program is revealed. While not each of the proposals was implemented, each adds a shading to the intent which colored every action taken thereafter. By the time directions on implementing the plan were issued, the outcome of the asylum adjudications was predetermined. The goal of the

Program was to expel Haitian asylum applicants as rapidly as possible.

On July 2, 1978, INS Regional Commissioner Armand J. Salturelli flew with an associate to Miami to survey the "Haitian Situation" at the request of Mario Noto, Deputy Commissioner of INS. See PX 307 at 1. Salturelli outlined the "Problem" in a manner consistent with the discussion above, and made several recommendations. In general, those recommendations called for a shift in INS policy toward Haitians. All Haitians should be detained on arrival, and a variety of actions should be taken to speed processing. Two of the speed-up proposals are particularly noteworthy.

Salturelli recommended two changes in immigration judge handling of Haitian asylum claims: they should cease the practice of suspending deportation hearings upon the making of asylum claims and instead proceed to a finding on deportability; they should cease the practice of allowing aliens ten days for the perfecting of applications to withhold deportation. *Id.* at 3. He also noted the problems with these suggestions. Operating Instruction (O.I.) 108.1(f) expressly requires that an immigration Judge suspend deportation proceedings upon the making of an asylum claim. *Id.*[93] Salturelli had a simple solution for this: the Operating Instruction should be cancelled, or, if not cancelled, "it should at least be *suspended insofar as Haitians are concerned." Id.* This suggestion illustrates two basic viewpoints on Haitian asylum claims. First, in order to dispose of the backlog of deportation cases, the processing of those cases would be expedited in every way possible, regardless of the cost to due process. Second, Haitians were to be treated differently. They were not to receive the same protections as others.

Salturelli's suggestion for shortening application time for withholding of deportation was somewhat less offensive to due process. The applicable regulation set 10 days as the maximum time for such application, allowing the Judge discretion to set a shorter limit. 8 C.F.R. § 242.17(c). The fact remains, however, that the suggestion was made without consideration of the due process consequences. Moreover, it was to be applied to Haitians uniformly and exclusively.

Just a few weeks later, on July 11, 1978, M. H. Landon, Jr., Director of Intelligence, sent a memo to the Associate Commissioner of Enforcement, Charles Sava.[94] PX 368. The memo was the Intelligence Division's explanation of the facts behind the "Haitian Problem in Florida." It states blandly and absolutely that the Haitian refugees are "economic" not political refugees, and that if they are too well received, others will be encouraged to immigrate. The memo thus classifies the Haitians as fitting into a broad class susceptible to uniform class treatment. Although the simplicity of this view contrasts with even the State Department's position on Haiti,[95] it apparently had persuasive effect.

 There is an appropriate context for the use of such information: the conditions in Haiti should be considered in adjudicating any individual asylum claim. But the conditions in a country should not be considered in devising procedures for handling asylum claims. The essence of procedural due process is that everyone should receive the same fair hearing, regardless of the merits of their individual claim. Economic refugees do not have fewer procedural rights than political refugees, just as a criminal defendant's procedural rights are not altered by his guilt or innocence.

93. Although there was dispute over the interpretation of this O.I. at trial, it is clear from his memo that Salturelli thought the instruction required suspension.

94. Although the memo was not addressed specifically to Sava, he was the Associate Commissioner of Enforcement at the time. *See* PX 321.

95. A considerably more balanced view of Haitian refugees was sent to the Miami District Director in April of 1978, but there is no evidence it was read by any of the persons involved in planning the Haitian Program. PX 277.

514

Three days after receiving Landon's memo, Sava sent a memo to Mario Noto, recounting a visit he made to Miami. PX 321. His visit followed a meeting in Washington at which he discussed the Haitian problem with a variety of persons, including Chief Immigration Judge Herman Bookford. See PX 290. The purposes of his visit were to discuss processing of Haitians with Miami personnel and to find space so that an increased number of deportation hearings could be held. Deterrence of Haitian immigration was among the matters discussed. In his memo to Noto, Sava discussed four possible means of deterrence: 1) detention of arriving Haitians likely to abscond; 2) "no authorization for employment"; 3) expulsion of Haitians from the United States; 4) enforcement actions against smugglers. The ramifications of these proposals are extensive.

Underlying any attempt to discourage immigration is the assumption that none of the potential immigrants have any right to seek entry into the United States. Phrased differently, such a policy indicates a predetermination that none of the Haitians could deserve asylum.

Sava's first two suggestions–incarceration and unemployment–appear intended to treat Haitians as poorly as permissible during their stay in the United States so that others would be deterred from immigrating. Were such an attempt wholly consistent with due process and equal protection, it would be difficult to condone. But here no such fine judgment need by made. While there is some precedent in INS practice for incarceration of likely abscondees, there is none for the blanket refusal of work permits contemplated by Sava's recommendation. Indeed, just 8 months earlier, the Commissioner of INS stated: "INS will provide written authorization to work on request to all Haitians presently in South Florida whether detained or not, who have previously sought political asylum and have

asylum claims pending." PX 362 at 7. Sava sought to implement his suggestion by instructing the Miami District Director (and no other) to "consider an asylum claim as the actual executed and submitted [Form I–589] application." PX at 321 at 3. This instruction, a necessary step if the conditions of Haitians were to be depressed, was without foundation. The Operating Instructions clearly indicate that an asylum claim means any indication of a desire for asylum, and that the Form I–589 is filled out after such a claim. O.I. 108.1a. Indeed, the INS later recognized as much. See PX 328. There is no indication that Sava's interpretation of "asylum claims" had ever been used before, or that it had ever been applied to another nationality or racial group. No consideration was given to its due process ramifications. The desire to deter further immigration apparently prevailed over such considerations.

Sava's third recommended deterrent, however, is the most troubling.[96] The Haitian problem could be best solved, he stated, by "expulsion from the United States." This recommendation, clearly directed at a group including the plaintiffs in this case,[97] shows nothing short of a callous disregard for the merits of individual asylum claims. Expulsion might solve the problem, but it would do so by exposing Haitians to the persecution and death they feared.

Sava's suggestion illustrates more than the prejudgment of Haitian asylum claims by INS. It also indicates the purpose of the Haitian program and its expedited processing:

I believe the best most practical deterrent to this problem is expulsion.... We will get the cases moved to hearings swiftly and keep things moving.

The purpose of the expedited processing was expedited expulsion. A copy of Sava's memo was sent to the INS District Director in Miami, and the message was clear. The

---

**96.** The Fourth recommendation–prosecution of smugglers–is entirely commendable.

**97.** Sava's mission was to find space for deportation proceedings; the primary problem he

was addressing was therefore deportable aliens. The plaintiffs in this case comprised the majority of Haitians in deportation proceedings in July of 1978.

Haitians should be deported; everything should be oriented toward achieving that goal. It is not surprising that asylum claims, which cause delay and might even prevent an expulsion, became the victims of such instructions.

These proposals evolved over a period of weeks until August 20, 1978, when Mario Noto sent a memo to INS Commissioner Leonel J. Castillo. Noto was able to set forth the specifics of the solution to the Haitian Problem, by then already underway. For the most part, his statements merely flesh–out the proposals discussed above. The mechanics of the speed–up, for example, are explained: additional immigration judges will be detailed to Miami, and a three–fold increase in productivity will be ordered. The memo also contains the only mention of due process in the program planning. Noto instructed the District Director to allow expedited processing of Form I–589 asylum applications; namely, to allow submission of handwritten instead of typed forms. He added the provision that this should only be done so long as due process would not be curtailed. While this consideration is commendable, it does not go far enough. In the same memo, Noto orders issuance of Orders to Show Cause in all pending deportation cases. This matter need not be discussed in detail; it clearly was an overbroad instruction, sweeping with it those Haitians who had requested asylum and should not have been subject to the orders. One guarantee of due process does not a fair procedure make; a vast number of procedures were established without consideration of such factors.

Noto's memo also contains a suggestion not previously made. He notes the possibility of taking intercepted boatloads of Haitians to Guantanamo Bay instead of to Florida. This proposal could arise from two possible motives. First, it could merely be an attempt to protect Florida from the potential dangers of an immigrant influx: disease, crimes committed by abscondees, and a drain on social resources are a few such possible dangers. On the other hand, it could be an attempt to isolate the Haitians from the information and aid they would receive in South Florida. In the context of this case, the second motive seems prevalent. As with so many of the other proposals, this one was directed at Haitians alone. Absent some showing that Haitians posed dangers to South Florida, greater than other groups, the motive could not have been protection. No other group had been taken away from Florida. Moreover, as noted above, the actions of lawyers representing Haitians were seen as part of the Haitian problem. By keeping the Haitians out of Miami, the INS could solve that aspect of the problem. Of course, the Haitians might be deprived of some rights as a result; but expulsion, not full consideration, was the goal.

INS enlisted other agencies in planning and executing the Haitian Program during the summer of 1978. Representatives of the State Department met with Commissioner Castillo on July 17 to discuss expediting Haitian asylum claims. Two recommendations surfaced: revision of the Form I–589; quicker State Department and other review of asylum decisions made by the District Director. A series of letters between Castillo and Patricia M. Derian, Assistant Secretary of Human Rights and Humanitarian Affairs ensued. *See* PX 356; PX 357; PX 358; PX 355; PX 374. Agreement was quickly reached on a plan for expediting review; this matter will be discussed below. *See* section IV.B.6. *infra.* The revision of Form I–589 produced a disagreement.

The subject of the dispute was whether to inform applicants of the existence of the United Nations High Commission on Refugees (UNHCR). The UNHCR reviews and comments on applications for asylum, while not performing any independent fact–finding. *See* PX 357. The State Department proposed that the amended Form I–589 include a notice to the applicant of the opportunity independently to seek that agency's review of an application. PX 359; PX 358. Such a procedure had been recommended by UNHCR, *see* PX 357 at 2, and, in the judgment of the State Department, would accord with the spirit of the U.N. Protocol on the Status of Refugees, *see* PX 374 at 1.

INS said no. The proposed notice, according to INS, would produce "interminable delay" in the processing and in the expulsion of aliens lacking meritorious claims. Moreover, the procedure would "tend to subordinate" INS adjudications to those of the UNHCR. PX 355 at 2. Although INS did express concern over the impact of this proposal on all asylum applications, id., there is no doubt that the context of the communication was, in the words of the first sentence of the letter, "the Haitian problem."

The effect of this refusal was to force the State Department to continue with its prior procedure of selecting those cases which the UNHCR would review. PX 374 at 1. Only approximately one percent of all Haitian cases were ever referred. PX 100 at 2 (quoting Lawrence Arthur, Refugee and Migration Officer, Department of State). Hence, the rush to dispose of the cases deprived Haitians of a possible avenue for seeking a review of their asylum claims.

The final inter–agency planning for the Haitian Program took place on August 15, 1978. A meeting was held at the INS District Office in Miami at which some 20 persons from the following agencies were present: Department of State; U. S. Public Health Service; U. S. Customs; U. S. Border Patrol; INS. Mario Noto informed all in attendance that the Haitian Problem was one of great importance, and one in which all agencies must cooperate. The State Department agreed to cooperate in deterrence:

> ... State Department would urge INS to revoke the present authorizations of work permission to Haitians arriving in the United States and, in turn, State Department would initiate a propaganda campaign in the Caribbean area relative to the United States Government refusal to grant such work permits to arriving Haitians.

PX 2 at 3.

The Defendants have frequently noted that Haitians are not the only nationality for which a program has been established. Exigent circumstances often create the need for special processing. Of course, many of those programs–particularly for Cuban and Indochinese refugees–have been legislatively enacted, and are therefore not comparable. But these legislative programs, see DX 28, DX 29, as well as those purely the result of executive action, see PX 349, PX 350, PX 351, have shared the common goal of allowing aliens to stay in the United States.

For example, the Miami Cuban Task Force, implemented in June of 1977, was created to process a backlog of Cuban adjustment cases. DX 28. It provided for screening of all adjustment applications, with any "questionable" cases to be dropped from the program and processed in the normal manner. Hence, the expedited processing under the program was only for those applications which were to be granted. The Program was expected to handle 200 persons a day, and provided a number of procedural shortcuts to achieve that result. Such shortcuts, when used to provide benefits more quickly do not carry the same risks as when used in a program designed to expel. There has never before been an expedited program designed to expel applicants for asylum.

These documents and memoranda discussed above originated with the highest officials in INS. As such, they provide persuasive evidence on the intent behind the Haitian program. But there is much more. Every step taken by INS evidenced its intent, from the implementation of the Program at the District Level to the daily processing of Haitian claims. These matters will be discussed below. All of that evidence, viewed in the light of these recommendations made at the top levels of INS, indicate that the results of the Haitian Program were intended: Asylum was not to be granted to Haitians.

3. *Implementation at the District Level.*

Mario Noto's memorandum of July 20, 1978, discussed above, set forth the basic mechanics of the Haitian program. Additional hearing space had been obtained by then, and two additional immigration judges were to be detailed to Miami by the

end of July. PX 290. Those immigration judges would be directed to triple their productivity to a minimum of 15 hearings a day per judge. Those directions were to come from Chief Immigration Judge Herman Bookford, who had been in on the Haitian Program from the beginning, see PX 321, and to whom a copy of Noto's memo was referred, see PX 290 at 3.

Noto also directed that orders to show cause should be issued in *all* pending deportation proceedings, and that "a daily minimum of 55 aliens a day are being called for deportation hearings." PX 290 at 1. Commenting on the absence of processing prior to this speed-up, Richard Gullage testified that this meant "we ... moved from ground zero to a minimum of 55 aliens a day." PX 311 at 64.

The striking feature of Noto's letter is its shallowness. Absolutely no guidance is offered on how to reach the numerical goals, let alone how to do so fairly. To direct the tripling of productivity is easy, but to find a means of doing so is substantially more difficult. As Gullage testified, "the fact was that he dumped, he put the responsibility for the program on the district and he said, move it. That is all." PX 311 at 37.

The District was thus presented with rather sharp and specific commands. It was not told to provide due process or to adjudicate fairly Haitian asylum claims. The numbers, the processing, were all important. In the letter setting forth the program, everything but the goal of expulsion falls to the side. The message would be driven home further.

Mario Noto visited the Miami office of INS on August 16, 1978 and met with a variety of persons who were to become involved in the Program. The apparent purpose was to make suggestions and give advice on the specifics of the Program. He failed, however, to make a single suggestion on how to assure due process or on the necessity of fair hearings. Everything he said was an exhortation to accelerate, and strategic advice on accomplishing that goal. Indeed, he seemed to consider due process and expedited processing to be mutually exclusive. Typed notes of the comments made at the meeting were introduced into evidence. See PX 100.

The attitude underlying Noto's contributions to the meeting can be fairly summarized by reference to a particular exchange. In the course of discussing the need for increased enforcement actions against smugglers of refugees, he asked the representatives of the United States Attorney's office to work with INS Trial Attorneys:

> Please work together with them.—ACTU-ALLY PAIN [sic] OUT THE DIMEN-SIONS OF THE HAITIAN THREAT. [Trial attorneys] should give the U. S. attorneys more data and background as to the importance of Haitian cases.—Volatile—show that these are unusual cases dealing with individuals that are threatening the community's well-being—socially & economically.

PX 100 at 5 (emphasis in original). These comments are nothing short of fantastic. No "Haitian Threat" was demonstrated to this court, and surely if there was one it would have been used to provide a basis for the Haitian Program. The community about whose social and economic well-being Noto was so concerned saw no threat, but rather a responsibility to act with compassion. See PX 353 (Report by County Manager M. R. Stierheim on Human Services to Haitians). Noto's incantation of a Haitian Threat is without basis. But it has more troubling implications.

Prejudice of any type is seldom overt. It often expresses itself in conclusions reached without sufficient basis. A seemingly illogical jump is made from a premise to a conclusion. Something necessary to the logical thread is missing, supplied by the speaker's mind. In that diversion from logic, from what has been shown, lies prejudice. For what the speaker supplies is his own emotional view, his own prejudice. Where did Noto find a Haitian THREAT? How can a group of poor, black immigrants threaten a community? What, for that matter, is a "social threat", if not the words of someone trying to protect his own views of how society should exist? On such views was the Haitian Program founded.

Noto also provided extensive advice on strategy for handling Haitian cases. The overall tenor of his remarks indicates that he viewed anything other than acquiescence by Haitians or their attorneys to be dilatory. His discussion focused on how INS trial attorneys should act when aliens sought to remain silent in a deportation hearing: "When mute, go with punches and give the most publicity to it to discourage them." *Id.* at 5. Later, he commented, "When alien refused to speak, why can't you deny pol[itical] asylum request?" The validity of the refusals to speak, the possibility that they pointed to some violation of rights, was not considered. Only the delay, and how to overcome it, was discussed.

Noto's comments at one point neatly summarized his advice and directions to the Miami District employees. They would have to move quickly to 1) adjudicate asylum claims, 2) issue orders to show cause, 3) schedule hearings expeditiously, 4) "*effect and improve physical expulsion.*" *Id.* at 7 (emphasis added). The pervasive message was that the first three were to lead to the fourth.

One week after meeting with Noto, Richard Gullage circulated a memo to all employees of the INS Miami office. He announced the creation of the Haitian Program, and his leadership of it. He passed along to his subordinates what he had learned from his superiors:

> ... processing of these cases cannot be delayed in any manner or any way. All supervisory personnel are hereby ordered to take whatever action they deem necessary to keep these cases moving through the system.

PX 294A at 2.

Gullage distributed his first specific directions on the Haitian Program that same day. He directed that all newly arrived Haitians were to be "detained," and that newly encountered Haitians should not receive work permits. PX 324. The alteration in work permit policy has been discussed above. INS has long detained newly arrived aliens, but never uniformly. Indeed, throughout the planning of the Pro-

gram, criteria for ordering detention were discussed. *See* PX 290 at 2. When Mario Noto held his session in Miami with local officials, criteria were discussed, and detention was still "an open question." PX 100 at 2. That open question closed with the same finality as the jailhouse doors behind the Haitians. No other group has been so uniformly treated.

One final aspect of the Program must be noted. INS Central Office, having created a result–oriented plan, sought to keep track of the results. *See* PX 100 at 6. Accordingly, there was substantial on–going contact between Central Office and Miami. Records were kept for that purpose, and William Zimmer, Acting District Director while Gullage was ill, testified that he was in daily telephone contact with the Central Office. PX 313 at 214.

Among the records kept were the documents introduced as Defendants' Exhibit 79. On a single sheet, a person in the Travel Control section kept track of the Form I–589 Asylum Applications processed that day. The controlling presumptions of the Haitian Program are evident from these forms. On the bottom of each sheet there are spaces for entering the day's total. But those spaces only provide for recording the total *denials*; no attempt was made to record granted applications. Moreover, there is a section of the form for recording disposition of those asylum applications which had been completed with a statement before a hearing officer. Two possible classifications are provided for: doubtful and denied. There was no place to record cases which were granted. But then there was no need to record that which would never occur under the Haitian Program.

### 4. *Conclusion: Discrimination.*

Monsignor Bryan Walsh, Director of Catholic Charities for the Archdiocese of Miami, has spent 24 years serving refugees in the South Florida community. He stated at trial that, in his observation, the treatment of Haitians, historically and presently, differs from that of any other immigrant group. European war orphans, Hungari-

ans, Cubans, Indochinese, Nicaraguans, and individuals from a variety of other countries have sought refuge in the United States in the course of Monsignor Walsh's experience. The Haitians alone have been consistently denied asylum.

This differing treatment has not been the result of Congressional action. Walsh testified to the treatment of Cuban refugees in the years before any special legislation was enacted. He personally brought 15,000 Cuban children into the United States through a waiver of the visa procedure. In the years 1959–1961, Walsh testified, the processing of Cuban asylum applications was routine; he did not know of a single case which had been denied.

The differing treatment continues to this day. Nicaraguan refugees are permitted to work while their asylum claims are pending, PX 350; Haitians are not. Walsh also testified that the end result of inconsistencies in procedure and attitude is that Cubans uniformly receive asylum and Haitians uniformly do not.

Raymond Morris, presently the District Director of the INS Miami office, agreed that results are disparate. He did not know of a single Cuban whose asylum claim had been denied, nor more than a few Haitians whose claim had been granted.

As the discussion above illustrates, there was a program at work within INS to expel Haitians. Their asylum claims were prejudged, their rights to a hearing given second priority to the need for accelerated processing. The discussion below will detail the violations of due process which occurred during the Haitian Program. Virtually every one of the violations occurred exclusively to Haitians. The violations were discriminatory acts, part of a Program to expel Haitians. Even those violations, however, lack the simple persuasive impact of the results of the Program. The District Director did not grant a single request for asylum between September, 1978 and May, 1979.[98] During that time, thousands of

Haitians were processed. Those denials were not case–by–case adjudication, but an intentional, class–wide, summary denial.

The court is therefore presented with a pattern of discrimination which began, according to Monsignor Walsh, in 1964. Over the past 17 years, Haitian claims for asylum and refuge have been systematically denied, while all others have been granted. The recent Haitian Program is but the largest–scale, most dramatic example of that pattern.

**B.** *The Haitian Program: Systematic Due Process Violations*

The plaintiffs have alleged, and proven, a wide variety of defects in the processing of Haitian asylum claims. The net result of these defects was that Haitians were unable to adequately present their claims for asylum, and were deprived of full and fair consideration of that which they did present.

No single aspect of the Program caused these results. Rather, the violations were cumulative. The abuses listed below were systematic and pervasive; for the most part they were the direct and logical result of the orders from the INS Central Office discussed in the preceding section. As such, each abuse is colored with the intent to expel Haitians. Taken as a whole, the Haitian Program, and all of the abuses listed below, carried out that intent.

**1.** *Immigration Judge Action*

Three actions by immigration judges are alleged to have violated the plaintiffs' rights. None are in dispute. During the Haitian Program, immigration judges refused to suspend deportation hearings upon the making of an asylum claim. Following that refusal, judges intimidated and penalized Haitians who sought to exercise their right to remain silent. Finally, immigration judges provided Haitians only ten days in which to file their completed Forms I–

---

**98.** The most he did was classify an application as doubtful and refer it to the State Department.

589 with the District Director. All that remains to be determined is whether these actions were proper, and, if not, whether they caused prejudice.

a. *Failure to Suspend Deportation Proceedings*

Deportation proceedings are initiated by the issuance of an order to show cause. Those orders require an alien to appear before an immigration judge and "show cause" why he should not be deported. Richard Gullage referred to these hearings as "arraignments." PX 311 at 62. With the onset of the Haitian Program, these hearings were scheduled at the rate of 55 per day, or approximately 18 per judge per day. *See* PX 290.

An alien may raise an asylum claim at virtually any time. At issue here is the proper procedural effect of a claim raised during the "arraignment" stage of a deportation hearing.

Plaintiffs allege that the INS Operating Instructions require the immediate suspension of a deportation hearing upon the making of an asylum claim. Such a suspension would provide the alien an opportunity to present his claim for asylum to the District Director before completing the deportation proceeding. The Operating Instruction does not leave room for contrary analysis:

> In any case in which deportation proceedings have been initiated and the alien or his representative introduces a request for asylum, the special inquiry officer shall postpone the hearing to enable the district director to fully consider the bona fides of the request.

O.I. 108.1f(2).

The defendant's contention that the Instruction does not mandate suspension is simply disingenuous. The evidence is uncontroverted that deportation hearings had consistently been suspended prior to the Haitian Program. Moreover, proposals that immigration judges cease suspending hearings were made with the recognition that to do so would contravene the Instruction. *See* PX 307, PX 100. Deportation proceedings are suspended in these circumstances in other parts of the country. Tr. at 1480–82. As a result of this change in procedures, the Haitians were denied substantial rights.

■ First, it is clear that these failures to suspend were a coordinated part of the discriminatory Haitian Program. The change in procedure was proposed at several times as a means of accelerating processing, PX 307, PX 100, and directions to immigration judges on other aspects of the Program were made through the Central Office. *See* PX 290. No other nationality has ever been subjected to this procedure. Accordingly, INS procedures were willfully and systematically violated, as part of a discriminatory plan to treat Haitians differently.

Second, independent of any violation of procedures, the Haitians were impermissibly prejudiced by this practice. The change in procedures allowed immigration judges to continue the hearings and make findings. Haitians were required to plead to their identity and alienage. Immigration judges invariably proceeded to findings of deportability. Tr. at 1703–04, 2438, 2483. In essence, Haitians were forced to concede deportability in order to pursue their asylum claims. Proving deportability is normally the government's burden, but that Haitian Program effectively removed that burden by forcing the Haitians to admit the underlying facts. Tr. at 1533–35. Moreover, the Haitians were foreclosed from raising objections to deportability such as illegal seizure, Tr. at 1536–37, and from pursuing alternative forms of administrative relief. The procedure to which Haitians were subjected is roughly the equivalent of requiring a criminal defendant to concede his guilt before providing him any constitutional or statutory rights.

Because they were able to reach findings of deportability, immigration judges were able to issue what Richard Gullage described as "three–barrelled" orders. PX 311 at 49, 60–61. Haitians were given ten days to seek asylum before the District Director; if they failed to meet that deadline, they then

had ten days to seek withholding of deportation from the immigration judge; if they failed to meet that deadline, an order of deportation would automatically be entered. The legality of these time limits is discussed in Section C below.

b. *Derogation of the Right to Remain Silent*

Upon refusing to suspend deportation proceedings, immigration judges forced Haitians to plead to alienage and deportability. The word "force" is used advisedly.

■■■■ A number of Haitians sought to remain silent on Fifth Amendment grounds when questioned about their alienage. Tr. at 1700, 1767, PX 395. They have an undeniable right to do so. An alien may not be compelled to give testimony about himself in a deportation hearing which could expose him to criminal liability in another forum.[99] Alienage is an element of several crimes. *See* 8 U.S.C. §§ 1304(e) & 1325. Accordingly, persons may not be forced to plea to a charge of alienage. Moreover, it is impermissible to draw inferences from the silence of an alien on questions to which he has asserted a valid claim of privilege.[100]

■■■■ It is not disputed that immigration judges systematically refused to recognize the claim of privilege raised by Haitians. INS Trial Attorney Lee Erwin, whose job was to attend deportation hearings during the Haitian Program, testified that the judges concluded there was no valid Fifth Amendment privilege to questions of alienage. The mere failure to recognize this privilege is not necessarily prejudicial. The immigration judges, however, systematically threatened, coerced, and penalized those Haitians who claimed it.

Immigration judges took the following actions in response to Fifth Amendment pleas. First, they inferred from the Haitians' silence an admission of the facts in the Order to Show Cause. PX 395, Tr. at 1767. Second, they harassed and penalized the Haitians by (1) denying them further aid from their counsel, and (2) revoking work permits. PX 395 at 6, 15. Third, they harassed and intimidated attorneys by threatening them with bar association action and by threatening them that "counsel needs to be taught a few things." PX 395. As a result of such action, attorneys representing Haitians felt forced to plead to deportability, Tr. at 1700, 1767, in violation of the Haitians' Fifth Amendment rights.

These actions were part of the Haitian Program. They were extensively discussed during Mario Noto's visit to Miami. PX 100. Indeed, his advice seems to have been precisely followed:

When mute, go with punches and give the most publicity to it to discourage him . . . . .

*Id.* at 5.

c. *Establishment of Time Limits for Filing Asylum Claims with the District Director*

■■■■ The facts, again, are not in dispute. Immigration judges required Haitians to file completed Forms I–589 before the District Director within a certain time or suffer dismissal of their claims for lack of prosecution. The amount of time provided for such filing varied from 10 to 30 days. Tr. at 1323–35, 1770, 2474–75. The only issues raised are whether this practice was legal, and if not, whether it caused prejudice.

At the outset, it should be noted that this practice is without authorization. "There is

**99.** *Estes v. Potter*, 183 F.2d 865, 867 (5th Cir. 1950), *see Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973) (Fifth Amendment protects persons from making potentially incriminating statements even though not in criminal proceeding). *Cf. Smith v. Immigration and Naturalization Service*, 585 F.2d 600, 602 (3rd Cir. 1978) (alien may be compelled to explain status in deportation proceed-

ings so long as it does not expose him to criminal liability).

**100.** *See* C. Gordon & H. Rosenfield, Immigration Law and Procedure § 5.10c at 126–27 nn. 46 & 46a (1980). *Cf. Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) (impermissible to penalize exercise of Fifth Amendment right).

no authority under the code of federal regulations or statute for requiring a 10 day time element," according to Richard Gullage, PX 311 at 208, and his observation is not disputed.

Although immigration judges set time limits for filing, their action would have been meaningless without the cooperation of the District Director. The Operating Instructions constrained the judges to delay the deportation hearings pending the District Director's review of the asylum claim, and it was the District Director who ultimately dismissed the asylum applications for lack of prosecution. *See* DX 2 at 342 (Administrative Record of Odilus Jean; dismissal for lack of prosecution signed by Richard Gullage). Hence, the plaintiffs have challenged a coordinated, two–party action. Two issues therefore arise; whether, as part of the Haitian Program, the practice of setting time limits was permissible; whether such a practice would ever be permissible.[101]

In the context of the Haitian Program, the practice of setting time limits for filing asylum claims was clearly impermissible. The results speak loudest. Richard Gullage testified at trial that perhaps 200 Haitians had their claims for asylum dismissed for lack of prosecution, Tr. at 2280. Although he stated that efforts were later made to contact these persons and advise them to refile, he conceded "I really don't know whether they were all contacted. I would suspect they were not." PX 311 at 7. Government counsel admitted at trial that there was no way of knowing how many applications had been so denied, nor who the applicants were. Tr. at 1382–84. Haitians alone, of course, were subjected to this practice.

David Carliner, Chairman of the ABA Subcommittee on Immigration Law and a veteran of numerous asylum representations, testified that immigration judges in other parts of the country do not set similar time limits. Tr. at 1483–84, 1540. Indeed, he found the question somewhat anomalous: his deadlines had always been set by the District Director. Tr. at 1483–87. He had normally been given at least 30 days, and more time whenever needed. *Id.* An attorney who represented Haitians indicated they were never given continuances. Tr. at 1772.

The prejudice from this practice was cumulative. Haitians were being called to attend deportation hearings at the rate of 55 per day, or in excess of 250 per week. In order to adequately prepare a Form I–589, an attorney requires between 10 and 40 hours. *See* Tr. at 1408 (10–40 hours), 1654 (19–20 hours). Richard Gullage was aware of only 13 attorneys available to represent Haitians. PX 311 at 272. If each of those attorneys did nothing during a 40 hour week except prepare Forms I–589, they would have been able to devote only about 2 hours to each client. Because of the other demands on their time made by the Haitian Program, however, they could not spend all of their time on these applications. Accordingly, the full prejudice of this procedure can only be expressed in the context of the overall accelerated program, discussed below. As that discussion makes clear, the 10–day time limit for filing asylum claims made full representation of Haitian claims impossible.

The process of compiling a Form I–589 is rather complex; indeed it appears unlikely that a Haitian could ever adequately prepare a form in 10 days, regardless of his attorneys' other responsibilities. Attorney Steven Mander testified that it was very difficult to extract information from his Haitian clients. In general, this was due to language difficulties and a certain reticence on their part. He described the gathering of information as follows: "In understanding the actual process of putting together an application, it required an interview, re–interview, cross examination, extracting details, and patience." Tr. at 1657.

---

**101.** Although the decisions of the immigration judges may be reviewable only if part of a pattern and program, see section IIA *supra*, the District Director's actions are always reviewable in this court. Accordingly, the dismissal of claims by the District Director for lack of prosecution would always be appropriately challenged in this court, see section II B 2 *supra*.

David Carliner testified that obtaining information is a lengthy and probing task regardless of the nationality of the applicant. Tr. at 1494–95.

Part of filing any claim for asylum involves obtaining corroboration. The INS indisputably relies on the ability of an applicant to support his claim. This involves obtaining letters from persons remaining in foreign countries, newspaper articles, or information showing an historical pattern of persecution in a country. *See* Tr. at 1488–90, 1658–59. Obviously, this process takes time, and the amount required varies depending on the country from which asylum is sought. For example, David Carliner noted that it was very easy to obtain information on Russia because of interest of the American press. Tr. at 1490. On the other hand, some countries present a greater problem because of poor communications, inadequate mail service, or restricted travel. *Id.* That is precisely the case with Haiti. As the discussion above indicates, Haiti is among the most closed societies in the world. Even the United States Government, with its vast resources including an embassy in the country, cannot determine with any certainty what is going on in Haiti. Among the matters the United States has been unable to establish over the past 23 years is how persons deported to Haiti will be treated upon arrival. Yet a poor, illiterate Haitian, with no resources at his command, is expected to secure proof in the space of 10 days that his fear of return is well–founded. The arbitrariness of such a rule is apparent.

### d. *Conclusion*

██ Immigration judges were a functioning part of the Haitian Program. Having received orders from the Chief Immigration Judge, they tripled the number of hearings, forced Haitians to plead to alienage, and joined with the District Director in setting unreasonable time limits for filing asylum applications. As a result, Haitians were deprived of rights normally available to aliens in deportation proceedings, and the opportunity to adequately prepare their asylum applications. The judges contributed to an accelerated program the purpose and effect of which was to deny Haitians asylum.

### 2. *The Cumulative Effect of Accelerated Processing*

Michael Posner, Executive Director of the Lawyers Committee for International Human Rights, visited the offices of INS in late 1978 to observe the Haitian Program in operation. He testified at trial on what he saw:

the one thing … that is most striking and stays with me is the volume of hearings that were conducted each day …. [W]hen we arrived in October there were 100 or more hearings a day.

We were struck by the number of people sitting in the waiting rooms, and the number of people packed into the three or four courtrooms set up.

We were also struck then by the fact that the Immigration lawyers and judges were being brought in from other parts of the country. It was really, I think, quite unbelievable, to me, to see the sheer number of cases they were trying to get through in a day.

Tr. at 938–84. INS Trial Attorney Lee Erwin testified that never before in history had an INS office attempted to process such a volume of asylum claims. Tr. at 2554.

██ Volume alone does not necessarily indicate inadequacies in processing. Because of the small number of attorneys available to represent Haitians, however, the volume of cases had great impact, causing substantial deprivation of rights.

### a. *Mass Scheduling*

Most of the particulars of the accelerated processing in Miami have been mentioned above, but it is useful to summarize. Immigration judges began scheduling 55 show cause hearings per day, PX 311 at 20, and eventually schedules "well beyond 60 cases" to perhaps as many as 80. *Id.* at 65. Prior to the Haitian Program, only between 1 and 10 hearings were held per day. *Id.* at 60.

Richard Gullage testified that asylum interviews were scheduled at the rate of 40 per day. See also DX 79. During this time, asylum applicants were allowed periods of as little as ten days in which to complete their Forms I–589. Hearings on applications to withhold deportation were also occurring.

All of these hearings were going on simultaneously, at several different locations. In the Eastern Union Building, four courtrooms were set aside for show cause hearings. In the Federal Building, about 2 blocks north of the Eastern Union Building, there were two courtrooms in use for show cause hearings, one room in use for political asylum interviews, and one in use for a work permit program involving Haitians. These rooms were on different floors. Finally, in the Ainsley Building, 3 blocks northeast of the Federal Building, there were three courtrooms set aside for show cause hearings. Tr. at 1757–58.

There were very few attorneys available to cover these numerous hearings. Only about 10 or 12 attorneys were handling Haitian cases. See, e. g., Tr. at 1760. The simplest calculations show that it was impossible for Haitians to receive fair and adequate representation. According to attorney Ronald Haber:

> A typical day in September or October of 1978 would include maybe two or three political asylum interviews scheduled at the Federal Building at 8 o'clock, maybe two, three, or four deportation hearings scheduled at 9 o'clock at 111 Southeast Third, and then at 10 o'clock maybe two or three political asylum interviews scheduled at the Federal Building.

Tr. at 1323. A copy of Haber's personal calendar for a typical Monday morning was introduced into evidence and corroborates this story. PX 386. Three other attorneys–Michael Shane, Steven Mander, and Melvyn Greespahn–testified to similar experiences. Michael Posner observed the same occurrences during his visit to Miami. Throughout this time, of course, the attorneys also were supposedly aiding their clients in preparation of Forms I–589.

This situation was known to INS. Richard Gullage testified that he knew of only approximately 13 attorneys who were representing Haitians at the time of the Program. PX 311 at 272. He stated that it was obvious that the accelerated scheduling would cause conflicts, id. at 250, that they had even anticipated the possibility of attorneys being scheduled for as many as 5 hearings or interviews simultaneously, id. at 252. There were even discussions of how these conflicts could be avoided; but INS decided that scheduling difficulties were "too cumbersome for us to handle" given the demands of the Haitian Program. Id. at 249.

Gullage's solution for the scheduling conflicts was simple: it would all work out. It did not. No instructions were given to Gullage's subordinates on how to avoid conflicts, id. at 220, how to reschedule matters to avoid further conflicts, id. at 222, or on what length continuances should be granted, id. at 230. Nonetheless, Gullage assumed that all the necessary continuances were granted, and all the problems worked out. Id. at 225.

While it is true that continuances were freely given, it is equally true that they did little good. One day was the same as any other. The attorneys were overscheduled throughout the Haitian Program and a rescheduling merely shifted the conflict to a later time. Attorney Steven Mander testified that he received continuances of one or two weeks which were "meaningless" because of the workload during the Haitian Program. Tr. at 1659–60. Continuances merely compounded the problem. Tr. at 1720. As attorney Ronald Haber stated, "the matter might be re–scheduled in a seven–day period which did not do any good because of the constant scheduling of cases during the four–month period. It would not give me any breathing space whatsoever." Tr. at 1460.

Defendants contended at trial that the real problem with scheduling was that attorneys simply accepted more clients than they should have, presumably for monetary reasons. The evidence shows otherwise.

At the outset of the Program, apparently in anticipation of this very problem, INS contacted the Dade County Bar Association, The Florida Bar, and the Association of Immigration and Nationality Lawyers, South Florida Chapter, in an attempt to find representation, especially *pro bono*, for Haitians. DX 27. Two responses were received: one suggested INS call the Public Defender's Officer; one enclosed a list of Lawyer's referral services. DX 27. Richard Gullage agreed that only 13 lawyers were available to represent Haitians. PX 331 at 246.

Ronald Haber described his representation of nearly 300 Haitians in the following manner:

> Most of them came in a desperate state. They came after an order to show cause was issued. Many of them had two or three days before the hearing when they first appeared in my office.
>
> They heard about my office from friends, usually, and they seemed to have their minds made up that I would be the one representing them.
>
> If I told them that I might have too many cases and I asked them to go to the Haitian Refugee Center, they would usually not leave my office until I made assurances that I would represent them.
>
> . . .
>
> I remember coming into the office at 8 o'clock in the morning and there would be 20 to 30 people in the waiting room, all of Haitian descent.

Tr. at 1318–20.

The ten or twelve attorneys swamped by the Haitian Program were all the Haitians had, and INS knew it.

b. *Cumulative Effect*

The evidence clearly indicates that the attorneys representing Haitians were placed in an untenable position during the Haitian Program. Because of the number of Haitians undergoing processing, and the speed with which the processing advanced, attorneys were not provided sufficient time to adequately represent their clients.[102]

As noted above, the preparation of an asylum claim is a complex and time consuming task. In the context of the accelerated Program, however, attorney Ronald Haber testified that he was "lucky to get a half an hour with each individual client." Tr. at 1322. Steven Mander testified that he did not have sufficient time to obtain all of the corroborative information he desired. Tr. at 1659. When asked if half an hour was sufficient time to prepare a Form I–589, David Carliner characterized the question as "ridiculous," and stated "If I was presented with that situation, I would simply say I couldn't do it." Tr. at 1494, 1495.[103]

As a result, the asylum claims of Haitians were never developed. Despite having insufficient time to adequately complete the forms, attorneys were filing their client's asylum claims so as to avoid dismissal for lack of prosecution. As Ronald Haber described it, "we just tried to meet the filing deadline . . . it was impossible to spend as much time as we would have liked." Tr. at 1323. Klaus Feldman of the United Nations High Commission on Refugees has reviewed numerous asylum applications submitted during the Haitian Program, and has reported that "many of the applications were incomplete or contained no information at all on the subject matter related to

**102.** Although plaintiffs claim that the Program actually deprived Haitians of counsel, the evidence is inconclusive. Apparently at least 80 percent of all Haitians were represented during asylum interviews, see PX 291, and the evidence does not show that the other 20 percent had counsel who were unable to attend due to scheduling conflicts.

**103.** Richard Gullage repeatedly stated that these problems could have been solved had they only been brought to his attention in some

manner. Yet Gullage attended a meeting in November of 1978 at which a representative of the National Council of Churches raised a variety of complaints concerning the Program, including allegations that scheduling had "diminished the ability of members of the bar to effectively represent alien clients." PX 304. William Zimmer, Acting District Director at the time, found "no substance" in the complaints. *Id.*

asylum." PX 264 at 2. The defendants, in the course of their repeated statements that these refugees are primarily economic, have relied on the absence of adequate claims in the Forms I–589. It appears that absence has more to do with the accelerated procedure than the validity of the plaintiffs' claims.

### c. Conclusion

By definition, the Haitian Program accelerated asylum application processing. That fact alone prejudiced the Haitians: their counsel were unable to adequately represent them. No other nationality has been similarly deprived.

This conclusion, of course, applies only to those cases in which attorneys represented a substantial number of Haitians. In some isolated instances, attorneys represented few Haitians, and accordingly could not have been burdened by the Haitian Program.

### 3. Conduct of Asylum Interviews

Plaintiffs allege that they were deprived of the "opportunity to fully present" their asylum claim provided by Operating Instruction 108.1f. A variety of actions are alleged to have caused this result. The problem, however, seems to have been systemic; the speed with which the Haitian Program went forward, not the actions of individuals, caused the deficiencies.

▮ Plaintiffs allege that asylum interviews were conducted in a hostile and sometimes abusive manner. This practice allegedly intimidated Haitians to such an extent that they were unable to state their claim.

There is some evidence that Haitians were improperly treated. Solomon Jocelyn testified that his interviewer "got mad and hit his hand on the table," and "treated me so hard that I . . . couldn't speak anymore." PX 316 at 26–27. Various attorneys testified that the interviewers were "intolerant of aliens," Tr. at 1729, hostile, Tr. at 1416, and "irritable and curt, and anxious to get the process moving." Tr. at 988. On the other hand, Nancy McCormick, a hearing officer, testified that interviews were conducted in courteous but firm tones. She added that emotions were running high because of the volume of interviews.

It appears to this court that the INS hearing officers were as much victims of the Haitian Program as the attorneys for the Haitians. They were laboring under the same time constraints. If at times their treatment became a bit harsh, they can no more be held responsible for it than the attorneys could be held responsible for malpractice in failing to complete Forms I–589. The Program, however, clearly is responsible.

Similarly, the participation allowed attorneys seems to have been controlled more by the pressures of the Program than a desire to impede presentation of the alien's claim. INS policy on attorney participation is not disputed. Richard Gullage testified that attorneys are allowed to ask questions during the interview, and are allowed to interject and clarify. PX 311 at 93, 262. David Carliner testified that his experience in asylum interviews in various other cities conformed with this statement. Tr. at 1511. Of course, there are limits to proper participation. Attorneys should not be allowed to coach witnesses or delay the proceedings. PX 311 at 252, Tr. at 1512. Moreover, Carliner stated that attorneys do not have the right to examine their client on the record. Tr. at 1512. Nancy McCormick testified that she followed a practice substantially in accord with these statements.

Attorney participation in asylum interviews undoubtedly was restricted at times during the Haitian Program. See Tr. at 1417, 1729. Hearing officers were under great time pressure, and accordingly probably tended to be concise at the expense of full explanation. Michael Posner testified that he observed lengthy answers cut short, and interviews conducted without sufficient time. Tr. at 987. Reasonable tactics and questions by lawyers in this context are more likely to have been considered dilatory, and therefore inappropriate. One of the premises of the Program was that attorneys

representing Haitians always attempted to delay, and the hearing officers probably sought to prevent such practices. *See* PX 100, PX 294A. Moreover, the training received by hearing officers prior to the placement in the Haitian Program was insufficient. Nancy McCormick testified that she was transferred to the Program along with three other persons, all of whom had previously worked at the airport. They observed asylum interviews for several days, read the Operating Instructions, and had their questions answered by the Acting District Director. Tr. at 2679. They were not prepared to perform the delicate balance between the Haitian's right to participation by their counsel and the INS' need to expedite processing.

Finally, the plaintiffs allege that the interviews were too short and too superficial to provide an adequate opportunity for the presentation of their claims. There cannot be much doubt this occurred. Prior to the acceleration, asylum interviews took an hour and a half, *see* Tr. at 1651; during the Haitian Program they took approximately one–half hour, *id.*, Tr. at 1409–10. Given that nearly all the interviews were conducted through interpreters, only 15 minutes worth of substantive exchange took place. The testimony of all the attorneys involved in representing Haitian cases indicated that interviews of these people, due to their illiteracy and the difficulties with translation, was a painstaking task. Indeed, this court observed the testimony of numerous Creole–speaking Haitians. Their answers to questions tended to be brief and quite literal; details were uncovered only through exploration. David Carliner testified that, in his experience, it takes "a minimum of an hour just to get the basic information and to probe and ask more questions." Tr. at 1494.

Moreover, it appears that the hearing officers did not comprehend the apprehension with which a Haitian could be expected to approach authority. The Reverend Gerald Jean Juste, Director of the Haitian Refugee Center, testified that Haitians "are so scared because they think that Immigration and Naturalization here is like the Tonton Macoutes." Tr. at 1618–19. Michael Shane testified that he observed "substantial distrust of those doing the interviews and the interpretation." Tr. at 987. Although these fears could have been overcome, it would have taken time.

The conduct of asylum interviews during the Haitian Program is appropriately considered in conjunction with two other aspects of the Program: mass scheduling and asylum filing deadlines. Each was caused by the decision to accelerate processing, and each contributed to the same result: Haitians were unable to fully present their claims. They were not given sufficient time to prepare their Forms I–589, to obtain adequate assistance of counsel, or to state their case before an INS hearing officer. In the end, the District Director's decision was based on an inadequate record.

Incomplete asylum applications were the foreseeable result of the Haitian Program. The planning of the Program showed a willingness to sacrifice due process for the sake of speed. The results show that the sacrifice was carried out with dispatch. Lost in the process were the asylum claims of thousands of Haitians.

### 4. *Asylum Decision–Making*

Virtually all applications for asylum during the Haitian Program were decided by agents of the District Directors who signed the Director's name. Richard Gullage testified that during his time as District Director he personally reviewed only 30 or 40 of the thousands of asylum cases processed in this district. PX 311 at 5. Indeed, all of those cases were in one week; from November 1978 to March of 1979 he did not review any asylum applications. *Id.*

Nancy McCormick was the supervisor of the Haitian asylum application unit from September 1978 until December 8, 1978. Tr. at 2618. She explained the decision–making process as follows: the interviewer made initial recommendations on the application; she categorized the application. When cases were categorized as clearly lacking in substance, she signed the District

Director's name to denials and placed them in the mail. When cases were categorized as doubtful, she referred them to the State Department. *See e.g.*, Tr. at 2619, 2700–01, 2926. All told, she was involved in deciding between 1,700 and 2,200 asylum claims. She never found a "clearly meritorious" claim.

 It has already been established that those decisions were not based on sufficient information. Further abuses have been alleged. Plaintiffs claim that the classification of nearly all asylum claims as clearly lacking in substance was arbitrary and capricious.[104]

 In order to be fair, a decision on an asylum application must take into account a variety of factors. Of course, the most important material for consideration is the applicant's interview statement and Form I–589. The information contained in those documents, however, would very possibly be meaningless unless placed in the proper context. Accordingly, both Richard Gullage–District Director at the time of the Program–and Raymond Morris–present District Director–agreed that an asylum decision cannot be made without reference to the political conditioning in the country from which asylum is sought. Moreover, Gullage testified that he has required hearing officers to consider all the factors in PX 294, including the country from which asylum is sought and the political characterization of that country. PX 311 at 201.

However the airport inspectors brought into the district office for the purpose of hearing Haitian asylum claims were not given any instruction on conditions in Haiti. Nancy McCormick testified on the training she received alone with 3 of the 4 other persons involed in interviewing Haitians. It is apparent that she was told nothing about Haiti; she was not even given any State Department material on the country. Tr. at 2679–80. This lack of training, and

therefore understanding, went beyond the hearing officers. William Zimmer, who was Acting District Director in Miami from September to November of 1978, testified that he had never read any official material on Haiti, only magazines and newspaper articles. PX 313 at 13–14.

Nancy McCormick also testified that she was never instructed by anyone at any level on what factors to consider in deciding on asylum claims. Tr. at 2925. Given this apparent failure to properly instruct hearings officers, compounded by the failure to provide them with any information on Haiti, it is not surprising that they failed to take account of the conditions in Haiti. Nancy McCormick, whom this court found to be intelligent, perceptive, and as sensitive to due process as any nonlawyer can be, testified that she did not consider anything other than the internal consistency and veracity of asylum applications. Tr. at 2693, 2926. She stated that it was not the province of INS to determine general political conditions in a country. Tr. at 2693. While this is quite true, it fails to appreciate the part general conditions play in understanding a particular claim, a part which the defendants concede is material.

Nancy McCormick reviewed and denied the asylum claim of Solomon Jocelyn. Tr. at 2926–29. Jocelyn, it will be recalled, was arrested for his activities in a labor union, imprisoned, and brutally beaten. McCormick testified that she concluded Jocelyn's problems "were of a personal nature with a particular individual within the Haitian Government." Tr. at 2977. The only problem with this analysis is that the person with whom Jocelyn had the dispute was Luc Desir, head of the Haitian Secret Police. Tr. at 2928. No hearing officer can fairly evaluate an asylum claim without knowing so critical a piece of information. Moreover, McCormick indicated that although she had heard of the Tonton Macoutes, she

---

**104.** INS has responded to this allegation by asserting that their decisions were reviewed by the State Department and the UNHCR. Both of those reviews, however, were based on the incomplete records created by INS. Moreover, the State Department review was faulty, see section IV B 6 *infra*, and UNHCR only reviewed approximately one percent of all applications, see PX 100.

was unaware of any other Secret Police in Haiti, such as the S.D. Tr. at 2978. The S.D., it will be recalled, meet returnees at the airport and escort them to the Casernes Dessalines.

The entire contents of section III of this opinion could appropriately be reproduced here, for it indicates the vast amount of data which must be digested before any fair understanding of Haiti can be reached. Moreover, it indicates that a definition of political persecution in Haiti cannot be gained from an understanding merely of United States, or even Russian, politics. Solomon Jocelyn's application was misperceived because INS failed to adequately instruct and inform its hearing officers.

The absence of information about Haiti caused pervasive problems in assessing asylum claims. As Solomon Jocelyn's story indicates, it caused the creation of an unrealistic definition for the term "political persecution." Other cases indicate other problems. Solives Romet testified before this court. He returned to Haiti of his own accord in 1977 and, upon his arrival, was arrested and beaten so savagely that his speech remains greatly impaired. *See* section III A 1 *supra.* One can hardly imagine a person with a more well–founded fear of persecution upon his return to Haiti, yet his claim for asylum was denied as clearly lacking in substance. PX 377. It is apparent from this denial that the burden of proof effectively placed on Haitians was simply too high. McCormick testified that she looked for corroboration of stories such as witnesses or persons knowledgable about the facts of a claim. Tr. at 2701. There will simply never be such corroboration for a story like Romet's. Obviously, he could not produce as a witness the secret police officer who beat him. In fact, the only evidence he could hope to present would be of a generalized nature, much like that presented to this court. But he could not hope to present the pattern of mistreatment on which this court spent several weeks receiving evidence in a 30 minute hearing. The hearing officers simply sought more from Haitians than they could possibly present. The absence of clearly meritorious

claims, and the paucity of doubtful ones, illustrates that only a few out of the thousands of Haitians processed through the Program could even come close.

The claims presented by Jocelyn and Romet indicate that McCormick may not have conformed precisely to the standards for determination she expressed at trial. She testified that she would classify a claim as doubtful, and therefore send it to the State Department for recommendation, if "he could name specific dates and places, possibly present a witness or a person who might know something about the facts." Tr. at 2701. Jocelyn did precisely that. He brought a witness to his asylum interview, and included in his file letters from Haiti tending to support his claim. Romet similarly presented a story of considerable detail, verified by travel documents indicating he had been to Haiti. PX 377. Neither claim was classified as doubtful. Hence, both plaintiffs were deprived of the right to State Department input which they deserved. Reference of cases to the State Department, a process which took thirty days, was undoubtedly discouraged during the Haitian Program.

One possible explanation for this lies in the Haitian Program. McCormick testified that she reviewed at least 1,500 asylum applications during approximately 11 weeks in the position of supervisor. Tr. at 2619. A rough calculation indicates that if she did nothing else during that time, she would have had to review those 1,500 cases at the rate of 3 per hour to keep up with the flood of the Haitian Program. During that time, however, she also personally conducted approximately 200 to 250 asylum interviews, Tr. at 2710 and had supervisory duties over the other interviewers. Full consideration of each claim was impossible in this situation.

5. *Other Asylum Procedures*

a. *Public Access to Prior Decisions and Nonrecord Matter*

Defendants admit they failed to allow plaintiffs access to prior decisions and non-

record matter. Moreover, they have admitted this practice was erroneous and assured the court that procedures have been changed.

Defendants contend, however, that these failings could not have caused plaintiffs any prejudice. First, it is alleged that access to prior decisions is unnecessary to represent an Haitian, because decisions are made on an individual basis according to widely known standards. Second, it is alleged that nonrecord material may not be relied upon in making asylum decisions, and Haitians accordingly could not have been prejudiced by their inability to gain access to such material and rebut it.

In the circumstances of this case, it appears that these two narrowly drawn arguments are correct; but they belie the underlying unfairness of the asylum process. The lack of access to prior decisions was not prejudicial to Haitians for the simple reason that all prior decisions were form letter denials. There was no explanation of the grounds, for any denial; accordingly, nothing could be learned from reading them. Similarly, the defendants are correct in asserting that hearing officers did not consider nonrecord material. Indeed, they considered nothing about Haiti. Although the Haitians were not prejudiced by the inaccessibility of the nonrecord material, they were prejudiced by the failure to consider it. Moreover, public access to these materials is apparently "standard practice" elsewhere. PX 313 at 27.

The regulations which require public access to nonrecord matter and prior decisions provide strong evidence of the sort of decision–making process which should have taken place during the Haitian Program. Obviously, the Regulations contemplated decisions based on materials in addition to those contained in the alien's application, including prior decisions. By failing to take such matters into account, INS failed to provide the requisite consideration of the Haitian claims.

### b. Use of Form Letter Denials

It is conceded that the defendants issued only form letter denials during the Haitian Program. No other office uses this procedure. See, e. g., Tr. at 2287, PX 313 at 65. Moreover, Gullage testified that he did not believe the Miami office had used form letter denials prior to the Haitian Program. Tr. at 2286–87.

Issuance of denials is obviously a part of the decision–making process. The regulation requiring access to prior denials would be nonsensical if it merely provided access to thousands of form letters. Throughout administrative law, decision–makers are required to articulate the grounds for their decisions. That requirement assures that each decision will be based on grounds which can be articulated, and that courts asked to review those decisions will have an adequate basis on which to do so. These assurances of due process are lacking in the issuance of form letter denials, and, therefore, in the Haitian Program.

### c. Accuracy of Translation

Plaintiffs allege that the translation of asylum interviews by INS interpreters was insufficient, incomplete, and at times misleading. Tr. at 990, 1411–12. But the evidence was inconclusive. The court is unable to conclude that verbatim transcripts of asylum interviews may be required. Transcripts of interviews should provide a fair record of the substance and meaning of the alien's statements. Nancy McCormick and Anne Maril Kabkow–translator during the Program–testified that transcripts made during the Haitian Program fulfilled these requirements.

### d. Failure to Advise Haitians of Rights Prior to Taking Statements

Plaintiffs allege that defendants systematically obtained statements from Haitians without first informing them of their rights. No evidence was offered at trial tending to show that this occurred, and the matter appears to have been waived in the plaintiffs' posttrial brief.

### 6. State Department Participation in Asylum Decisions

Two causes of action are aimed at the State Department's role in the asylum decision-making process. First, it is alleged that INS failed to forward all of the evidence on each asylum claim to the State Department. Second, the State Department allegedly failed to fairly evaluate Haitian claims. There was no evidence presented at trial tending to show that any evidence was ever excluded from the material forwarded to the State Department, and plaintiffs have not argued the matter in their brief.

The State Department's review of asylum claims was altered during the Haitian Program. Lawrence Arthur, Refugee and Migration officer in the Department of State, prepares advisory opinions on asylum matters. PX 310 at I–4. He stated that the following procedure was normally followed in reviewing asylum claims: (1) he or another officer prepared advisory opinions on all claims; (2) every advisory opinion is then referred to the appropriate "country desk" in the State Department for review; (3) all denials were reviewed by a Deputy Assistant Secretary of State. *Id.* at 4, 5, 61.

Arthur attended meetings during the creation of the Haitian Program. *See* PX 2, PX 100. At those times, the need for speeding State Department review was discussed. During the Program, Arthur traveled to Miami to review asylum applications. PX 310 at I–76. The second and third steps of the review process were abandoned at that time. *Id.* at 76–77. Moreover, during those visits, Arthur apparently reviewed in excess of 100 cases per day. PX 291. Clearly the State Department participated in the Haitian Program by denying Haitians the same review it provided other nationalities.

### 7. Deprivation of the Haitian Refugee Center's Right to Free Speech

█ It is undisputed that representatives of the Haitian Refugee Center (HRC) were excluded from the room where Haitians were waiting prior to their asylum interviews. Plaintiffs allege this violated the First Amendment rights of the HRC, its members and representatives.

Defendants present three independent justifications for the exclusion of HRC members: they were causing disturbances; they were on private property; they had not received authorization under the appropriate regulation to solicit clients. The court finds all the arguments wholly without merit.

Richard Gullage testified that he ordered HRC excluded after being told by one of his employees, that its representatives were causing disturbances. PX 311 at 84–85. Nancy McCormick was working in the room adjoining the waiting room and was supposedly among the persons disturbed by the HRC activity. She testified however that she had no knowledge of any such disturbance, and that only a very small amount of noise could carry through the heavy door to the waiting room. Tr. at 2671, 2680. In any event it is uncontested that members of the HRC were always cooperative, and agreed to leave the waiting room on the occasions when disturbances allegedly took place. DX 311 at 85.

The Reverend Gerard Jean–Juste testified to the events surrounding the supposed disturbance. He testified that he read a statement to Haitians in the waiting room in a normal voice. Tr. 1611–17. The court has had the opportunity to observe the demeanor and behavior of the Reverend throughout his testimony and participation in this trial. His testimony about the event in the INS waiting room is wholly credible and in keeping with what the court has come to know of his character. He was physically forced from the room for his attempt to inform Haitians of their rights. Tr. at 1617.

█ There is no substance to the defendants' assertion that the INS waiting room is "private property." Government agencies are not private institutions. They do not operate in secret and they cannot bar the public from their halls. Although public access to some governmental functions

(national security, for example) may appropriately be limited, an INS waiting room does not present such a case.

Finally, the defendants allege that the HRC had not been authorized to solicit clients because it had not qualified as a non–profit organization under 8 C.F.R. § 292.2. While this court has serious reservations about the applicability of that regulation to the circumstances of this case, the regulation cannot be used in derogation of the plaintiffs' first amendment rights. The Reverend Jean–Juste testified that he applied for authorization under the regulation three years ago. Up through the time of trial, INS, so often heard to complain of dilatory tactics, had taken no action on the application. The court notes that INS has recognized that HRC has sufficient resources to aid Haitians in their legal representation. See DX 311 at 76 (immigration judges distributed cards referring unrepresented aliens to HRC). The record in this case alone indicates that the HRC qualifies under the provisions of C.F.R. § 292.2. There is simply no justification for the continuing abuse of the Haitian Refugee Center's first amendment rights.

## C. *Conclusion*

Those Haitians who came to the United States seeking freedom and justice did not find it. Instead, they were confronted with an Immigration and Naturalization Service determined to deport them. The decision was made among high INS officials to expel Haitians, despite whatever claims to asylum individual Haitians might have. A Program was set up to accomplish this goal. The Program resulted in wholesale violations of due process, and only Haitians were affected.

■ This Program, in its planning and executing, is offensive to every notion of constitutional due process and equal protection. The Haitians whose claims for asylum were rejected during the Program shall not be deported until they are given a fair chance to present their claims for political asylum.

## V. RELIEF

The plaintiffs seek mandamus, declaratory, and injunctive relief. The court declines to issue a writ of mandamus against the defendants at this time. The plaintiffs also seek costs and attorneys' fees in their complaint. The court reserves ruling on this aspect of their prayer for relief until those matters are fully briefed by the parties.

■ Clearly, the plaintiffs have demonstrated that declaratory relief is warranted in this case. The plaintiffs' constitutional, statutory, treaty, and administrative rights were violated. These findings are hereby incorporated in full as the declaratory relief granted the plaintiffs.

The plaintiffs' complaint requests that specific injunctive relief be granted against the defendants. Each aspect of the injunctive relief sought would contribute to the proper processing of Haitian asylum applications. However, rather than the court specifying the minutiae of the subsequent reprocessing of the plaintiffs' asylum claims before the District Director, the defendants shall submit for the court's approval a detailed plan providing for the orderly, case–by–case, nondiscriminatory and procedurally fair reprocessing of the plaintiffs' asylum applications to the District Director before individuals competent to hear such applications upon a full record which will permit meaningful judicial review. In formulating such a plan, the defendants shall adhere to their own regulations and operating procedures as they were in force prior to May 10, 1979. The defendants' plan shall address each of the plaintiffs' concerns as found to be meritorious in this opinion. The court encourages the defendants to submit this detailed plan as expeditiously as they see fit. The court will review the defendants' plan or their progress towards their plan ninety (90) days from the date of this order.

The defendants are hereby enjoined from expelling or deporting any members of the plaintiff class, from initiating, continuing, or otherwise proceeding with deportation hearings for members of the plaintiff class, and from further processing asylum appli-

cations to the District Director of the plaintiff class until such time as the court has approved the defendants' plan for reprocessing the plaintiffs' applications. The court retains jurisdiction to enforce the terms of this order.